## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* Michael McGee, and PEOPLE OF THE STATE OF ILLINOIS *ex rel.* Michael McGee, | ) ) ) ) | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |
| Plaintiffs, | ) ) | **CIVIL ACTION NO. _____** |
| v. | ) ) ) | **CHIEF JUDGE HOLDERMAN** |
| IBM CORPORATION, JOHNSON CONTROLS INCORPORATED, WIRELESS INFORMATION TECHNOLOGIES ENTERPRISE, LLC, TECHNOLOGY ALTERNATIVES, INC, TECHALT, INC., PUBLIC SAFETY COMMUNICATIONS, INC., MWOBE CONTROLS, INC., SERVICES BY DESIGNWISE, LTD., I.T. SUITE, INC., DUDLEY DONELSON, RAYMOND M. CHIN, MICHAEL SHARES, JAMES SOLOMON, PETER LYNCH, BYRON ARTIS, CLARENCE BROWNLOW, CATHERINE MARAS O'LEARY n/k/a Catherine Maras, DANIEL COUGHLIN, JUANITA MASANEK, PAUL MASANEK, and ANTONIO HYLTON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **FALSE CLAIMS ACT COMPLAINT**<br><br>11-cv-03482<br>Judge James F. Holderman<br>Magistrate Judge Jeffrey T. Gilbert<br><br>**JURY TRIAL REQUESTED** |
| Defendants. | ) | |

FILED

MAY 2 4 2011

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### COMPLAINT

The United States of America and the People of the State of Illinois, each by and through

Michael McGee ("McGee" or "relator"), complain of the above named defendants and each of

them as follows:

1

## NATURE OF THE CASE

1.     This is a case of public corruption and bid rigging that has cost the United States, the

State of Illinois ("State") and Cook County ("County") over $50 million dollars. It concerns false

claims submitted under "Project Shield" later known as "Project Gold Shield" (collectively the

"Project"), a program funded by Department of Homeland Security ("DHS") and Urban Area

Security Initiative ("UASI") grants to the State of Illinois and Cook County.

2.     The goal of the Project was for Cook County to interconnect and provide interoperable

communications among all of its 128 municipalities, providing police, fire and EMT personnel

with live streaming video, voice and data communications to enable first responders to instantly

send and receive mission-critical information in the event of a terrorist attack or natural disaster.

3.     The relator, Michael McGee, seeks to recover on behalf of each of the governments treble

damages and civil penalties arising from false claims, and the creation of false records and

statements made or caused to be made and submitted directly or indirectly by the defendants, to

the United States Government and the State of Illinois, and for a conspiracy to obtain payment of

same, all in violation of the False Claims Act, 31 U.S.C. §§ 3729-32, and the Illinois False

Claims Act, 740 ILCS 175/1 *et. seq.* (f/n/a the Illinois Whistleblower Reward and Protection

Act).

4.     At the heart of this fraud on the governments is a Cook County official, defendant Dudley

Donelson, who saw the Project as an opportunity to enrich himself, and who, in a conspiracy

with the knowing participation of the other defendants herein, used his position to cause false

certifications of compliance with grant requirements to be presented to DHS and the State of

Illinois, caused, along with the other defendants herein, false claims to be presented to the

governments, and each of them, for payment or approval, and conspired with IBM Corporation

2

("IBM"), Johnson Controls Incorporated ("JCI") and other defendants as detailed herein to fraudulently induce the governments to expend grant funds and to get false claims paid or approved.

5.      Defendant Donelson, was at all times relevant hereto, employed by Cook County as the Deputy Director of Wide Area Networks/IT.

6.      At all relevant times, Donelson had an undisclosed interest in a subcontractor on the Project, defendant Public Safety Communications, Inc., ("PSC") that was formed for the purpose of defrauding the governments. PSC was unqualified and incompetent to do the required work and there was no legitimate business reason for hiring it in connection with the Project. The company was hired at the insistence of Donelson with the collusion of other subcontractors and IBM. Knowing that it was illegal, corrupt and *ultra vires* for Donelson to designate the Project subcontractors, IBM nevertheless agreed to such a scheme. Later, in Phase 3 of the Project, Johnson Controls Incorporated ("JCI") also joined the conspiracy and corruptly agreed to Donelson's choice of incompetent subcontractors.

7.      IBM was the project manager and prime contractor on Phase 1 and 2 of the Project, which totaled in excess of $24 million. In Phases 1 and 2 IBM knowingly billed for and delivered defective project management services, defective equipment, defective and incompetent subcontractor services, fictitious services and work not done, defective or nonexistent maintenance, double-billed for work and billed for work performed by minority-owned businesses which had no commercially useful function relevant to the Project or which were fraudulent flow-through entities designed to enrich the conspirators with fraudulently received grant proceeds. The County, the State and DHS received virtually nothing of value from

3

the Phase 1 and 2 contracts with IBM and the over $24 million of federal funds granted to Illinois and Cook County.

8.      JCI was, and is the project manager and prime contractor on Phase 3 of the Project. The Phase 3 contract had an initial maximum of $17.5 Million that has ballooned to $25.9 million. The cost of Phase 3 nearly equals that of Phases 1 and 2 combined. In Phase 3, JCI was tasked to redo the work done by IBM under the Phase 1 and 2.

9.      Installations, software and equipment ultimately provided under Phases 1 and 2of the Project were non-functional or could not be and were not maintained in a functional form by IBM necessitating efforts in Phase 3 of the Project to achieve functioning installations. The failure of the Project upon the conclusion of Phase 2 was primarily because of IBM's compliance with Donelson's illegal Project directives pursuant to the conspiracy. In short, a substantial portion of the cost of Phase 3 was necessitated by IBM's false or fraudulent claims in the first two Phases.

10.      The conspiracy initiated by Donelson continued under JCI's project management. Knowing that it was illegal, corrupt and *ultra vires* for Donelson to designate JCI's subcontractors, JCI also hired, at the insistence of Donelson, core personnel, subcontractors and associates of PSC, who had proven incapable and incompetent to perform the work in the earlier Project Phases.

11.      In furtherance of the conspiracy, JCI knowingly billed for and delivered defective project management services, defective equipment, and defective and incompetent subcontractor services. As a result of the fraudulent scheme and incompetent Project work, the County, the State and DHS received virtually nothing of value from the contract and the nearly $26 million of additional federal funds granted to Illinois and Cook County in Phase 3 of the Project.

4

12.     The purpose and intent of the conspiracy alleged herein was to defraud the Federal, State

and County governments of grant funds and obtain payment or approval of the participants' false

claims through the use of false statements, certifications and records.

### JURISDICTION AND VENUE

13.     The Court has jurisdiction over the subject matter of the False Claims Act claims

pursuant to 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions

brought pursuant to § 3729 and 3730 of Title 31, pursuant to 28 U.S.C. § 1331, which confers

federal subject matter jurisdiction for federal questions and pursuant to 28 U.S.C. §1345 which

confers federal subject matter jurisdiction over actions where the United States is plaintiff. This

Court has jurisdiction over the subject matter of the Illinois False Claims Act claims pursuant to

31 U.S.C. §3732 (b) and 28 U.S.C. §1367.

14.     Contemporaneous with the filing of this Complaint, McGee provided the Attorney

General of the United States and the Attorney General of the State of Illinois a statement of

material evidence and information regarding the allegations herein of which McGee is aware,

together with a copy of the Complaint, in accordance with the provisions of 31 U.S.C.

§3730(b)(2) and 740 ILCS 175/4(b)(2).

15.     This Court has personal jurisdiction over each defendant herein pursuant to 31 U.S.C.

§3732(a) because each submitted or caused to be submitted false claims directly or indirectly to

the Government and because each has made, used, submitted or caused to be made or used, false

or fraudulent records and conspired in this District to get false claims paid or approved.

16.     Venue is proper in this District under 31 U.S.C. 3732(a) and pursuant to 28 U.S.C.

§1391(b) and (c) because during the relevant period, defendants and/or their co-conspirators

5

resided, transacted business, or were found in this District and/or because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

17.     Relator, Michael McGee, is a citizen of the State of Illinois and resides in this State. McGee brings this action on behalf of the governments pursuant to 31 U.S.C. § 3730(b)(1) and 75 ILCS 175/4(b)(1). This suit is not based upon the public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media and to the extent that some allegations or transactions alleged herein have been publicly disclosed McGee is an "original source" of same within the meaning of The False Claims Act and Illinois False Claims Act and voluntarily disclosed such information to the governments before filing this action. McGee gained direct and independent knowledge of the frauds alleged herein through his observation and participation in the Project through his company Responder Systems, LLC which joined the Project late in Phase 1.

18.     Defendant IBM Corporation ("IBM") is a New York corporation headquartered in Armonk, New York. IBM was the prime contract manager for Phases 1 and 2 of the Project.

19.     Defendant Johnson Controls Incorporated ("JCI") is a Wisconsin corporation with its headquarters in Milwaukee, Wisconsin. JCI was the prime contract manager for Phase 3 of the Project.

20.     Defendant Wireless Information Technologies Enterprise, LLC ("WIT") is an Illinois Limited Liability Company that was involuntarily dissolved on October 9, 2009 and is sued pursuant 805 ILCS 5/12.80. WIT was a subcontractor on the Project during Phase 1, and was responsible for the installation of network towers and ostensibly responsible as a front for the

work reserved by the conspiracy to PSC, specifically, the integration/installation/maintenance of the fixed building and strongbox cameras, and the operation of the Wireless Support Center.

21.     Defendant Technology Alternatives, Inc. ("TAI") is an Illinois corporation that was involuntarily dissolved on June 1, 2006 and is sued pursuant 805 ILCS 5/12.80. TAI's primary role on the Project was the development and marketing of the mobile platform which was supposed to provide first responders with vehicular live streaming video, voice and data communications.

22.     Defendant TechAlt, Inc., previously known as Dendo Global Corp. ("Dendo"), is a Nevada corporation. In the latter half of 2004, Dendo licensed TAI's patented mobile platform, and subsequently changed its name to TechAlt, Inc. TAI then merged with TechAlt, Inc., and became a wholly owned subsidiary. TechAlt, Inc. is sued as successor-in-interest to TAI and for its own wrongful acts and participation in the conspiracy. At all times relevant hereto, TAI and TechAlt had substantially the same management and personnel. TechAlt, Inc. was the successor in interest of TAI in the conspiracy alleged herein, and TechAlt, Inc. was the entity that acted as a subcontractor on the Project. The two entities are collectively referred to herein as "TechAlt."

23.     Defendant Public Safety Communications, Inc., ("PSC") is an Illinois corporation that was involuntarily dissolved on August 8, 2008 and is sued pursuant 805 ILCS 5/12.80. PSC's ostensible role on the Project, among other things, was to supply and integrate building and strongbox cameras and operate the Wireless Support Center.

24.     Defendant Mwobe Controls, Inc. ("Mwobe") is an Illinois corporation located in Skokie, Illinois. The business name of defendant Mwobe is an intentional acronym for "Minority-Woman Owned Business Enterprise." Mwobe is ostensibly owned by Juanita Masanek, but is controlled, managed and run by Paul Masanek and at all relevant times it used the offices,

facilities and resources of Mr. Masanek's other business, defendant Services By Designwise, Ltd., and served as a mere "pass-through" entity to fraudulently qualify for Project work as a minority/woman owned business.

25.     Defendant Services By Designwise, Ltd. ("SBD") is an Illinois Corporation formed, owned and controlled by defendant Paul Masanek. SBD knowingly supplied defendant TechAlt, Inc. with defective Project equipment and parts that were charged to the governments. SBD also participated in the scheme to perpetrate and maintain the fraudulent representation to the governments that Mwobe was a genuine minority woman owned business.

26.     Defendant I.T. Suite, Inc., ("I.T. Suite") is an Illinois Corporation that was involuntarily dissolved on August 1, 2006 and is sued pursuant to 805 ILCS 5/12.80. I.T. Suite was owned and controlled by defendant Dudley Donelson, and its purpose was to commercialize the technical applications of the Project, *i.e.,* to sell to private entities the systems being provided to the County under the Project.

27.     Defendant Dudley Donelson was at all relevant times employed by the County of Cook, an Illinois political subdivision (hereinafter "the County") as the Deputy Director of Wide Area Networks/IT for Cook County, Illinois and owed a fiduciary duty to the County. Donelson resides in Olympia Fields, Cook County, Illinois. Throughout the Project, Donelson was the designated "point of contact" and program manager for the County for the performance of the Project's contracts. At all relevant times, Donelson had an undisclosed interest in defendant PSC, headed a conspiracy to defraud the governments, and his wrongful acts as alleged herein were all done *ultra vires* and in violation of federal law, federal regulations, Illinois law, County ordinances and his fiduciary duty to the County. Donelson is currently under federal indictment

8

for bankruptcy fraud, for, among other things, failing to disclose his interest in defendant I.T. Suite, the vehicle through which Donelson received and intended to receive kickbacks.

28.    At all times relevant, defendant Raymond M. Chin was President of defendant WIT, signed the secret agreement memorializing a portion of the conspiracy alleged herein, and otherwise knowingly directed, authorized and participated in the wrongful acts of WIT alleged herein.

29.    At all times relevant, defendant Michael Shares was an officer and/or principal of defendant WIT and knowingly directed, authorized and participated in the wrongful acts of WIT alleged herein. Shares was also an officer and/or principal and officer of Renaissance Communications, Inc., another subcontractor on the Project.

30.    At all times relevant, defendant James Solomon was President and CEO of defendant TAI, and was Chairman and CEO of defendant TechAlt, Inc. Defendant Solomon signed the secret agreement memorializing a portion of the conspiracy alleged herein, and otherwise knowingly directed, authorized and participated in the wrongful acts of both corporations alleged herein.

31.    At all times relevant, defendant Peter Lynch was the President and Chief Operating Officer of defendant TechAlt, Inc., and knowingly directed, authorized and participated in the wrongful acts of TechAlt alleged herein.

32.    At all times relevant, Defendant Byron Artis was an officer of PSC. Artis knowingly directed, authorized and participated in the wrongful acts of PSC alleged herein.

33.    At all times relevant, Defendant Clarence Brownlow was a principal and president of defendant PSC and signed the secret agreement memorializing the conspiracy alleged herein, and otherwise knowingly directed, authorized and participated in the wrongful acts of PSC alleged

9

herein. Among other things, Brownlow agreed to provide Donelson an interest in PSC in return for Donelson's corrupt influence on the County in connection with the Project and otherwise, and further agreed to pay the rent obligations of Donelson's company, I.T. Suite.

34. Defendant Catherine Maras O'Leary ("O'Leary") was the Chief Information Officer of Cook County from the inception of the Project until April 2007, and throughout that time owed a fiduciary duty to the County. From at least the inception of the Phase 1 contract, O'Leary agreed to support, and, as alleged herein, did support Donelson's preferential treatment of PSC, as well as agreeing to and participating in overt acts in furtherance of the conspiracy as hereinafter alleged. Her wrongful acts as alleged herein were all done *ultra vires* and in violation of federal law, federal regulations, Illinois law, County ordinances and her fiduciary duty to the County. O'Leary was terminated for cause by then Cook County Board President, Todd Stroger, and County auditors reported that she had provided "many inaccuracies" in response to audit requests. She is now known as "Catherine Maras" and is the Chief Information Officer for Bexar County, Texas.

35. At all times relevant, Defendant Daniel Coughlin was employed by the County as the director of the Judicial Advisory Council, the County agency that applied for and was responsible for the administration and oversight of the relevant Department of Homeland Security grants and owed a fiduciary duty to the County. His wrongful acts as alleged herein were all done *ultra vires* and in violation of federal law, federal regulations, Illinois law, County ordinances and his fiduciary duty to the County. Coughlin left his position with the County in the fall of 2010.

36. At all times relevant, defendant Juanita Masanek was the nominal owner of defendant Mwobe and resides in Skokie, Illinois. At all relevant times, Juanita Masanek was a full-time

employee of Illinois School District 219 in Niles Township, and was not engaged in any substantive or substantial way with or in the business of Mwobe. Representations by Juanita Masanek, to the County or others, of her having a substantial role or control in Mwobe's business were false and were made by Mrs. Masanek solely to obtain minority woman owned status for Mwobe.

37.     At all times relevant, defendant Paul Masanek was a principal or director of defendants TAI , SBD and Mwobe and knowingly directed, authorized and participated in the wrongful acts of those defendants as alleged herein. For a short time, Mr. Masanek was also a principal in McGee's company Responder Systems, LLC, but was bought out by McGee after he discovered, among other things, that Masanek was attempting to continue to knowingly supply the County with defective SBD equipment through Responder Systems.

38.     Defendant Antonio Hylton was O'Leary's successor as Chief Information Officer of Cook County and oversaw the Project from May 2007 through January 2010, and throughout that time owed a fiduciary duty to the County. His wrongful acts as alleged herein were all done *ultra vires* and in violation of federal regulations, federal law, Illinois law, County ordinances and his fiduciary duty to the County. Hylton was terminated by then Cook County Board President, Todd Stroger in January 2010.

## CO-CONSPIRATORS AND AGENTS

39.     Wherever in this Complaint reference is made to any act, statement or transaction of any corporation or entity, the allegation means that the corporation or entity engaged in the act or transaction, or made the statement, by or through its officers, directors, members, partners, agents, employees or representatives while they were engaged in the management, direction,

11

control or conduct of the corporation's or entity's business or affairs and acting within the scope of their authority.

40.     Various other persons, firms, companies and corporations not named as a defendant herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

41.     Each defendant acted as the principal, agent, or joint venture of, or for, other defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

## BACKGROUND

*The Conspiracy Begins*

42.     In early to mid-2003 defendant TAI contacted defendant Donelson, in its effort to interest Cook County in applying for a DHS grant to install in government vehicles an interoperable video, voice and data "mobile platform" that TAI had designed.

43.     Donelson agreed with TAI to facilitate a DHS grant application by the County, and a related "proof of concept" demonstration through the Cook County Sheriff's Department, on the condition that TAI agree to include in the demonstration and any future DHS grant-related and other contracts, a company in which Donelson had a financial interest, and which was formed in March 2003 to take part in the Project, defendant Public Safety Communications, Inc. ("PSC"). TAI, with knowledge of Donelson's interest in PSC, agreed to Donelson's condition. TAI also agreed that the scope and extent of PSC's participation in the "proof of concept" demonstration would be determined by Donelson. Donelson did so. For the demonstration, PSC was "assigned" work it could not perform which was acknowledged would be actually performed by TAI and other companies.

12

44.     The mobile platform demonstration took place in Olympia Fields, Illinois in June of 2003.

45.     At all relevant times, defendant PSC's two officers and employees were defendants Clarence Brownlow and Byron Artis, neither of whom had degrees in engineering or computer science, or college or graduate degrees of any kind, and neither were programmers, network administrators or integrators, nor did they have the technical knowledge, skills or experience needed to perform the Project work that PSC engaged in or was responsible for.

46.     There was no legitimate business or technical reason for defendant PSC's participation in the demonstration or Project, as other competent, responsible and experienced contractors were available.

47.     Instead, defendants Donelson, TAI and PSC planned that PSC would be built up in its revenues, experience and business through work paid for by Department of Homeland Security (DHS) grants funding the Project, and other government contracts. At all relevant times, Donelson had an arrangement with PSC whereby, once PSC was established, PSC would merge with Donelson's company, I.T. Suite.

48.     In furtherance of the conspiracy, during mid 2003, defendants TAI and Donelson worked together to obtain a grant from DHS under the Urban Areas Security Initiative (UASI); specifically, TAI provided grant information, grant-drafting assistance, budget and technical information for the grant to Donelson or his designees for the grant, which grant application was intentionally written to utilize TAI's designed "solution" for interoperable mobile and fixed platforms. The budgets for the Project submitted in applying for the first two related DHS grants, detailed below, were based on TAI's equipment, its patented technology, and the functionality

included in TAI's design. No other contractors or designs were solicited or considered by the County in drafting the grant application.

49. Cook County submitted the initial DHS grant application in June or July of 2003, and on or about July 18, 2003, it received notice of the federal government's acceptance of its "grant narrative" and budget.

50. From mid to late 2003, defendants Donelson, TAI and PSC worked together to assure that they would all benefit from the available DHS grant and other government-funded opportunities. Thus, for example, Donelson, in conjunction with TAI and PSC organized, under the County's sponsorship, a "Homeland Security Summit" that took place on August 13, 2003 in Matteson, Illinois, to outline Cook County's Homeland Security plans, specifically highlighting TAI's mobile platform and interoperability "solution."

51. Major companies and potential prime contractors on the Project, such as defendant IBM, as well as SBC, Nextel, Motorola, Microsoft and Cisco Systems were invited to and attended the Homeland Security Summit. Defendant PSC was also "invited." The conspiratorial purpose of the "summit" included conveying, directly or indirectly, to potential prime contractors who were considering bidding on the Project that TAI and PSC were Project subcontractors whose use by a prime contractor would influence the likelihood of acceptance of a bid on the Project, and that only bids containing these subcontractors likely would be accepted.

52. The efforts of the conspiracy were successful, and at least one of the two bidders for the Phase 1 contract other than IBM included TAI, and PSC, in its proposal and used a subterfuge similar to the one described below to hide PSC's role and responsibilities in the Project.

*WIT Joins the Conspiracy*

53.     TAI, Donelson and PSC recognized that defendant PSC did not have the expertise to do the work on the contemplated Project, and that given its lack of qualifications and experience, PSC was such an implausible subcontractor that its inclusion in a bid could raise red flags with the County, State or Federal governments. Therefore, in mid or late 2003, they recruited defendant WIT, a more established tech company, to "front" for PSC in the bid documents, (i.e. to be ostensibly performing PSC's role, but to actually sub-subcontract the work to PSC).

54.     In return for falsely representing that PSC's officers, defendants Brownlow and Artis, were actually part of WIT's personnel, WIT agreed to receive and PSC agreed to pay kickbacks to WIT from PSC Project billings.

55.     Defendants Donelson, TAI, PSC, and later WIT and others joining the conspiracy, referred to themselves as "the Team." Donelson repeatedly used his influence as a County official to attempt to obtain non-Project business for the Team, and marketed and recommended the Team's security products to other government entities, similar to his marketing on the Team's behalf at the August 2003 "Homeland Security Summit."

56.     Because of his financial interest in PSC, Donelson participated in PSC's management and business tasks. Donelson was the main promoter of the Team and was consulted on the Team's internal business decisions and marketing approaches, and authored the Team's bid prices on Phase 1 of the Project as well as a manual published by PSC for equipment supplied on the Project.

57.     In furtherance of the conspiracy and in exchange for its work and role in the Project, Donelson was, among other things, apparently compensated by PSC in the form of rent paid by PSC for commercial space that PSC supposedly used as its "second location" but which PSC neither used nor occupied. The subject commercial space was leased by Donelson's company,

15

I.T. Suite, and Donelson was thereby paid kickbacks by PSC from Project funds "laundered" in the form of rent payments on Donelson's I.T.Suite, Inc.'s rent obligations.

*The Secret Bid-Rigging Agreement*

58.     Defendants TAI, PSC and WIT entered into a secret written bid-rigging "Teaming Agreement" dated December 12, 2003, which was fully executed by December 17, 2003. The Teaming Agreement expressly provided that it could not be disclosed to anyone without the consent of all signatories.

59.     By the terms of the "Teaming Agreement," PSC, TAI and WIT formally agreed to jointly seek Cook County work on the Project as a team of subcontractors.

60.     Defendants PSC, TAI, and WIT further agreed to divide up the Project work and agreed not to submit competing bids or protest another signatory's bid and to "support the terms contained in this Agreement, during negotiations for the award of subcontracts."

61.     The purpose of the Teaming Agreement was to cement the Team's corrupt deal. Defendant PSC was inexperienced and unskilled, and as a business matter, was far inferior to other available companies. PSC's only valuable contribution to the Team was the promise of Donelson's corrupt influence on County procurement along with his commitment to promote the Team to other government entities at County expense. Thus the Agreement was designed to prevent PSC's ouster in favor of a more competent entity, and for TAI and WIT the agreement secured continued access to Donelson's political influence.

62.     The Teaming Agreement stated that as a result of the "reputations" of the parties, "the Team may be recommended by Cook County for future projects." This language referred to Donelson's improper use of his position to enrich himself by securing Team participation in the Project, and the promotion of business for PSC and the Team.

16

63.     Donelson's position in the conspiracy was protected by a series of provisions of the Teaming Agreement that required the parties to bid and perform contracts solely in accordance with his "recommendation." Specifically, "Team members agree to abide and bid" or "refrain from bidding…or contesting the bidding of others recommended… consistent with the recommendation made by Cook County." They also agreed to "abide by Cook County's recommendation as to which Team member shall act as Project Leader and/or area(s) of responsibility for each particular project." Further, the Team agreed not to "attempt to unduly expand prices and/or any scope of work beyond that for which a Team member has been recommended." In short, Donelson was given the power to direct who would get work and the "Team" agreed to rig their bids and perform the contracts in accordance with his instructions.

64.     The Team adhered to this agreement and when the Team made a proposal to a locality per a "recommendation" by Donelson, a copy of the proposal was sent to Donelson for his approval and to allow him to supervise his rights under the Teaming Agreement.

*IBM Joins the Conspiracy*

65.     After the "summit," IBM sought to become a primary contractor on Phases 1 and 2 of the Project. Thus, on October 3, 2003, IBM employee Timothy Zeman submitted IBM's response to the County's Request for Proposals ("RFP") for the Phase 1 contract.

66.     At all relevant times, IBM agreed to and complied with all the terms of the Teaming Agreement regarding the division of work and Donelson's "right" to designate the role and scope of work allotted to the Team members, and participated in the underlying conspiracy alleged herein to defraud the governments.

67.     In its response to the RFP, IBM hid the role and participation of PSC in the Project, and falsely stated that TAI's mobile platform was a "Proven Solution" using "proven technology." At

the time it submitted the RFP response to the governments, IBM knew that the mobile platform technology would require significant additional development before it could be successfully installed.

68.    IBM was awarded the prime contracts by the County for Phases 1 and 2 of the Project.

69.    Under the Phase 1 and Phase 2 agreements, IBM was the "project manager" and the installation, configuration and substantive work was to be done by subcontractors ostensibly under IBM's supervision. IBM was paid a fee as project manager and took a markup on the subcontractors' work which it billed to the County.

70.    On September 2, 2004, IBM entered into a base agreement with TechAlt, at the time still known as Dendo, pursuant to which TechAlt agreed to supply and maintain its mobile platform under Phase 1 of the Project.

71.    Pursuant to both Phase 1 and 2 contracts, IBM agreed and represented that:

   a.    It would provide "efficient project management services," "appropriately supervise all work performed" and use "commercially reasonable judgment;"

   b.    That it "shall all at all times act consistently with the obligations assumed by it in entering into this Contract;"

   c.    "Contractor represents that it presently has no interest, and covenants that it shall not acquire any interest, directly or indirectly, in the project to which this Contract pertains that conflict in any manner or degree with the performance of the Service hereunder."

72.    Thus, beginning with the bidding, and throughout the performance of Phase 1 and 2 of the Project, IBM participated in and furthered the conspiracy by, among other things, the following acts:

18

a. Submitting its bid for Phase 1 of the Project with the intention of conforming and in fact conforming its contract performance with the bid-rigging terms of the "Teaming Agreement;"

b. Utilizing defendant PSC for the work reserved to it on Phase 1 by the conspiracy although it knew that PSC did not have the experience, competence to do so and otherwise acting in accordance with Donelson's illegal and *ultra vires* "recommendation" of defendant PSC;

c. Adopting the scheme to use defendant WIT to "front" for PSC, specifically, IBM concealed PSC's participation in its response (dated October 17, 2003) to the County's Request for Proposals ("RFP"), by failing to list PSC as a subcontractor, and instead falsely listing the PSC officers (defendants Brownlow and Artis) as personnel of "Team" member WIT;

d. Agreeing to and actually dividing Project work and responsibility pursuant to Donelson's directives, including agreeing to:

    i. Retain co-conspirator PSC on the Project during Phase 1 despite its manifest incompetence to perform the contract, its operation as a pass-through entity and demonstrated lack of financial responsibility, all of which added delays and expenses to the Project;

    ii. Accept and pay for defective equipment, services and installations by co-conspirators TechAlt and PSC, and to bill the government for services and equipment not provided;

    iii. Expand PSC's responsibilities in Phase 2 of the Project to include development, installation and integration of a new mobile communications platform, touted by IBM as "state of the art" and "cutting edge" technology when IBM knew that PSC had not a single employee who was qualified for such work and without any proposed design by PSC or any plausible ability by PSC to produce, integrate or install such technology;

    iv. Utilize defendant Mwobe Controls, Inc., in Phase 2 of the Project as a "Minority-Woman Owned Business Enterprise" although it knew that Mwobe's "MWBE" status was a sham and a fraud;

e. Agreeing to and approving PSC's kickbacks to WIT in exchange for its participation in the scheme;

f.   Failing to disclose or report to the governments that Donelson had made PSC's participation in the Project a condition of approving IBM's bids for Phases 1 and 2 of the Project;

g.   Enforcing the conspiracy agreement by removing IBM manager Harold Stiffler from the Project in 2006 because of his efforts to replace or take business away from PSC for its poor performance;

h.   Certifying compliance with the contract and federal regulations on each and every invoice it submitted on the Project, when it knew that Donelson had a conflict of interest because of his interest in PSC in violation of Federal Regulation and the express terms of the Project contracts;

i.   Certifying compliance with the contract and federal regulations on each and every invoice it submitted on the Project, when it knew that its agreement to follow Donelson's illegal directives was harmful to the performance of the Project and created a conflict of interest with its obligation to provide efficient and competent project management services.

73.   The IBM employees, among others, who variously made the above decisions and committed the acts outlined in the previous paragraph include: Timothy Zeman, Principal, IBM Integrated Technology Services, Joyce Blackwell, Vice President, Global Financing, James Lautenbach, Client Director, Harold Stiffler, Project Executive, IBM Global Services, George Aguiar, Senior IT Specialist, Tim Herlihy Senior Project Manager, Ladislao Delgado, Project Manager, and Anne McHale, IBM Regional Counsel.

*IBM's Misrepresentations in the Contracts
and False Claims Submitted Pursuant to the Conspiracy during Performance*

74.   IBM expressly represented to the governments in the Phase 1 and 2 Project contracts that:

a.   each of its subcontractors "are, and the Contractor warrants that they shall at all times be, competent to perform their respective duties and obligations…and otherwise capable of performing their duties and obligations under this contract;"

     b.  it and its subcontractors "shall at all times use a commercially reasonable degree of skill and judgment to assure the satisfactory rendering of the Services, completion of the System, and the performance of all its other duties and obligations hereunder in a timely manner;"

     c.  all Services "shall be performed in a timely, competent, professional, and workperson-like manner by qualified personnel, in accordance with specification for the System;" and that

     d.  "all services that require the exercise of professional skills or judgment shall be accomplished by professionals qualified and competent in the applicable discipline and, if and as required, appropriately certified by all applicable manufacturers and suppliers and appropriately licensed."

75.     At the time that IBM executed the Contracts, IBM knew that these representations were false because of its agreement to employ PSC for the work reserved to PSC in the Teaming Agreement, and that PSC was not qualified or competent to perform, and was not performing, its Project work in a timely, competent and workperson-like manner with qualified personnel. Moreover, on each and every invoice submitted to the governments, IBM falsely certified that it was in compliance with the contract and federal regulations, although it knew such certifications to be false.

76.     More specifically, at all relevant times, IBM additionally knew, among other things, that:

     a.  During the bidding for and performance of the Phase 1 and 2 contracts for the Project, PSC did not meet IBM's own internal guidelines to be a subcontractor or direct vendor to IBM;

     b.  During the bidding for and performance of the Phase 1 and 2 contracts for the Project, PSC's employees did not have the training, skills, experience or ability to perform the Project work contracted to it;

     c.  During the bidding for and performance of the Phase 1 and 2 contracts for the Project, PSC was undercapitalized;

d. During the performance of Phases 1 and 2 of the contract, IBM knew that PSC was financially irresponsible and consistently failed to pay its Project vendors and sub-subcontractors; thus, by the end of Phase 2 PSC owed hundreds of thousands dollars to its vendors and sub-subcontractors;

e. According to Quality Assurance reports during the Phase 1 contract, 90% of the fixed cameras PSC was assigned to integrate into the system were non-functional after installation;

f. During performance of the Phase 1 contract PSC was unable to obtain requisite Underwriters' Laboratory approval of the fixed "strong box" cameras, although this was a nearly ministerial task of providing correct technical information; after this failure caused massive delays, this task was ultimately performed by personnel of Responder Systems;

g. Despite its known financial irresponsibility and instability, PSC was paid a year in advance for "maintenance" of the strong box cameras, although it did not have the necessary equipment, vehicles, employees, skills or expertise to maintain them; and that as a result, defendant WIT did the repairs and maintenance at additional cost to the governments that should have been done pursuant to PSC's maintenance obligations;

h. During at least Phase 1 of the Project, PSC subcontracted some of its installation tasks to an automobile-stereo store near its office;

i. PSC was tasked with running the Wireless Support Center for Phase 1 of the Project—a "help desk" type function that it did not have the technological knowledge to set up and administer; and that, incapable of doing so itself, it had to turn to a fellow subcontractor to write its "scripts" for this function;

j. During Phase 1 of the Project, PSC's lack of financial responsibility resulted in a mechanics' lien and suit for collection being filed against IBM and the County by a PSC vendor;

k. In Phase 2 of the Project, PSC used Scotch Tape® or similar product instead of appropriate insulating material in a mobile installation, causing a police car to catch fire;

l. In Phase 2 of the Project, PSC's design of the mobile platform did not include a practical method of downloading video from the Digital Video Recorders installed in vehicles, precluding any ability to use such video as evidence;

m. In Phase 2 of the Project, the "video browsing" specification was eliminated from mobile platforms to ease the technical demands of the Project on PSC; and

n. In Phase 2, PSC was incapable of getting its mobile platform to function, rendering its warranty obligations worthless, causing IBM to seek another contractor to ostensibly "maintain," but actually to fix, the PSC installations.

77. In its response to the County's RFP for Phase 1, IBM stated that it was "very aware of the potential weakness of working with sub contractors" but if a "sub contractor is not delivering effectively in its promises" IBM's "multiple vendor relationships" allowed it to "immediately identify replacements in an efficient and effective manner." These statements were intentionally misleading because IBM knew that its conspiratorial agreement with Donelson and O'Leary would not allow it to replace PSC, no matter how abysmal its performance. For example, in 2006 O'Leary told IBM manager Harold Stiffler that he was being removed from the Project because he was "trying to take business away from PSC" on the Project.

78. TechAlt's role under the Phase 1 contract was, in part, to install its mobility platform into eighty cars belonging to the County and certain municipalities in Cook County. Donelson's own car was one of the eighty cars into which the platform was installed and which was, thereafter, non-functional, and, accordingly, he was at all relevant times aware of the lack of functionality of the installations.

79. Between October 2004 and September 2005, TechAlt was unable to get its mobile platform to function properly. TechAlt engineers advised against the installation of the platforms as it was no more than a "beta system" and was not ready for deployment, but defendants Peter

23

Lynch and/or Paul Masanek over-ruled the engineers, and TechAlt proceeded to install 47 non-functional platforms into Project vehicles.

80.     At all relevant times, IBM had full knowledge that TechAlt's mobile platform was not functioning. For example, a September 2, 2005 "Incident Readiness Index" prepared for the Project shows that out of 46 cars surveyed, only 17 cars functioned at all.

81.     The mobile platform that IBM had represented as a "proven solution" was fraught with problems. For example, TechAlt issued over 150 releases of the software to fix problems, but never succeeded in deploying a functional platform. There were also more blatant issues, for example, the computer hard drives installed by TechAlt were only rated to perform at above 41° F, and would fail during startup in colder weather without internal heating. Such heating was never installed by TechAlt. IBM and TechAlt knew the hard drive specifications, and certainly knew that Cook County weather was frequently colder than 41° F, yet TechAlt installed the platforms, and IBM accepted them, paying the full price and charging it to the governments.

82.     Another contributing reason to the failure of the TechAlt mobile platform was that defendant Services By Designwise, Ltd. ("SBD") was supplying TechAlt with a flawed interface board to integrate the sound and video that was also causing the platform to fail. At that time, TechAlt accounted for over 95% of SBD revenue.

83.     For his personal enrichment, Mr. Masanek used his position at TechAlt to cause TechAlt to continue to use and install this flawed piece of hardware, and prevented TechAlt engineers (who had advised that the platform was not ready to be installed) from changing this hardware.

84.     At all relevant times, IBM knew that Masanek was acting as both supplier and purchaser/evaluator of the platform hardware, and that such relationship constituted a conflict of

interest prohibited by its County contract and TechAlt's subcontract as well as constituting poor and defective project management by IBM.

85.    IBM approved the arrangement with Masanek for the same reason it paid TechAlt: because Masanek and SBD were considered "on the team" by Donelson, and IBM had agreed to follow Donelson's directives regardless of their legality or harmful impact on the performance of the Project.

86.    The Phase 1 contract required that IBM test the installations, and specifically that "Contractor shall perform thorough and adequate testing of each Component (or set of Components, or the System as applicable) against all applicable Acceptance Testing Criteria to verify that Installation, Implementation, and Integration of Such Component (or, as applicable, such set of Components, both individually and collectively, or the System) complies therewith."

87.    Because of widespread complaints by the end-using municipalities, and its inability to correct the problems, TechAlt halted installations in May of 2005 while they sought a working retrofit.

88.    Notwithstanding its diverse sources of knowledge that TechAlt's mobile platform was unfit for the purpose intended, IBM accepted the work and paid for the installations.

89.    Even though only 47 defective platforms had been installed, by September 2005, IBM had paid TechAlt over 99% of the contract price under the "Statement of Work 4904T30218," which provided for the installation of 80 platforms., as follows:

| Date | Invoice # | Statement of Work Identification | | Amount |
|---|---|---|---|---|
| 10/20/2004 | 5001 | 4904T30218 | $ | 1,000,664.00 |
| 11/19/2004 | 5002 | 4904T30218 | $ | 24,381.22 |
| 12/17/2004 | 5003 | 4904T30218 | $ | 19,692.00 |

| | | | | |
|---|---|---|---|---|
| 1/20/2005 | 5004 | 4904T30218 | $ | 20,268.00 |
| 2/21/2005 | 5007 | 4904T30218 | $ | 299,318.00 |
| 3/21/2005 | 5008 | 4904T30218 | $ | 229,372.50 |
| 4/21/2005 | 5009 | 4904T30218 | $ | 224,553.00 |
| 5/20/2005 | 5010 | 4904T30218 | $ | 380,539.50 |
| 6/2/2005 | 5011 | 4904T30218 | $ | 4,329.00 |
| 6/14/2005 | 6001 | 4904T30218 | $ | 315,072.00 |
| 6/23/2005 | 5012 | 4904T30218 | $ | 37,462.50 |
| 7/16/2005 | 5013 | 4904T30218 | $ | 376,437.95 |

**Total Paid for 47 Defective Installations**      $   **2,932,089.67**

**Total Subcontract Price for 80 Installations**      $   **2,941,554.00**

90.     In addition to paying TechAlt for its defective installations, IBM knowingly paid TechAlt

for work that was never done. An example was TechAlt's invoice to IBM No. 5013 dated July

16, 2005 for $376,437.90, which on its face described the charges as "Billing for

services/Hardware/ Software not provided." This invoice was paid by IBM on September 1,

2005.

91.     At all relevant times, IBM knew that TechAlt's installations were defective and should

never have been accepted, and that TechAlt had been paid with Project funds for services and

equipment never provided. IBM billed the County for all of TechAlt's charges along with IBM's

own markup/profit on the TechAlt billing, plus a "Project Management" fee for IBM's supposed

"supervision" of TechAlt.

92.     The IBM bills in Phase 1 were almost always submitted to the attention of Donelson,

who, with the agreement and participation of defendant Catherine Maras O'Leary, in turn

submitted the claims for payment and approval to the County Purchasing Agent along with the

false representation that the charges represented payment for goods and services billed in

conformance with the contract and meeting specifications.

93.     At all relevant times, Donelson and O'Leary knew that such representations of contract conformance were false. Absent IBM's false certification on each invoice, and the County IT department's (by O'Leary and Donelson) collusive false representations of IBM's compliance, the County Purchasing Agent could not have approved or paid the Project invoices.

94.     Through one or more of the following IBM invoices, among others, submitted for payment or approval by the governments, IBM falsely included charges for TechAlt's defective performance and fictitious billings, as follows:

| Inv No | Invoice Date | Attention | Service Dates | Amount |
|--------|-------------|-----------|---------------|--------|
| IT06148 | Nov 5, 2004 | Mary Jo Horace | 10/6 - 12/31/05 | $ 2,515,418.03 |
| C05BVR3 | March 1, 2005 | Dudley Donelson | 2/05 | $ 484,668.82 |
| C05CJLZ | April 27, 2005 | Dudley Donelson | 04/1-04/29/05 | $ 355,849.56 |
| IT02873 | May 4, 2005 | Dudley Donelson | 04/1-04/30/05 | $ 208,312.25 |
| IT03006 | May 27, 2005 | Dudley Donelson | 5/05 | $ 353,076.37 |
| C05C5JN | June 28, 2005 | Dudley Donelson | 6/1-6/27/05 | $ 571,183.49 |
| C05DG9X | July 27, 2005 | Dudley Donelson | 7/4-7/27/05 | $ 488,632.46 |

*TechAlt Fails and Relator's Company Becomes Involved in the Project*

95.     Despite being paid virtually the full contract price by September of 2005, and having completed only 47 of the 80 required installations, TechAlt was in financial distress.

96.     Both IBM and TechAlt knew about TechAlt's Project installation defects early on, but TechAlt had continued the installations. TechAlt tried to correct the problems and find a working retrofit but never succeeded.

97.     Having installed only 47 of the 80 mobile platforms required of it, and unable to find a working retrofit to make the platforms fully functional, TechAlt would fail financially unless kept afloat by additional unearned and improper payments after May of 2005..

98.     At a meeting at the County Building in mid-September of 2005, the status of TechAlt installations was discussed. Attending the meeting was IBM through managers, Joyce Blackwell,

Timothy Zeman, and Harold Stiffler, relator (McGee), and defendants Catherine Maras O'Leary, Dudley Donelson and Paul Masanek. At the meeting, IBM through its managers stated that a TechAlt bankruptcy would be a disaster for IBM. County officials O'Leary and Donelson were equally frank in discussing at the meeting the embarrassment and scandal TechAlt's failure in the middle of the Project might bring to them personally.

99.     As relator later learned, a TechAlt bankruptcy would have been a disaster for the conspirators because it would have revealed the false claims for payment made by IBM and County conspirators for non-functional equipment and fictitious work, as well as exposing the misrepresentation that a proven "solution" and technology would be deployed under the contract.

100.    At the mid-September 2005 County Building meeting, it was agreed by those present that McGee's contemplated new company, Responder Systems, LLC would acquire TechAlt's Project-related assets and take over TechAlt's role on the Project. With this solution in hand, IBM informed TechAlt that there would be no further payments to keep it afloat, and TechAlt closed its doors later that month.

101.    Responder Systems, upon receiving assurances of its role to replace TechAlt on the Project, acquired TechAlt's Project-related assets.

*Relator and his Company Refuse to Join the Conspiracy*

102.    A few days after the meeting at the County Building, Donelson invited McGee to South Holland, Illinois ostensibly to meet the President of PSC, Clarence Brownlow. Shortly thereafter, on September 19, 2005, McGee met with Donelson at 450 Taft Drive, South Holland, Illinois, where McGee was introduced to Brownlow. A colleague of McGee's was also present.

103.    Immediately after the September 19, 2005 meeting, Donelson invited McGee and his colleague to see his nearby business, I.T. Suite, at 510 Taft Drive in South Holland. Once there,

28

Donelson asked McGee to invest $600,000 in I.T. Suite. At that time, based on his conversation with Donelson, I.T. Suite did not have a substantial customer base, a detailed business plan projecting reasonable sales expectations, or any valuable patents, copyrights or other intellectual property.

104.    During the September 19, 2005 meeting at I.T.Suite, Donelson told McGee that he had an understanding with PSC that after PSC had been built up by work on the Project, PSC would merge with I.T. Suite. Donelson explained to McGee that the planned I.T. Suite merger with PSC was Donelson's "exit strategy" from the County.

105.    During the September 19, 2005 meeting at I.T.Suite, Donelson further stated to McGee that if McGee made the investment in I.T. Suite, it would mean that McGee's company, Responder Systems, was "on the team." If Responder Systems was "on the team" Donelson would use his position as a County official to promote McGee's business. Specifically, as an immediate *quid pro quo* Donelson stated that, upon McGee making the investment in I.T. Suite, Donelson would invite Responder Systems to the 2006 annual National Association of Counties (NaCo) show, and that Donelson would promote Responder Systems to local governments nationwide.

106.    In late September 2005, relator informed IBM manager Harold Stiffler of the foregoing September 19, 2005 meetings at PSC and at I.T.Suite, and in particular, of Donelson's attempted shakedown.

107.    In early November of 2005, McGee was again pressured to invest in PSC. Donelson organized a meeting between the principals of Responder Systems and PSC at Responder's offices in Skokie, Illinois. He urged Responder to merge with PSC and stated to McGee that "I can't protect you" if such a merger did not take place. McGee construed Donelson's comment as

29

a threat against future Responder Systems work prospects on the Project, should Responder decline. McGee later learned that Donelson and O'Leary, in collusion with IBM, had already reserved for PSC the mobile platform work on the Project's Phase 2 contract, even though Donelson, O'Leary and IBM knew PSC did not have the skills, expertise or resources to do so.

108.    Relator did not invest in Donelson's company or merge Responder with PSC and McGee's company was not invited to the 2006 or 2007 NaCo show. PSC, despite its abysmal performance on the Project contracts, was invited to and attended the shows under County sponsorship and during those shows, its services were recommended to other counties by Donelson.

109.    Towards the end of Phase 1 of the Project, relator's company, Responder Systems, was able to successfully re-engineer the Project's mobile system by making changes to the interface board and other hardware and writing additional software. Responder then retro-fitted the 47 defective TechAlt installations, and installed the re-engineered system on an additional 31 cars, resulting in 78 functioning systems. Responder's mobile system was rigorously tested by an independent laboratory, Trace Labs, for functionality under extreme environmental conditions. It met or exceeded all requirements. IBM later informed Responder System that its mobile platform had met or exceeded all of IBM's and the County's requirements.

110.    In a November 30, 2005 Project meeting, Donelson announced that he wanted a new design for the Phase 2 mobile installations using a different component and a new mobile Digital Video Recording system.

111.    Donelson limited the ability of Responder Systems and others from successfully bidding on such a redesign for Phase 2 by stating that no design evaluation criteria would be issued by the County and no performance competition would be held. Instead, Donelson would simply

decide on the preferred design. PSC, at Donelson's urging and direction, "bid" on providing a mobile platform under a new design.

112. IBM knew PSC had no new mobility design at all, and that it had no competence to develop one. In early 2006, IBM manager, Harold Stiffler, stated to McGee that PSC "couldn't get their building cameras to work, never mind developing a mobile video platform that is functional."

113. IBM continued discussions with Responder Systems about Responder Systems performing the Project's Phase 2 design and installation work. In retrospect, these discussions were a ruse, engaged in by IBM in an effort to maximize Responder Systems' competent work on the existing system for use in any redesign in Phase 2.

114. For example, in March 2006, IBM manager Harold Stiffler promised that IBM would award Responder the Phase 2 subcontract if start-up times of the mobile platform could be shortened for cold weather conditions (10° F). Responder Systems did so.

115. However, IBM, had, without ever informing McGee, already signed a letter of intent dated November 5, 2005—weeks before the meeting where Donelson announced PSC's "bid" for the work—committing to provide the Project's mobility business to PSC. When the letter of intent was issued, IBM knew PSC was incapable of providing the cutting edge technology that was required by the Project. No reasonable project manager would have made the decision to use PSC for this contract or task, and IBM knew that it was violating its contractual obligations by hiring PSC pursuant to its agreement to follow Donelson's directives.

*IBM Double Billed the Governments for TechAlt Work Already Done During the Phase 1 Contract*

31

116.    Because IBM had knowingly overpaid and billed the government for TechAlt's defective installations and for purely fictitious charges, there were insufficient remaining funds payable to remedy and finish the 80-vehicle installation portion of the Phase 1 contract.

117.    In order to bill the governments a second time for what would actually amount to fixing and completing TechAlt's work, IBM would need to cut services from other portions of the Project's contract or increase the contract price to pay Responder Systems to finish the contract. To do so, pursuant to the contract, IBM would be required to prepare a Project Change Request ("PCR")—a modification of the contract. IBM prepared such a document. However, because such a record could potentially reveal to the County, the State and/or DHS monitors and auditors that the initially paid funds had been misspent, IBM did not to want submit the referenced PCR.

118.    With the agreement and consent of Donelson and O'Leary, IBM instead devised a scheme where no PCR would be submitted. Under the Contract, IBM was allowed to bill for other services such as "maintenance" of the installations. As many of the platforms had not been installed, and the rest had to be completely re-engineered, the contract did not allow IBM to bill a second time for installation. Thus, Responder's services in re-engineering the 47 nonfunctioning platforms and installing an additional 31 new mobile platforms were mischarged by IBM under the guise of different "line items" (such as "maintenance") as services that in fact were not actually provided by IBM.

119.    Pursuant to the conspiracy to defraud the governments, the defendant County officials, O'Leary and Donelson, falsely reported to the County Purchasing Agent that the Project bills were in conformance with the contract. Pursuant to the scheme set forth in the preceding paragraph of this Complaint, IBM falsely charged the governments approximately $ 1.5 million.

120.    As the price of the mobile platforms and the installations was fixed and previously paid, IBM was obligated under the Project contract to supply and install the mobile platforms at no additional charge.

121.    In the fourth quarter of 2005, Responder Systems began installing the mobile platforms that TechAlt had already been paid to install before it went out of business. In order to conceal the fact that Responder Systems was performing the work that TechAlt had failed to complete, defendant Michael Shares of WIT requested that Responder Systems billing personnel prepare a bill for the fourth quarter 2005 work which falsely stated that the work had been "provided through September 18, 2005." Senior management for Responder Systems, upon learning of the request, ordered that the bill not be sent.

122.    In order to pay Responder Systems for the work it performed in the fourth quarter of 2005, while concealing that it was payment for work for which TechAlt had already been paid, a Project Manager for IBM, Gerald Foster, prepared a record which falsely stated that the work performed by Responder Systems during the fourth quarter consisted primarily of maintenance work.

*IBM Falsely and Deceptively Billed the Governments During the Phase 1 Contract*

123.    At all relevant times, IBM knew PSC's fixed camera installation and integration was incompetent and generally non-functional, and that its Wireless Support Center's services were defective, unresponsive and of no value to the Project's participating municipalities. Nevertheless, IBM and the County conspirators, with knowledge of all of the defects and the generally non-functional status of PSC's installation, integration and service, accepted PSC's work, paid PSC, and billed these charges to the governments.

124.    During Phase 1, PSC was also paid a year in advance for Project maintenance of the strong box cameras, even though PSC and the other co-conspirators knew that PSC did not have the personnel or equipment to fulfill maintenance and warranty obligations, and did not do so. All monies paid to PSC for such maintenance were billed by IBM to the governments.

125.    As it had with TechAlt's defective work, IBM again engaged another subcontractor, defendant WIT, to perform PSC's maintenance obligations for which the governments had also already paid. IBM billed the governments a second time for WIT's performance of the work that PSC had been already paid to provide.

126.    At all relevant times, WIT had a more developed business and business history than PSC. WIT's actual function with respect to PSC was to act as a "cover" in IBM's response to the County's RFP. IBM managers knew that their own internal guidelines for subcontractors prevented PSC from being a direct subcontractor. Therefore, PSC was ostensibly a subcontractor of WIT and theoretically subject to WIT's management.

127.    Nevertheless, PSC was treated as a direct subcontractor by IBM and the County. For example, when breaking down the billing sent to Donelson and O'Leary, IBM would identify PSC along with WIT and TechAlt as a service provider. However, WIT exercised no supervisory or other management function with respect to PSC. WIT did not, for example, inspect or approve PSC's work before billing the work through to IBM, who in turn billed the governments. WIT was paid a project management fee for, among other things, ostensibly managing PSC, but provided no Project management services with respect to PSC.

128.    At all relevant times WIT was paid a kickback for passing-off PSC's Project work as its own. The kickback operated as follows: PSC billed its sub-subcontract price to WIT, which would pass the bill on to IBM as a vendor cost. IBM then paid WIT's "cost" and billed the

governments; WIT would retain a 5-10% rake-off of the "cost" reimbursement and remit the remainder to PSC in return for WIT's participation in the conspiracy.

129.    WIT was also paid for the unnecessary installation of three wireless "bridges" on each "hot spot" tower, even though only one bridge was technically preferred due to cross-interference issues. Donelson and IBM knew of WIT's over-equipping, and approved it to inflate the amount of grant funds flowing through the conspiracy.

130.    In late 2005, PSC billed IBM for work to "harden" (install cameras and other equipment) the Stroger Battered Women's Shelter. This was not part of the Project's Statement of Work, was not in the grant application budget, was outside the scope of the Project contract, and was completely unrelated to providing interoperable communications to first responders. IBM initially refused to pay the bill on this basis, but after Donelson and O'Leary intervened, IBM paid PSC for the work and billed the County DHS Project grant funds approximately $125,000 for the work.

131.    IBM submitted invoices for payment and/or approval by the governments, in which IBM falsely billed the governments for defective PSC work, for WIT's performance of PSC's prepaid maintenance obligations, PSC kickbacks to WIT, WIT billings for excess equipment, and billed for PSC work that was outside the scope of the Project's grants and contracts.

*IBM Knowingly Billed for its defective Project Management Services*

132.    Throughout the Project, IBM knew it was acting inconsistently with the obligations assumed and representations made under its Phase 1 and Phase 2 Project contracts. IBM knew of its foregoing acts and omissions, including those set forth in paragraph 71 above. At all relevant times, IBM knowingly violated its contractual responsibilities of providing efficient project management services, appropriately supervising all work performed, or exercising commercially

reasonable judgment, and knew it was in contractual breach. Yet on each invoice for its services, it certified that it was in compliance with the Phase 1 or Phase 2 contract.

133.    When executing each of its Project contracts, and throughout its performance under the contracts, IBM knew that it had an interest in the Project that conflicted with the performance of its services; specifically, its participation in the conspiracy and its agreement with Donelson to hire subcontractors designated by Donelson, and its agreement to submit false claims and thereby obtain payment from the governments.

*The Conspiracy's Phase 2 Bait and Switch*

134.    IBM, in collusion with co-conspirators Donelson, O'Leary and PSC, decided that rather than engage Responder Systems, which had provided a functional mobile platform that had passed independent testing during Phase 1, it would, instead, for Phase 2, reduce the functionality specifications of the mobile platform and rely on PSC to design, develop, install and integrate a new and purportedly improved "state of the art" interoperable mobile system.

135.    IBM knew the problems that TechAlt, which had credentialed, experienced electrical, hardware and software engineers, had in getting the mobile platform to function, yet intentionally chose inexperienced, unskilled and unqualified PSC, with a history of incompetent performance, to undertake the Phase 2 mobile platform development and installation effort. IBM also knew that this decision violated its obligations to provide "efficient project management services" and use "commercially reasonable judgment" in performing the contract.

136.    The conspirators did not disclose this material and obviously disastrous Phase 2 decision to the County Board or to State and Federal grant authorities. Instead, DHS had been informed that working systems had been installed as a result of Phase 1 and that Phase 2 was designed to extend that success. Thus, defendant Dan Coughlin, director of the Cook County Judicial

Advisory Council, which oversees the County's grant applications, falsely represented that Phase 2 of the Project would be installing "a secure wireless interoperable communications system that has been extensively tested and is now operational in 27 municipalities." The conspirators knew and intended that, instead, they would use the grant funds to install an as yet un-designed and untested system.

137.    Furthermore, the Cook County Board had approved the Project's Phase 2 Contract because Donelson and O'Leary reported to them that IBM's proposal "met all system requirements." In other words, IBM and its co-conspirators were again claiming that IBM would be installing a "proven solution" when they knew that to be untrue, just as they had falsely claimed in Phase 1. But in the case of Phase 2, the conspirators intentionally abandoned a working solution installed by Responder Systems and decided, solely for corrupt purposes, to entrust PSC with reinventing a platform at the governments' expense.

*Phase 2 – IBM Accepts and Bills for PSC's Defective Installations*

138.    PSC's "plan" for developing the "new" platform turned out to be an unsuccessful attempt to reverse engineer the Phase 1 platform installed by Responder Systems. During the reverse engineering effort, PSC and its sub-subcontractors disassembled and rendered inoperable two working Phase 1 systems, thereby, for example, depriving the municipality of Calumet City of its previously installed working systems.

139.    On the formal recommendation of O'Leary, the Phase 2 contract was awarded to IBM by the County Board on April 6, 2005.

140.    The Phase 2 mobile platforms which were delivered were non-functional and defective, including because:

a. There was no practical method of safeguarding and off-loading mobile platform video for evidentiary or other purposes, because, among other things, PSC installed Digital Video Recorders without any output ports for downloads;

b. The installed Phase 2 mobile platform did not and could not provide consistent video image and video recording functionality; for example, the DVRs had "time-sync" problems that were never solved;

c. The Phase 2 platform did not and could not provide consistent and effective connectivity to the County network;

d. The software for the mobile platform was so defective that a bidding requirement for the Phase 3 contract was that the Phase 2 software not be used.

141.   Because PSC's mobile platform was defective, several municipalities demanded removal of the equipment even though it had been provided them free of charge by the County. To facilitate the acceptance and payment for defective installations without the danger of such acceptance being questioned by municipalities dissatisfied with the equipment, IBM and the conspirators changed the Project plan so that the number of mobile platforms to be installed in County vehicles was increased from 9 that were originally planned to 33, thereby reducing the number of mobile platforms to be installed in the vehicles of municipalities.

142.   Thus, IBM, Donelson, O'Leary and PSC knew that PSC would never be able to fulfill its responsibilities under the Phase 2 contract. Indeed, while the PSC installations were still under warranty from PSC, IBM contacted Responder Systems, and proposed that Responder Systems again fix (as "maintenance") the new non-functional PSC mobile platforms that IBM had accepted and billed to the governments. Responder declined to reprise its role of fixing a mobile platform's defects, because, among other things, in the opinion of its engineering and technical personnel, no commercially reasonable amount of effort would result in rendering the Phase 2 design functional.

*IBM's Motives for Participation in the Conspiracy*

143.     IBM had at least three profit motives for joining the conspiracy. First, it knew that unless

it used subcontractors designated by Donelson, particularly PSC, it would not be awarded the

Phase 1 and 2 contracts. Second, IBM was doing, and expected to do, tens of millions of dollars

of other business with the County over which Donelson and O'Leary had control or influence,

and which IBM did not want to place in jeopardy. Third, by being on "the Team" it would be

"protected" by Donelson during its performance of the contracts—hence its ability to improperly

bill and double bill on the Project. Donelson's protection also extended to IBM's ability to

falsely claim fulfillment of its Minority/Woman Owned Business Enterprise obligations, as set

forth below.

*IBM's False Claims for Minority/Woman Owned Business Enterprises ("MBE/WBE")*

*IBM's Use of MBE/WBE Pass-through Entities*

144.     The Project contract called for 35% of the goods and/or services to be provided by

Minority Business Enterprises and or Women Business Enterprises. In the first quarter of 2005,

IBM found itself $870,000 shy of MBE/WBE payments necessary to satisfy its minority contract

requirements on the Project. IBM's shortfall was caused by its elimination or reassignment to

itself of Project work originally planned for two MBE/WBE contractors.

145.     To meet MBE/WBE contract requirements, in an April 1, 2005 email IBM, told TechAlt

to "find 870,000 worth of work for these guys," specifically, Arias Information Solutions, LLC

("Arias") and SOS Quality Systems ("SOS"). In an April 6 email response, TechAlt complained

that it "had great difficulty finding work for them to do" but TechAlt agreed to "make it happen."

146.     With IBM's knowledge, TechAlt "subcontracted" some its own work to Arias and SOS.

The work attributed to and billed by Arias and SOS was actually performed by TechAlt

employees on its own premises. Although IBM knew of the deception, it falsely reported these

expenditures toward meeting MBE/WBE goals and submitted claims to the County for such services.

147. IBM and the conspirators' willingness to simply lie about minority hiring goals is also exemplified by its use of PSC. PSC never had a commercially useful function on the Project. Companies doing PSC's work included Mwobe, AZ-Tec Car Audio & Window Tint, Tech Win I.T., Inc., Notions Unlimited, Inc., and Complex Network Solutions, Inc.

*IBM's Use of a Sham Woman Owned Business*

148. PSC's subcontractor, defendant Mwobe, was a sham MBE/WBE contractor. At all relevant times, Mwobe's purported owner, defendant Juanita Masanek, did not principally manage, control or operate the business.

149. At all relevant times, Mwobe, formed on or about June 22, 2004, was and has been controlled, managed and run by Paul Masanek, who would not qualify as a MBE/WBE business owner. Mwobe used the offices, facilities and resources of Mr. Masanek's other business, defendant Services by Designwise, Ltd., and served as a mere "pass-through" entity to fraudulently qualify Masanek and SBD for government business contracts intended to benefit legitimate minority/woman owned business. Any government contracts awarded to Mwobe, including contracts awarded to it in conjunction with the Project, diverted business from genuine minority and woman-owned businesses.

150. At a Project meeting in November 2005, at which were present relator, Paul Masanek, IBM managers Harold Stiffler and Timothy Zeman, Michael Shares of WIT, and Gene Chevalier, a consultant to WIT, the participants discussed meeting Cook County MBE/WBE hiring goals. Referring to Mwobe, Masanek stated "I have a minority business." After the

40

meeting, McGee spoke with Zeman and warned that Mwobe was a sham. Nevertheless, the conspirators resolved to use Mwobe on the Project as a MBE/WBE contractor.

151.    At all relevant times, and throughout Phases 1 and 2, IBM, Donelson and the other conspirators knew that defendant Mwobe, was a mere sham and front for Paul Masanek and his other business, defendant SBD. Nevertheless, IBM billed, and Donelson and O'Leary approved Mwobe's work and billing in satisfaction of MBE/WBE requirements.

*The Cover-up of Phase 2 Failures*

152.    By the time the Phase 3 RFP was issued in 2008, Phase 2 concluded with a nonfunctional network of mobile platforms and fixed installations.

153.    In 2008, towards the end of Phase 2 of the Project, County Board members were publicly questioning the failure of the Phase 2 mobility platform to function effectively. Defendant Daniel Coughlin, whose primary role in the conspiracy was to cause false certification of State and Federal grant requirements and mislead the grant authorities, monitors and auditors, falsely reported to the Cook County Board about the Project's status, functionality, and problems. For example, during a Cook County Board Meeting on May 7, 2008, Coughlin reported in reference to the functionality of the Project's mobile platforms, that "The Phase 2 portion of the grant is functioning much better than the Phase 1," when he knew that the Phase 1 vehicle systems installed by Responder Systems were functional, while the Phase 2 systems were not. Coughlin further falsely stated that in 2006, the Phase 2 equipment "was operational."

154.    Also, at the May 7, 2008 Board meeting, defendant Hylton was asked whether there would be any attempt to recoup money that had been paid to vendors involved in Phases 1 and 2. Hylton responded that there would be no recoupment efforts because the technology was three years old, and that the problems were "just part of the standard evolution...," when he knew that

statement was false. He further falsely stated that vendors involved in Phase 1 and 2 met the contract requirements at the time they did the work.

*The Conspiracy Continues into Phase 3*

155.    The Phase 3 RFP was released in January-February 2008 by defendant Hylton, O'Leary's replacement as Chief Information Officer for Cook County, Bureau of Information and Technology. The Phase 3 contract had an initial maximum of $17.5 million. Donelson remained in charge of Project Shield (renamed "Project Gold Shield" for Phase 3).

156.    At the direction of Donelson, and with the approval and agreement of Coughlin and Hylton, the exact same hardware configuration that had failed in Phase 2 was retained in the Phase 3 RFP. This was done to allow the same personnel designated by Donelson who worked on Phase 2 of the Project to continue to participate in Phase 3, notwithstanding the myriad failures in Phase 2.

157.    In recognition of the failure of the Phase 2 software, the Phase 3 RFP did not contain software specifications, but rather, specifically required that the new software would have to be developed and expressly banned use of the existing Phase 2 software.

158.    IBM did not bid on Phase 3. And, although PSC was paid well over a million dollars a year for its "work" on the Project, and it never had more than four or five employees (*including* the defendant officers Brownlow and Artis) it sought bankruptcy protection under Chapter 11 in early 2008. According to PSC's sworn statements, at that time it owned not a single computer, piece of testing or diagnostic equipment, electronic component, and no intellectual property. The U.S. Trustee contended that PSC had made inadequate financial disclosures and the bankruptcy action was dismissed.

159.     While it was publicly announced that IBM was replaced for Phase 3 of the Project so that a new vendor could fix the problems, Donelson intended to continue to corruptly designate the new vendor's subcontractors.

160.     Defendant Johnson Controls, Inc., ("JCI") was awarded a prime contract for Phase 3, thereby taking over the role previously performed on the Project by IBM. At all relevant times, JCI agreed to hire only subcontractors designated by Donelson and admitted this to McGee.

161.     Believing IBM and PSC were no longer involved in the Project, Responder Systems attempted to bid on Phase 3 work and met with JCI in February of 2008, shortly after the bidder's conference. At the meeting, certain of JCI's agents and employees in attendance expressed confidence that JCI would be obtaining the prime contract for Phase 3 and bragged that JCI had a relationship with an influential and "significant" minority contractor, who it declined to disclose. Later in the meeting, a manager told McGee that JCI was going to be working with some people from South Holland who McGee immediately realized was PSC or its core personnel. Relator then warned JCI about PSC's lack of qualifications and legacy of failure in Phases 1 and 2, but they were dismissive and uncaring about what impact this might have on the contract.

162.     Several months after JCI took over as project manager, McGee telephoned a JCI manager and stated that Responder had been contacted by a number of municipalities complaining of nonfunctional Phase 1 mobile platforms and inquiring whether Responder could service the equipment. McGee asked the JCI manager whether Responder could be given work on Phase 3 maintaining Phase 1 mobile platforms, to which the JCI manager responded that no personnel who worked on Phases 1 or 2 of the Project would receive work on Phase 3. When McGee stated

43

that other contractors from Phases 1 and 2, including PSC-associated personnel were already working on Phase 3, the JCI manager stated that "We hire who the County tells us to hire."

163.    By its contractual terms, the purpose of Phase 3 was "to scale the project to the remaining 82 municipalities that were in no part of Phases 1 or 2."

164.    To date, Phase 3 has never been completed as contracted. The mobile platforms installed in Phase 3 are non-functional or unreliable. As in Phase 2, some municipalities have demanded removal of the Project's mobile platform equipment.

165.    During Phase 3, JCI also obtained two increases in contract price for "triage" of the Phase 1 and 2 platforms. JCI has been unable to maintain the Phase 1 mobile platform and unable to fix or render functional the Phase 2 platforms. Although Responder Systems, or some other similarly competent business, could maintain the Phase 1 mobile platform in functional status, JCI agreed to use the incompetent personnel designated by Donelson for all mobile platform maintenance.

166.    As a result of one or more of the foregoing acts, or omissions, any value obtained from the successful Phase 1 platforms has been destroyed by reason of the conspiracy.

*The DHS Grants*

167.    At all relevant times, Project Shield was financed by a series of government grants, and grant extensions made by DHS to the State of Illinois, which in turn granted the funds to Cook County, Illinois as sub-grantee.

168.    At all relevant times, DHS and the State retained the right to disallow any costs that violated the terms and conditions of the grant or federal regulations and conditioned the grant on a series of certifications and assurances by the grantees. The contracts issued in all Phases of the Project required the contractors to immediately repay any disallowed costs. The County Officials

44

who participated in the conspiracy, including Donelson, O'Leary, Coughlin and Hylton, were

variously responsible for misleading (a) the County Purchasing Agent and the County Board (as

alleged above), and (b) the State and Federal grant authorities, whose approval was not only a

condition precedent to approving the grants, but was also a condition subsequent with respect to

the payment of grant funds under the contracts.

*The Fraudulent Grant Applications Caused to Be Submitted By the Conspiracy*

169.    A list of the grants and grant extensions that were approved to finance the Project is

contained in a schedule attached as Summary Exhibit A.

170.    Each grant application to the State contained the following certification and assurance

and was intended to cause the State to make the same, or similar certification to the Federal

government:

> The Applicant hereby assures and certifies compliance with all Federal statutes,
> regulations, policies, guidelines and requirements, including OMB Circulars No. A-21,
> A-87, A-110, A-122, A-133; E.O. 12372 and Uniform Administrative Requirements for
> Grants and Cooperative Agreements - 28 CFR, Part 66, Common rule, that govern the
> application, acceptance and use of Federal funds for this federally-assisted project.

171.    At all relevant times, defendant Coughlin was responsible for preparing and submitting

the grant applications on behalf of the conspirators.

172.    At all relevant times, the conspirators knew and intended, among other violations, that the

Project would be and was bid, undertaken and conducted in violation of 28 CFR §66, specifically

§66.36(b)(3), which provides that, "No employee, officer or agent of the grantee or subgrantee

shall participate in selection, or in the award or administration of a contract supported by Federal

funds if a conflict of interest, real or apparent, would be involved," and subsection (b)(4), which

provides that "The grantee's or subgrantee's officers, employees or agents will neither solicit nor

accept gratuities, favors or anything of monetary value from contractors, potential contractors, or

parties to subagreements." The participants in the conspiracy, and each of them, caused such false assurance and certification to be presented to the State and the Department of Homeland Security.

173.    Had the State and DHS known that Donelson had an interest in PSC, was soliciting and accepting things of monetary value from Project contractors, and would be the day-to-day administrator of the Project's contracts supported by the governments' grants, neither the State nor DHS would have approved the grants and paid out funds for Project work.

*The False Records and False Statements Made and Caused to be Made*

174.    Pursuant to federal regulations, the State and County were required to submit Biannual Strategy Implementation Reports (BSIR) on the Project; these reports are designed to show "progress made in meeting strategic goals and objectives." In each BSIR, and in furtherance of the conspiracy alleged herein, the conspirators falsely reported the progress of the Project.

175.    At all relevant times, and pursuant to federal regulations, the State and Federal governments monitored the progress of the grants. During the governments' monitoring, the Project's defective equipment, the false claims submitted by the contractors, and Donelson's conflict of interest and solicitations were concealed and not disclosed. Pursuant to the conspiracy, defendant Coughlin warned the conspirators when monitoring was to take place, and discussed how it would be handled. Additionally, the monitors were materially misled by the conspirators' false statements, certifications, reports, and claims.

176.    Pursuant to federal regulations and the contracts with the County, the expenditures under the grants and the records of the contractors on the Project were required to be retained for submission to State and Federal auditors. IBM, JCI and the other conspirators knew that their false contract invoices would be submitted to the auditors for approval. Annual audits were in

fact conducted, that reviewed and relied upon false invoices and records submitted and made or caused to be made or submitted by the conspirators.

177.    At all relevant times, the defendants, and each of them, submitted the false statements, false records and false claims with the purpose of obtaining the Governments' approval.

178.    Absent approval by the governments, the expenditures under the grants would have been disallowed and, accordingly, the Project monies paid to the corporate defendants herein, pursuant to the foregoing false statements and claims are immediately repayable.

179.    By reason of the foregoing, each and every invoice submitted by IBM to the governments was falsely certified to be in accordance with the Phase 1 and Phase 2 contracts and federal regulations. A listing of said invoices is attached hereto and made a part hereof as Summary Exhibit B.

180.    By reason of the foregoing, each and every invoice submitted by JCI to the governments was falsely certified to be in accordance with the Phase 3 contract and federal regulations.

### *CLAIMS FOR RELIEF*

### I
### FEDERAL FALSE CLAIMS ACT – PRESENTATION OF FALSE CLAIMS
### (31 U.S.C. § 3729(a)(1)

181.    By virtue of the acts and omissions described above, defendants, and each of them, knowingly presented, or caused to be presented, to an officer or employee of the United States Government false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1).

182.    The acts and omissions described above were material to contract approvals, grant approvals, audit and monitoring approval, payments and other contract actions by the United States.

183.    The acts and omissions described above caused damages to the United States, in substantial amounts to be determined at trial.

## II
## FEDERAL FALSE CLAIMS ACE - FALSE RECORDS AND STATEMENTS
### (31 U.S.C. § 3729(a)(2)

184.    By virtue of the acts and omissions described above, defendants knowingly agreed to make use of, and did indeed make use of, or cause to be made use of, false records or statements to get false or fraudulent claims paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(2).

185.    The acts and omissions described above were material to contract approvals, grant approvals, audit and monitoring approval and payments and other contract actions by the United States.

186.    The acts and omissions described above caused damages to the United States, in substantial amounts to be determined at trial.

## III
## FEDERAL FALSE CLAIMS ACT – CONSPIRACY
### (31 U.S.C. § 3729(a)(1)

187.    Defendants, by virtue of the acts and omissions described above, conspired to defraud the United States Government by getting a false or fraudulent claim allowed or paid, and to commit a violation of 31 U.S.C. § 3729 (a)(1) (A – B).

188.    The acts and omissions described above were material to contract approvals, grant

approvals, audit and monitoring approval and payments and other contract actions by the United

States.

189.    The acts and omissions described above caused damages to the United States, in

substantial amounts to be determined at trial.

## IV
## ILLINOIS FALSE CLAIMS ACT – FALSE CLAIMS
## (740 ILCS 175/3(a)(1)(A))

190.    By virtue of the acts and omissions described above, defendants knowingly presented, or

caused to be presented to an officer or employee of the State of Illinois, a false or fraudulent

claim for payment or approval, in violation of 740 ILCS 175/3(a)(1)(A).

191.    The acts and omissions described above were material to contract approvals, grant

approvals, audit and monitoring approval, payments and other contract actions by the State of

Illinois.

192.    The acts and omissions described above caused damages to the State of Illinois, in

substantial amounts to be determined at trial.

## V
## ILLINOIS FALSE CLAIMS ACT – FALSE RECORDS
## (740 ILCS 175/3(a)(1)(B))

193.    By virtue of the acts and omissions described above, defendants knowingly made, used,

or caused to be made or used, false records or statements material to false or fraudulent claims,

to get false or fraudulent claims paid or approved by the Government and to commit violations of

740 ILCS 175/3(a)(1)(B).

194.    The acts and omissions described above were material to contract approvals, grant approvals, audit and monitoring approvals, and payments and other contract actions by the State of Illinois.

195.    The acts and omissions described above caused damages to the State of Illinois, in substantial amounts to be determined at trial.

## VI
## FEDERAL FALSE CLAIMS ACT – CONSPIRACY
## (740 ILCS 175/3(a)(1)(C))

196.    By virtue of the acts and omissions described above, defendants conspired to conspired to defraud the State of Illinois by getting a false or fraudulent claim allowed or paid and to commit violations of the Illinois False Claims Act, 175/3(a)(1)(B) and (C).

197.    The acts and omissions described above were material to contract approvals, audit and monitoring approval, and payments and other contract actions by the State of Illinois.

198.    The acts and omissions described above caused damages to the State of Illinois, in substantial amounts to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Michael McGee, on behalf of himself, the United States of America and the People of the State of Illinois, prays that:

1.    This Court enter judgment against defendants in an amount equal to three times the amount of damages sustained by the United States Government, plus a civil penalty of $11,000 for each false claim submitted and each false statement and record made in violation of the federal False Claims Act, 31 U.S.C. §§ 3729-32.

2.    This Court enter judgment against defendants in an amount equal to three times the amount of damages sustained by the State of Illinois, plus a civil penalty of

$11,000 for each false claim submitted and each false statement and record made in violation of the Illinois False Claims Act, 740 ILCS 175/1 *et. Seq.*

3.   Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the federal False Claims Act and 175/4(d) of the Illinois False Claims Act;

4.   Relator be awarded all reasonable attorneys' fees, costs, and expenses;

5.   The Court award pre-judgment and post-judgment interest;

6.   The United States, the State of Illinois and the Relator, and each of them, receive all other relief, both at law and equity, to which they are entitled.

Respectfully submitted,

One of Relator's Attorneys

Thomas F. Asch
Law Offices of Thomas F. Asch
7516 North Eastlake Terrace
Chicago, IL 60626
(773) 338-2323


John R. Malkinson
Seth R, Halpern
Malkinson & Halpern PC
208 South LaSalle St.
Suite 1750
Chicago, IL 60604
(312) 427-9600

Bruce C. Howard, Esq.
Robert D. Allison
ROBERT D. ALLISON & ASSOCIATES
122 South Michigan Ave.
Suite 1850
Chicago, IL 60603
(312) 427-7600
David M. Stieper
2500 West Higgins Rd.
Suite 1200
Hoffman Estates, IL 60169
(847) 519-7970


DATED:  May 24, 2011

# EXHIBIT A

| COOK COUNTY PROJECT SHIELD | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| GRANTS TO COOK COUNTY PRIMARILY FOR | | | | | | |
| INTEROPERABLE WIRELESS COMMUNICATION SYSTEM, | | | | | | |
| SECURITY ASSESSMENTS AND SYSTEMS, TESTING AND | | | | | | |
| ADMINISTRATION OF INITIATIVES | | | | | | |
| SCHEDULE UPDATED MARCH 1, 2011 | | | | | | |

## GRANTS AWARDED TO COOK COUNTY

| TYPE | URBAN AREA SECURITY INITIATIVE | DATE APPROVED IN COOK COUNTY BOARD MINUTES | GRANT AMOUNT | FUNDING PERIOD | DESCRIPTION | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| **2003** | | | | | | |
| | | | | | | |
| Grant | UASI 2003 | 2/19/2004 | $ 1,699,800.00 | 1/1/2004-7/31/2005 | Phase 1 development and installation of interoperable wireless communicationsystem for first responders | |
| Grant | UASI 2003 | 5/4/2004 | $ 12,848,927.19 | 7/1/2003-4/30/2005 | Amended grant award and funding period for above | |
| Extension | UASI 2003 | 4/6/2005 | | 5/1/2005-1/31/2006 | Funding period extension | |
| Extension | UASI 2003 | 12/6/2005 | | 1/1/2006-6/30/2006 | Funding period extension | |
| **2004** | | | | | | |
| Grant | UASI 2004 | 5/4/2004 | $ 16,869,672.00 | 12/1/2003-11/30/2005 | No phase indicated. | |
| Extension | UASI 2004 | 12/6/2005 | | 12/1/2005-5/31/2006 | Funding period extension | |
| Extension | UASI 2004 | 7/12/2006 | | 5/31/2006-11/30/2006 | Funding period extension | |
| Appears to be expiration of first 2004 grant and issuance of new grant | UASI 2004 | 9/7/2006 | $ 16,110,714.64 | 7/1/2005-11/30/2006 | Second grant agreement for UASI 2004 because, according to the board minutes, state did not process the County's extension request on a timely basis. | |
| Extension | UASI 2004 | 11/14/2006 | | 11/30/2006-5/31/2007 | Funding period extension | |
| Extension | UASI 2004 | 5/15/2007 | | 6/1/2007-11/30/2007 | Finalize Phase 2 and for Mutual Aid Box Alarm System Initiative which provides Incident Command organizational material | |
| **2005** | | | | | | |
| Grant | UASI 2005 | 9/20/2005 | $ 22,465,000.00 | Date of final execution by the grantor through 12/31/2006 | No phase identified | |
| Extension | UASI 2005 | 11/2/2006 | | 1/1/2007-3/31/2007 | Funding period extension | |
| Extension | UASI 2005 | 3/20/2007 | | 3/31/2007-3/31/2008 | Funding period extension | |
| Extension | UASI 2005 | 5/7/2008 | | 4/2/2008-9/30/2008 | Funding period extension | |
| Extension | UASI 2005 | 9/17/2008 | | 10/1/2008-3/31/2009 | Various see minutes, no mention of Phase 2 | |
| **2006** | | | | | | |
| Grant | UASI 2006 | 9/7/2006 | $ 13,065,000.00 | Date of final execution by the grantor through 3/31/2008 | No phase identified | |
| Extension | UASI 2006 | 3/8/2008 | | 4/1/2008-3/31/2009 | Funding period extension | |
| **2007** | | | | | | |
| Grant | UASI 2007 | 3/6/2008 | $ 16,548,000.00 | 8/9/2007-12/31/2009 | No phase identified. | |
| **2008** | | | | | | |
| Grant | UASI 2008 | 11/5/2008 | $ 15,904,525.00 | 9/1/2008-12/31/2010 | Maintenance of wireless data communications system, purchase and maintain radio interoperability communication system etc | |
| | | 12/14/2010 | | 12/31/2010-8/31/2011 | Funding period extension | |
| | **2009** | UASI 2009 | 2/9/2010 | $ 15,225,309.00 | 8/1/2009-12/31/2011 | Maintenance of wireless data communications system, purchase and maintain radio interoperability communication system, purchase eqpt and supplies for EM personnel etc |
| | **2010** | UASI 2010 | 1/19/2011 | $ 15,904,274.00 | 8/1/2010-12/31/2012 | Maintenance of wireless data communications system, purchase and maintain radio interoperability communication system, purchase eqpt and supplies for EM personnel etc |
| | | TOTAL GRANTS | $ 129,771,549.83 | | | |
| Note: | The grant funds originate with the United States Department of Homeland Security/Office of Domestic Preparedness and flow through the Illinois Emergency Management Agency. Extensions are also granted through Illinois Emergency Management Agency. | | | | | |

## CERTAIN PRIMARY CONTRACTS AWARDED BY COOK COUNTY FOR PROJECT SHIELD

| DATE | VENDOR | REASON COUNTY AWARDED CONTRACT PER BOARD MINUTES | | AMOUNT |
|---|---|---|---|---|
| 6/15/2004 | IBM | Phase 1. Lowest cost proposal to RFP and met all system requirements | $ | 12,850,000.00 |
| 4/6/2005 | IBM | Phase 2. Lowest cost proposal to RFP and met all system requirements | $ | 11,303,495.00 |
| 10/4/2006 | Avatar Systems LTD | Phase 3. Current subcontractor under this grant who has performed well | $ | 12,064,677.00 |
| | | and will allow for additional technology within the same budget amount | | |
| | | (No RFP. Per Avatar website company indicated to be an SBC reseller.) | | |
| 7/31/2007 | Avatar Systems LTD | This award was rescinded 7/31/07 | $ | (12,064,677.00) |
| 3/18/2008 | Johnson Controls (1) | Phase 3. Most competitive response that met all system /financial | $ | 17,500,000.00 |
| | | requirements. For mobile video and CC command center software | | |
| | | Meeting of 12/14/2010 summarized increased contract amount: | | |
| | | 1/13/2009 | $ | 957,154.75 |
| | | 1/12/2010 | $ | 5,000,000.00 |
| | | 12/14/2010 | $ | 2,427,490.00 |
| | | | | |
| | | Total Johnson Controls Contract | $ | 25,884,644.75 |
| | | | | |
| 3/18/2008 | Synch-Solutions(2) | Phase 3. Most competitive response that met all system /financial | $ | 500,000.00 |
| | | requirements. For quality control. | | |
| | | 4/15/2009 | $ | 500,000.00 |
| | | Total Synch Solutions Contract | $ | 1,000,000.00 |
| | | | | |
| | | TOTAL PRIME CONTRACTS AWARDED | $ | 51,038,139.75 |
| Source: | All info found in Cook County Board Minutes | | | |
| | | | | |
| (1) | Contract was extended through 12/31/2011 from a previous extended expiration of 12/31/2010. CC intends to do an RFP for | | | |
| | "status, scheduling, troubleshooting, and problem resolution for current Shield equipment that is deployed and to deliver the | | | |
| | required preventive maintenance, repair labor and repair materials for Phases I, II and III equipment." | | | |
| (2) | Contract was extended through 12/31/2009. No additional extensions were noted as given to Johnson Controls. | | | |
| | As such, it is assumed that all installations were completed and submitted to quality control by 12/31/2009. | | | |

# EXHIBIT B

**SUMMARY OF IBM INVOICES TO COOK COUNTY**

**PROJECT SHIELD**

**PHASE I AND PHASE II**

**PHASE 1 INVOICES**

| INV DATE | INV NUMBER | SENT TO | SERVICE DATES | AMOUNT | |
|---|---|---|---|---|---|
| 11/4/2004 | C04D9YC | Donelson | 11/1/2004-11/30/2004 | $ | 493,903.67 |
| 11/5/2004 | IT01648 | Mary Jo Horace | | $ | 2,515,418.03 |
| 3/9/2005 | IT02542 | Donelson | | $ | 194,754.13 |
| 3/30/2005 | IT02630 | Donelson | Not specified | $ | 203,970.54 |
| 4/27/2005 | C05CJLZ | Donelson | 4/1/2005-4/29/005 | $ | 355,849.56 |
| 5/4/2005 | IT02873 | Donelson | 4/1/2005-4/30/2005 | $ | 208,312.25 |
| 11/26/2004 | C04FJ3H | Maras | 11/1/2004-11/30/2004 | $ | 355,968.73 |
| 11/30/2004 | IT01858 | Maras | 11/1/2004-11/30/2004 | $ | 438,987.69 |
| 1/10/2005 | C05BCQ4 | Maras | 12/1/2004-12/31/2004 | $ | 428,595.84 |
| 1/11/2005 | IT02265 | Maras | 12/1/2004-12/31/2004 | $ | 131,083.00 |
| 2/2/2005 | IT02363 | Maras | 1/1/2005-1/31-2005 | $ | 346,571.36 |
| 3/1/2005 | C05BVR3 | Maras | 2/1/2005-2/28/2005 | $ | 484,668.82 |
| 3/28/2005 | C05B283 | Maras | 3/1/3005-3/31/2005 | $ | 340,503.13 |
| 5/25/2005 | C05CTWV | Donelson | 5/1/2005-5/26/05 | $ | 53,074.00 |
| 5/25/2005 | C05CTWX | Donelson | 5/2/2005-5/26/2005 | $ | 21,197.00 |
| 5/25/2005 | C05CTWW | Donelson | 5/2/2005-5/26/2005 | $ | 88,428.00 |
| 5/26/2005 | C05CWTY | Donelson | 5/2/2005-5/26/2005 | $ | 232,064.91 |
| 5/27/2005 | IT03006 | Maras | 5/1/2005-5/31/2005 | $ | 353,075.37 |
| 6/28/2005 | C05C5JN | Donelson | 6/1/2005-6/27/2005 | $ | 571,183.49 |
| 7/27/2005 | C05DG9R | Donelson | 7/1/2005-7/27/2005 | $ | 145,867.00 |
| 7/27/2005 | C05DG9S | Donelson | 7/1/2005-7/27/2005 | $ | 2,846.37 |
| 7/27/2005 | C05DG9T | Donelson | 7/1/2005-7/27/2005 | $ | 14,349.00 |
| 7/27/2005 | C05DG9W | Donelson | 7/1/2005-7/27/2005 | $ | 26,477.00 |
| 7/27/2005 | C05DG9V | Donelson | 7/1/2005-7/27/2005 | $ | 5,294.00 |
| 7/27/2005 | C05DG9X | Donelson | 7/1/2005-7/27/2005 | $ | 488,632.46 |
| 8/1/2005 | IT03340 | Donelson | Not specified | $ | 10,960.08 |
| 8/29/2005 | C05DP4B | Donelson | 8/1/2005-8/29/2005 | $ | 359,151.24 |
| 8/29/2005 | C05DP39 | Donelson | 8/1/2005-8/29/2005 | $ | 11,110.00 |
| 8/29/2005 | C05DP4D | Donelson | 8/1/2005-8/29/2005 | $ | 2,267.00 |
| 9/27/2005 | IT03583 | Donelson | 9/1/2005-9/28/2005 | $ | 199,229.07 |
| 9/28/2005 | C05DZYD | Donelson | 9/1/2005-9/28/2005 | $ | 282,393.76 |
| 10/27/2005 | C05FBNS | Maras | 10/1/2005-10/31/2005 | $ | 114,939.29 |
| 10/27/2005 | C05FBNN | Maras | 10/1/2005-10/31/2005 | $ | 21,404.70 |
| 11/14/2005 | 9523540 | Maras | 11/1/2005-11/30/2005 | $ | 2,237,159.84 |
| 11/19/2005 | C05FHX8 | Donelson | 11/1/2005-11/30-2005 | $ | 28,377.50 |
| 11/19/2005 | C05FHX6 | Maras | November-05 | $ | 12,702.34 |
| 11/19/2005 | C05FHX7 | Donelson | 11/1/2005-11/30/2005 | $ | 12,075.00 |
| 11/19/2005 | C05FHX5 | Donelson | 11/1/2005-11/30/2005 | $ | 7,066.64 |
| 11/19/2005 | C05FHX9 | Donelson | 11/1/2005-11/30/2005 | $ | 3,034.00 |
| 11/19/2005 | C05FHX4 | Maras | 11-2005 | $ | 7,522.35 |
| 11/19/2005 | C05FHX4 | Donelson | 11/1/2005-11/30/2005 | $ | 12,702.34 |
| 10/27/2005 | C05FBNP | Maras | October-05 | $ | 3,533.32 |
| 11/28/2005 | C05FL27 | Maras | November-05 | $ | 196,684.18 |
| 11/19/2004 | D427341 | Maras | December-04 | $ | 16,208.00 |

| | | | | | |
|---|---|---|---|---|---|
| 1/11/2006 | IT04259 | Maras | December-05 | $ | 32,939.82 |
| 1/11/2006 | IT04261 | Maras | December-05 | $ | 23,410.00 |
| 1/11/2006 | IT04260 | Maras | December-05 | $ | 19,964.00 |
| 1/23/2006 | C06BF27 | Maras | January-06 | $ | 125,359.00 |
| 1/23/2006 | C06BF28 | Maras | January-06 | $ | 60,558.40 |
| 1/23/2006 | C06BF26 | Maras | January-06 | $ | 35,214.00 |
| 3/23/2006 | C06BZFK | Maras | March-06 | $ | 37,601.00 |
| 3/23/2006 | C06BZFL | Maras | March-06 | $ | 2,880.00 |
| 3/25/2006 | C06BZRQ | Maras | March-06 | $ | 7,578.00 |
| 5/26/2006 | C06H7N | Maras | May-06 | $ | 22,560.00 |
| 5/26/2006 | C06CLWQ | Maras | June-06 | $ | 34,286.19 |
| 6/22/2006 | 06222006 | Maras | June-06 | $ | 39,604.00 |
| 6/26/2006 | 06262006 | Maras | June-06 | $ | 22,713.00 |
| 4/26/2006 | C06B9F3 | Maras | April-06 | $ | 8,920.00 |
| 4/26/2006 | C06B9F1 | Maras | April-06 | $ | 7,805.00 |
| 6/27/2006 | IT05181 | Maras | June-06 | $ | 329,007.97 |
| | | | | | |
| | **TOTAL PHASE I INVOICES** | | | $ | **12,837,294.04** |
| | | | | | |
| **PHASE 2 INVOICES** | | | | | |
| | | | | | |
| 3/23/2006 | C06BZGX | Maras | Mar-06 | $ | 95,269.00 |
| 3/7/2006 | C06BWYB | Maras | Jan 2006 and Feb 2006 | $ | 183,275.01 |
| 6/9/2007 | C07CRM8 | Hylton | May-07 | $ | 182,973.00 |
| 4/26/2006 | C06B9TH | Maras | Apr-06 | $ | 57,118.35 |
| 5/22/2006 | C06CHQ3 | Maras | May-06 | $ | 41,800.00 |
| 5/23/2006 | C06CHYZ | Maras | May-06 | $ | 32,000.00 |
| 6/28/2006 | C06CXDN | Maras | Jul-06 | $ | 32,000.00 |
| 6/28/2006 | C06CXDL | Maras | Jun-06 | $ | 32,000.00 |
| 6/28/2006 | C06CXDM | Maras | Jun-06 | $ | 5,535.00 |
| 7/27/2006 | C06C5QJ | Maras | Jul-06 | $ | 14,892.77 |
| 8/29/2006 | C06DDXN | Maras | Aug-06 | $ | 34,881.64 |
| 10/27/2006 | C94YW09 | Maras | Oct-06 | $ | 526,749.80 |
| 10/27/2006 | C06D2TK | Maras | Oct-06 | $ | 1,604,150.05 |
| 11/6/2006 | C06D6KD | Maras/No DD | 10-1-2006 - 10-31-2006 | $ | 4,200.00 |
| 12/27/2006 | C06FMW4 | Hylton | Dec-06 | $ | 39,860.54 |
| 12/27/2006 | C06RMWH | Maras | Dec-06 | $ | 39,860.54 |
| 12/27/2006 | C06FMWW | Maras | Dec-06 | $ | 2,790.00 |
| 12/27/2006 | C06FMWX | Office of the CIO | 12/1/2006 - 12/27/2006 | $ | 7,629.91 |
| 12/27/2006 | C06FMWY | Hylton | Dec-06 | $ | 51,016.58 |
| 12/27/2006 | C06FMWZ | Hylton | Dec-06 | $ | 5,246.58 |
| 12/27/2006 | C06RMW0 | Hylton | Dec-06 | $ | 3,806.58 |
| 12/27/2006 | C06FMW1 | Hylton | Dec-06 | $ | 7,629.91 |
| 12/27/2006 | C06FMW2 | Hylton | Dec-06 | $ | 6,956.98 |
| 12/27/2006 | C06FMW3 | Hylton | Dec-06 | $ | 12,186.58 |
| 12/27/2006 | C06FMW5 | Office of the CIO | 12/1/2006 - 12/27/2006 | $ | 39,860.54 |
| 12/27/2006 | C06FMWC | Hylton | Dec-06 | $ | 45,109.91 |
| 12/27/2006 | C06FMWD | Hylton | Dec-06 | $ | 6,596.58 |
| 12/27/2006 | C06FMWF | Hylton | Dec-06 | $ | 10,429.91 |
| 12/27/2006 | C06FMWG | Cook County | 12/1/2006 - 12/27/2006 | $ | 39,860.54 |
| 12/27/2006 | C06FMWJ | Hylton | Dec-06 | $ | 39,860.54 |
| 12/27/2006 | C06FMWK | Hylton | Dec-06 | $ | 63,366.84 |

| 12/27/2006 | C06FMWL | Hylton | Dec-06 | $ | 7,629.91 |
|---|---|---|---|---|---|
| 12/27/2006 | C06FMWM | Hylton | Dec-06 | $ | 43,669.91 |
| 12/27/2006 | C06FMWN | Hylton | Dec-06 | $ | 4,839.91 |
| 12/27/2006 | C06FMWP | Hylton | Dec-06 | $ | 1,440.00 |
| 12/27/2006 | C06FMWR | Hylton | Dec-06 | $ | 5,590.00 |
| 12/27/2006 | C06FMWS | Hylton | Dec-06 | $ | 60,566.84 |
| 12/27/2006 | C06FMWT | Hylton | Dec-06 | $ | 6,596.58 |
| 12/27/2006 | C06FMWV | Hylton | Dec-06 | $ | 44,076.58 |
| 2/6/2007 | C07BNTB | Hylton | Dec 2006 or Jan 2007 | $ | 34,296.73 |
| 2/6/2007 | C07BNTC | Hylton | Dec 2006 or Jan 2007 | $ | 34,296.73 |
| 2/6/2007 | C07BNS9 | Hylton | Dec 2006 or Jan 2007 | $ | 22,814.19 |
| 2/6/2007 | C07BNTQ | Hylton | Dec 2006 or Jan 2007 | $ | 22,814.19 |
| 2/6/2007 | C07BNS8 | Hylton | Dec 2006 or Jan 2007 | $ | 34,296.73 |
| 2/6/2007 | C07BNTD | Hylton | Dec 2006 or Jan 2007 | $ | 34,296.73 |
| 2/6/2007 | C07BNTF | Hylton | Dec 2006 or Jan 2007 | $ | 24,561.86 |
| 3/28/2007 | RS01599 | Maras | 12/1/2006 - 2/28/2007 | $ | 96,000.00 |
| 5/1/2007 | C07CCZV | Maras | 8/1/2006-4/30/2007 | $ | 325,870.00 |
| 5/1/2007 | C07CCZW | Hylton | Apr-07 | $ | 27,654.00 |
| 5/1/2007 | C07CCZX | Hylton | Apr-07 | $ | 27,654.00 |
| 5/1/2007 | C07CCZY | Hylton | Apr-07 | $ | 27,654.00 |
| 5/1/2007 | C07CCZZ | Hylton | Apr-07 | $ | 8,360.00 |
| 5/1/2007 | C07CCZ0 | Hylton | Apr-07 | $ | 8,360.00 |
| 5/1/2007 | C07CCZ1 | Hylton | Apr-07 | $ | 8,360.00 |
| 5/1/2007 | C07CCZ2 | Hylton | Apr-07 | $ | 27,654.00 |
| 5/1/2007 | C07CCZ3 | Hylton | Apr-07 | $ | 27,654.00 |
| 5/1/2007 | C07CCZ4 | Office of the CIO | 4/1/2007-4/30/2007 | $ | 8,360.00 |
| 5/1/2007 | C07CCZ5 | Hylton | Apr-07 | $ | 27,654.00 |
| 6/9/2007 | C07CRN0 | Hylton | May-07 | $ | 7,302.00 |
| 6/9/2007 | C07CRN1 | Hylton | May-07 | $ | 7,302.00 |
| 6/9/2007 | C07CRN3 | Hylton | May-07 | $ | 854.53 |
| 6/9/2007 | C07CRN4 | Hylton | May-07 | $ | 3,689.00 |
| 6/9/2007 | C07CRN5 | Hylton | May-07 | $ | 3,613.00 |
| 6/9/2007 | C07CRN8 | Hylton | May-07 | $ | 1,395.00 |
| 6/9/2007 | C07CRNC | Hylton | May-07 | $ | 23,236.00 |
| 6/9/2007 | C07CRND | Hylton | May-07 | $ | 854.52 |
| 6/9/2007 | C07CRNF | Hylton | May-07 | $ | 4,543.52 |
| 6/9/2007 | C07CRNG | Hylton | May-07 | $ | 854.52 |
| 6/9/2007 | C07CRNH | Hylton | May-07 | $ | 24,227.05 |
| 6/9/2007 | C07CRNJ | Hylton | May-07 | $ | 45,260.48 |
| 6/9/2007 | C07CRNK | Hylton | May-07 | $ | 10,372.40 |
| 6/9/2007 | C07CRNL | Hylton | May-07 | $ | 4,328.00 |
| 6/9/2007 | C07CRNM | Hylton | May-07 | $ | 3,613.00 |
| 6/9/2007 | C07CRNP | Hylton | May-07 | $ | 3,302.06 |
| 6/9/2007 | C07CRNR | Hylton | May-07 | $ | 5,353.03 |
| 6/9/2007 | C07CRNS | Hylton | May-07 | $ | 10,372.40 |
| 6/9/2007 | C07CRNT | Hylton | May-07 | $ | 38,507.40 |
| 6/9/2007 | C07CRNW | Hylton | May-07 | $ | 88,372.46 |
| 6/9/2007 | C07CRNX | Hylton | May-07 | $ | 65,612.48 |
| 6/9/2007 | C07CRNY | Hylton | May-07 | $ | 5,353.03 |
| 6/9/2007 | C07CRNZ | Hylton | May-07 | $ | 6,767.04 |
| 6/9/2007 | C07CRM9 | Hylton | May-07 | $ | 1,939.00 |
| 6/9/2007 | C07CRN7 | Hylton | 5/1/2007-5/31/2007 | $ | 147,019.64 |

| 6/9/2007 | C07CRNB | Hylton | 5/1/2007-5/31/2007 | $ | 92,488.79 |
| 6/9/2007 | C07CRNN | Hylton | May-07 | $ | 123,660.88 |
| 6/9/2007 | C07CRNQ | Hylton | 5/1/2007-5/31/2007 | $ | 14,390.23 |
| 12/27/2006 | C06FMWQ | Hylton | Dec-06 | $ | 5,246.58 |
| 6/9/2007 | C07CRN2 | Hylton | May-07 | $ | 4,543.53 |
| 7/10/2007 | C07C1J0 | Hylton | Jun-07 | $ | 109,770.00 |
| 7/10/2007 | C07C1J1 | Hylton | Jun-07 | $ | 4,732.70 |
| 7/10/2007 | C07C1J2 | Hylton | Jun-07 | $ | 92,506.44 |
| 7/10/2007 | C07C1J3 | Hylton | Jun-07 | $ | 4,732.70 |
| 7/10/2007 | C07C1J4 | Hylton | Jun-07 | $ | 4,732.70 |
| 7/10/2007 | C07C1J5 | Hylton | Jun-07 | $ | 43,886.87 |
| 7/10/2007 | C07C1J6 | Hylton | Jun-07 | $ | 1,327,153.04 |
| 7/10/2007 | C07C1J7 | Hylton | Jun-07 | $ | 4,732.70 |
| 7/10/2007 | C07C1J8 | Hylton | Jun-07 | $ | 48,554.95 |
| 7/10/2007 | C07C1J9 | Office of the CIO | 6/1/2007-6/30/2007 | $ | 4,732.70 |
| 7/10/2007 | C07C1KB | Hylton | Jun-07 | $ | 4,732.70 |
| 7/10/2007 | C07C1KC | Hylton | Jun-07 | $ | 94,273.74 |
| 7/10/2007 | C07C1KD | Hylton | Jun-07 | $ | 4,732.70 |
| 7/10/2007 | C07C1KF | Hylton | Jun-07 | $ | 4,732.70 |
| 7/10/2007 | C07C1KG | Hylton | Jun-07 | $ | 55,054.95 |
| 7/10/2007 | C07C1KH | Hylton | Jun-07 | $ | 4,732.70 |
| 7/10/2007 | C07C1KT | Hylton | Jun-07 | $ | 87,773.74 |
| 7/10/2007 | C07C1KK | Hylton | Jun-07 | $ | 92,506.44 |
| 7/10/2007 | C07C1KL | Hylton | Jun-07 | $ | 92,506.44 |
| 7/10/2007 | C07C1KM | Hylton | Jun-07 | $ | 34,457.70 |
| 7/10/2007 | C07C1KN | Hylton | Jun-07 | $ | 4,732.70 |
| 7/10/2007 | C07C1KP | Hylton | Jun-07 | $ | 9,282.70 |
| 7/10/2007 | C07C1KQ | Hylton | Jun-07 | $ | 48,684.19 |
| 7/10/2007 | C07C1KR | Hylton | Jun-07 | $ | 11,232.70 |
| 7/10/2007 | C07C1KS | Hylton | Jun-07 | $ | 4,732.70 |
| 7/10/2007 | C07C1KJ | Hylton | Jun-07 | $ | 87,773.74 |
| 8/7/2007 | C07C8ZD | Hylton | Jul-07 | $ | 664,902.45 |
| 8/7/2007 | C07C8ZF | Hylton | Jul-07 | $ | 720.00 |
| 8/7/2007 | C07C8ZG | Hylton | Jul-07 | $ | 360.00 |
| 8/7/2007 | C07C8ZH | Hylton | Jul-07 | $ | 3,480.00 |
| 8/7/2007 | C07C8ZJ | Hylton | Jul-07 | $ | 31,639.33 |
| 8/7/2007 | C07C8ZK | Hylton | Jul-07 | $ | 360.00 |
| 8/7/2007 | C07C8ZL | Hylton | Jul-07 | $ | 720.00 |
| 8/7/2007 | C07C8ZM | Hylton | Jul-07 | $ | 42,778.49 |
| 8/7/2007 | C07C8Z9 | Hylton | Jul-07 | $ | 360.00 |
| 8/7/2007 | C07C8ZP | Hylton | Jul-07 | $ | 10,699.00 |
| 8/7/2007 | C07C8ZQ | Hylton | Jul-07 | $ | 720.00 |
| 8/7/2007 | C07C8ZR | Office of the CIO | 7/1/2007-7/31/2007 | $ | 720.00 |
| 8/7/2007 | C07C8ZS | Hylton | Jul-07 | $ | 720.00 |
| 8/7/2007 | C07C8ZT | Hylton | Jul-07 | $ | 3,480.00 |
| 8/7/2007 | C07C8ZV | Hylton | Jul-07 | $ | 10,699.00 |
| 8/7/2007 | C07Z8ZW | Hylton | Jul-07 | $ | 3,480.00 |
| 8/7/2007 | C07C8ZX | Hylton | Jul-07 | $ | 12,103.33 |
| 8/7/2007 | C07C8ZY | Hylton | Jul-07 | $ | 3,480.00 |
| 8/7/2007 | C07C8ZZ | Hylton | Jul-07 | $ | 4,200.00 |
| 10/2/2007 | C07DRPF | Project Shield | 9/1/2007-9/30/2007 | $ | 193,355.44 |
| 10/17/2007 | RS04274 | Maras | 4/1/2006-4/30/2006 | $ | 32,000.00 |

| 6/9/2007 | C07CRN6 | Hylton | May-07 | $ | 7,302.00 |
|---|---|---|---|---|---|
| 10/24/2007 | 10242007 | Hylton | Not specified | $ | 442,323.00 |
| 10/24/2007 | 10242007A | Donelson | Not specified | $ | 545,258.00 |
| 6/9/2007 | C07CRNV | Hylton | May-07 | $ | 37,958.48 |
| 12/19/2007 | C07FDHS | Hylton | Dec-07 | $ | 28,467.50 |
| 12/19/2007 | C07FDHP | Hylton | Dec-07 | $ | 13,135.01 |
| 12/19/2007 | C07FDHY | Hylton | Dec-07 | $ | 1,764.50 |
| 12/19/2007 | C07FDHZ | Hylton | Dec-07 | $ | 1,764.50 |
| 12/19/2007 | C07FDH1 | Hylton | Dec-07 | $ | 1,764.50 |
| 12/19/2007 | C07FDH0 | Hylton | Dec-07 | $ | 882.25 |
| 12/19/2007 | C07FDHQ | Hylton | Dec-07 | $ | 1,764.50 |
| 12/19/2007 | C07FDHR | Hylton | Dec-07 | $ | 882.25 |
| 12/19/2007 | C07FDHT | Hylton | Dec-07 | $ | 882.25 |
| 12/19/2007 | C07FDHV | Hylton | Dec-07 | $ | 1,764.50 |
| 12/19/2007 | C07FDHW | Hylton | Dec-07 | $ | 882.25 |
| 12/19/2007 | C07FDHX | Hylton | Dec-07 | $ | 1,764.50 |
| 1/16/2008 | 1282008A | Hylton | Not specified | $ | 886,675.15 |
| 1/16/2008 | 12282008B | Hylton | Not specified | $ | 251,862.28 |
| 4/7/2008 | IT06867 | Project Shield | Not specified | $ | 13,860.00 |
| 4/7/2008 | IT06865 | Project Shield | Not specified | $ | 19,161.29 |
| 5/16/2008 | 5162008A | Hylton | August-November - no year specified | $ | 168,778.50 |
| 5/16/2008 | 5162008 | Hylton | May, June, July - no year specified | $ | 93,769.50 |
| 7/23/2008 | 7232008 | Hylton | WSC services April, May, June, July August - no year specified | $ | 565,297.56 |
| | **TOTAL PHASE II INVOICES** | | | **$** | **11,422,726.79** |