UNITED STATES OF AMERICA, EX REL.
MICHAEL MCGEE,

        Plaintiff,

v.

IBM CORPORATION; JOHNSON CONTROLS
INCORPORATED; WIRELESS INFORMATION
TECHNOLOGIES ENTERPRISE, LLC;
TECHNOLOGY ALTERNATIVES, INC.;
TECHALT, INC.; PUBLIC SAFETY
COMMUNICATIONS, INC.; SERVICES BY
DESGINWISE, LTD.; LT. SUITE INC.;
DUDLEY DONELSON; RAYMOND M CHIN;
Michael Shares; James Solomon; Peter
Lynch; Byron Artis; Clarence Brownlow;
Catherine Maras O'Leary, n/k/a
Catherine Mara; Daniel Coughlin; and
Antonio Hylton,

        Defendants.

No. 11 C 3482

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Plaintiff-Relator Michael McGee ("McGee") brings this *qui tam* action on behalf of the United States and the State of Illinois. R. 1. McGee alleges that IBM, Johnson Controls Incorporated ("JCI"), Wireless Information Technologies Enterprise ("WIT"), Technology Alternatives Incorporated ("TAI"), TechAlt Incorporated ("TechAlt"), Public Safety Communications ("PSC"), MWOBE Controls, Services By Design ("SBD"), I.T. Suite, Dudley Donelson ("Donelson"), Raymond Chin ("Chin"), Michael Shares, James Solomon, Peter Lynch, Byron Artis,

Clarence Brownlow, Catherine Maras O'Leary, Daniel Coughlin, Juanita Masanek, Paul Masanek, and Antonio Hylton violated the "Presentation of False Records" (Count I), "False Records and Statements" (Count II), and "Conspiracy" (Count III) provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B), and 3729(a)(1)(C), respectively, and the corresponding provisions of the Illinois False Claims Act ("IFCA"), 740 ILCS 175/1, *et seq*. (Counts IV, V, and VI). R. 1.[1] Specifically, McGee alleges that the Defendants colluded to defraud Cook County, the State of Illinois, and the Department of Homeland Security ("DHS") out of approximately $50 million dollars of grant funds in connection with a program called "Project Shield" ("the Project"). R. 1. McGee filed his complaint under seal on May 24, 2011. R. 1. On July 22, 2013, the United States and the State of Illinois declined to intervene in the matter, R. 4, after which the complaint was unsealed. Defendants IBM, JCI and Chin have filed separate motions to dismiss on various grounds. R. 58; R. 62; R. 66. IBM moves to dismiss McGee's complaint on the basis

[1] While 31 U.S.C. § 3729 was amended in 2009, McGee's complaint is not clear as to which version of this statute his complaint relies upon. However, the amendment did not materially alter the relevant portions of the statute on which this Opinion relies and therefore, the Court's analysis is unaffected regardless of which version McGee intended to use. As such, for ease of reference, the Court will refer to the statute throughout this Opinion as it is currently written and numbered.

Count VI is titled "Federal False Claims Act – Conspiracy," but cites to the conspiracy provision of the Illinois False Claims Act, 740 ILCS 175/3(a)(1)(C). R. 1 at 50. Because the complaint already contains a count for conspiracy under the Federal False Claims Act, the Court assumes that the title for Count VI is a typographical error and assumes that Count VI alleges a conspiracy under the Illinois False Claims Act.

In addition, because the standards and resulting analysis for FCA claims are the same as those for IFCA claims, they will be addressed simultaneously as the "FCA" claims. *United States ex rel. Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158, 1163 n.2 (N.D. Ill. 2007).

that it is improper under the public disclosure bar doctrine, that McGee fails to adequately plead his stated causes of action under Federal Rule of Civil Procedure 9(b), and that the FCA statute of limitations bars all claims predating May 24, 2005. R. 58. JCI likewise moves to dismiss McGee's complaint alleging that McGee failed to adequately plead the asserted causes of action under Rule 9(b) and is improper under the public disclosure bar doctrine. R. 62-1. Finally, Chin moves to dismiss McGee's complaint contending that McGee's complaint fails to adequately allege the stated causes of action under Federal Rules of Civil Procedure 8(a) and 9(b). R. 67. For the following reasons, the Court grants JCI's motion to dismiss, grants Chin's motion to dismiss, and denies IBM's motion to dismiss.

## Background

In the aftermath of the terrorist attacks of September 11, 2001, DHS initiated a grant program to provide municipal emergency responder vehicles with interoperable video, voice, and data "mobile platform" systems. R. 1 ¶ 2. The purpose of these mobile platform systems was to enable first responders to instantly relay mission-critical information to a centralized database in the event of a terrorist attack or natural disaster. R. 1 ¶ 2. TAI designed such a mobile platform system and in early 2003 contacted Donelson—the Deputy Director of Wide Area Networks/IT for Cook County—in an effort to convince him to have Cook County apply for a DHS grant in the hopes that TAI's mobile platform system would be used. R. 1 ¶ 42. Donelson agreed to have Cook County apply for a DHS grant on the condition that TAI include PSC, a company in which Donelson had a financial

interest, in any resulting contracts awarded to TAI from the grant. R. 1 ¶ 43. TAI agreed to this condition despite knowing that neither PSC, nor any of its employees, were qualified to do the work that would be required under the contracts, and knowing that TAI and other companies would actually be the ones performing the required work. R. 1 ¶¶ 43, 45.

TAI assisted Donelson in completing the grant application that provided for the exclusive utilization of TAI's equipment. R. 1 ¶ 48. In July of 2003, Cook County was awarded the DHS grant. R. 1 ¶ 49. Thereafter, TAI and Donelson arranged a "Homeland Security Summit," whereby potential prime contractors would learn more about the Project. R. 1 ¶ 50. IBM and several other potential prime contractors were invited and attended the summit. R. 1 ¶ 51. Another purpose of the summit was to convey to the potential contractors that including TAI and PSC as subcontractors in their bids would increase their chance of being awarded a contract. R. 1 ¶ 51. However, TAI, PSC, and Donelson were concerned that PSC's lack of technical expertise could result in a prime contractor's proposal being rejected by the County, so TAI and Donelson recruited WIT, a more established tech company, to join their conspiracy and "front" for PSC in the proposal documents. R. 1 ¶ 53. McGee's allegations do not clearly explain what it meant for WIT to "front" for PSC beyond alleging that WIT agreed to list PSC officers as WIT personnel, and that WIT agreed to subcontract its work to PSC in exchange for kickbacks from PSC's Project billings. R. 1 ¶¶ 53-54.

To memorialize their relationship, TAI, PSC, and WIT entered into a teaming agreement in December of 2003. R. 1 ¶ 58. By its terms, TAI, PSC, and WIT agreed to seek Project work as a team and not to submit competing bids. R. 1 ¶¶ 59-60. The agreement further required the signatories to bid in accordance with the recommendation of the County and to abide by the County's recommendation as to who would act as Project Leader. R. 1 ¶ 63. The agreement contained a nondisclosure clause that required the consent of all signatories prior to the contents of the teaming agreement being disclosed to outside parties. R. 1 ¶ 58. McGee alleges that this agreement was in fact a bid-rigging agreement whereby PSC, TAI, and WIT ensured their participation in the Project through Donelson's influence with the County, and despite PSC's inability to actually perform the work. R. 1 ¶ 61. The agreement was designed to ensure Donelson's own personal enrichment by allowing him to control how the bids would be submitted and who would ultimately be awarded the work. R. 1 ¶ 64.

IBM submitted a bid for Phase I of the Project as a prime contractor. R. 1 ¶ 52. It is unclear whether IBM's proposal simply included TAI and PSC as subcontractors, or whether the proposal listed TAI and WIT as subcontractors, and listed PSC personnel as WIT personnel. *Compare* R. 1 ¶¶ 52, 53, 54, 67. In any case, McGee alleges that IBM agreed to abide by the terms of the teaming agreement. R. 1 ¶ 66. In its proposal, IBM stated that TAI's mobile platform was a "Proven Solution," despite knowing that this was not the case and that the platforms required significant work prior to becoming operational. R. 1 ¶ 67.

IBM was awarded the prime contract for Phase I of the Project. R. 1 ¶ 68. In signing the contract, IBM warranted that it would supervise all work performed, act consistently with the obligations included in the contract, that the subcontractors used by IBM were competent to perform their respective duties, and that it did not have any conflict of interest that could affect the performance of the work required by the contract. R. 1 ¶¶ 71, 74. IBM made these representations even though it had agreed to the terms of the teaming agreement, knew that PSC was not qualified to do the work required by the contract, hid PSC's involvement within its proposal, and knew about the conflict of interest inherent in the teaming agreement and did not disclose it. R. 1 ¶¶ 72, 75.

In furtherance of their agreement, in September 2004, IBM entered into a subcontract agreement with TAI whereby TAI agreed to supply, install, and maintain its mobile platform for Phase I of the Project. R. 1 ¶¶ 70, 78.[2] Despite knowing that the mobile platforms were not functioning properly, TAI installed 47 platforms into municipal vehicles. R. 1 ¶ 79. In September 2005, IBM conducted a survey of 46 of the installed platforms. Only 17 were functional. R. 1 ¶ 80. Despite its awareness of the functionality problems, and the fact that TAI had installed only 47 of the 80 platforms contracted for, IBM accepted TAI's work and paid them 99% of their total contract price. R. 1 ¶¶ 88-89. IBM was paying TAI for work that it had not performed and for non-functional platforms. R. 1 ¶ 90. IBM passed these

[2] The cited paragraph of the complaint refers to TechAlt, not TAI. R. 1 ¶ 70. For ease of reference and because TechAlt and TAI are essentially the same entity for purposes of this litigation, R. 1 ¶ 22, all references to TechAlt or TAI will be to "TAI."

fraudulent costs along to the County for repayment. R. 1 ¶ 91. IBM's bills were usually submitted to Donelson, who, knowing the bills to be false, would submit them to the County for repayment, representing that the bills conformed to the contract's specifications. R. 1 ¶ 92.

Due to TAI's inability to deliver functioning platforms, McGee's company, Responder Systems, LLC, ("Responder") was asked to acquire TAI's Project-related assets and take over TAI's role in the Project. R. 1 ¶ 100. Responder did so in the Fall of 2005. R. 1 ¶ 101. Shortly thereafter, Donelson invited McGee to meet the President of PSC. R. 1 ¶ 102. During this meeting, Donelson asked McGee to join "the team," which McGee alleges meant the bid-rigging team discussed above. R. 1 ¶ 105. If McGee accepted Donelson's invitation, Donelson would use his position with the County to promote McGee's company for other County projects. R. 1 ¶ 105. McGee relayed these events to IBM manager Harold Stiffler ("Stiffler"). R. 1 ¶ 106. Several months later, Donelson again attempted to convince McGee to join "the team," explaining that McGee's refusal could result in his company not being considered for future work on the Project. R. 1 ¶ 107. McGee declined to join with Donelson and the other conspirators. R. 1 ¶ 108.

Despite these interactions, McGee's company provided its services during the tail-end of Phase I of the Project. Responder was able to fix the existing non-functioning units and install additional functioning units, leaving the County with 78 functioning platforms that met or exceeded the County's requirements. R. 1 ¶ 109. However, paying Responder for this work became difficult for IBM. The

contract contained specific line items, providing a specific amount of funds for a specific type of work. R. 1 ¶¶ 117-18. IBM had already paid almost the entirety of the contract funds to TAI for installation of the platforms despite TAI's failure to successfully complete this work. In order to pay Responder Systems for the same work, IBM would have to submit a Project Change Request to the government to increase the installation line item values. R. 1 ¶ 117. IBM was concerned that these change requests would alert the government to the defectiveness of TAI's prior work. R. 1 ¶ 117. To obtain repayment from the government for Responder's installation work, IBM, with the consent of Donelson, submitted bills to the government claiming reimbursement for work included in other line items such as "maintenance." This was done knowing that the funds would actually be used to pay for installation work that was not properly covered by a maintenance line item. R. 1 ¶ 118. Donelson verified the accuracy of these bills to the County in furtherance of the fraud. R. 1 ¶¶ 119, 122.

McGee also alleges that IBM paid PSC in advance for work that IBM knew PSC was not qualified to perform. R. 1 ¶ 124. As a result, IBM had to subcontract with another entity to perform the same work that PSC had already been paid to perform. R. 1 ¶ 125. IBM billed the government both for the money paid to PSC and for the money paid to the second subcontractor despite the fact that it was for the exact same work. R. 1 ¶¶ 124-25. At some point, IBM manager Stiffler began diverting work away from PSC due to its demonstrated incompetence. IBM removed Stiffler from the Project as a result. R. 1 ¶ 77.

McGee further alleges that PSC billed IBM for the installation of cameras and other equipment outside of the Stroger Battered Women's Shelter. R. 1 ¶ 130. This work was not within the contract's scope of work and IBM denied payment. R. 1 ¶ 130. However, Donelson intervened and ultimately caused IBM to pay PSC $125,000 for this work, which IBM then charged to the government. R. 1 ¶ 130. In addition to billing for defective, duplicative, and uncontracted for services, McGee alleges that IBM fraudulently reported that work was being performed by minority business or women business enterprises, as required by the contract, when the work was being performed by TAI, before being replaced by Responder, or companies that were not truly minority or women owned. R. 1 ¶¶ 144-51.

Despite Responder's success in providing functional platforms in Phase I, Donelson announced that for Phase II, the County was seeking a new design for the mobile installations and a new video recording system. R. 1 ¶ 110. PSC submitted a bid touting a new mobile platform design. R. 1 ¶ 111. IBM knew that any proposed design by PSC was likely to be unusable. IBM employee Stiffler admitted to McGee that PSC was not capable of getting their own stationary building cameras to work, let alone developing a new mobile platform. R. 1 ¶ 112. Nevertheless, IBM signed a letter of intent in November 2005, committing to subcontracting the Project's Phase II redesign and installation work to PSC. R. 1 ¶ 115. Knowing it to be false, Donelson represented to the Cook County Board that IBM's proposal, which was based on PSC's new design, met all system requirements, inducing the Board to approve IBM's Phase II contract. R. 1 ¶ 137.

PSC's method for developing the Phase II platform was to attempt to reverse engineer Responder's Phase I platform. R. 1 ¶ 138. PSC was unsuccessful in doing so. R. 1 ¶ 138. Ultimately, the Phase II platforms suffered from numerous problems that rendered them non-functional. R. 1 ¶ 140. IBM asked Responder to fix the platforms. R. 1 ¶ 142. Responder declined after surveying the equipment and having determined that no amount of effort would render the Phase II design functional. R. 1 ¶ 142.

The Phase III request for proposal was released in early 2008. R. 1 ¶ 155. Despite the equipment failures in Phase II, Donelson directed that the same hardware configuration be used for Phase III. R. 1 ¶ 156. Donelson did this to ensure that the same personnel who worked on Phase II would work on Phase III. R. 1 ¶ 156. However, the software utilized in Phase II was prohibited in the RFP, which called for the development of new software. R. 1 ¶ 157. IBM did not bid on Phase III of the Project and was not involved in any way with the Project after the completion of Phase II. R. 1 ¶ 158.

Responder met with JCI in February of 2008 knowing that JCI planned to bid on Phase III of the contract. R. 1 ¶ 161. At the meeting, JCI conveyed its confidence that it would receive the Phase III contract due to its relationship with a minority contractor, who McGee understood to mean PSC. R. 1 ¶ 161. McGee told JCI of the problems during Phase I and II due to PSC's involvement. R. 1 ¶ 161. Ultimately, JCI won the award for the Phase III contract. R. 1 ¶ 162. Several months later, McGee contacted JCI to ask whether it could be given work on the

Phase III contract. R. 1 ¶ 162. JCI told McGee that personnel who worked on Phase I or II of the Project were prohibited from working on Phase III. R. 1 ¶ 162. McGee responded that he was aware that PSC-associated personnel were working on Phase III of the Project. R. 1 ¶ 162. The JCI employee with whom McGee was speaking responded that JCI hired who the County told them to hire. R. 1 ¶ 162.

Originally, the purpose of Phase III was to expand the Project to provide mobile platform systems to municipalities not included in Phases I and II. R. 1 ¶ 163. However, the scope of Phase III was revised to include fixing the non-functional platforms from Phases I and II. R. 1 ¶ 165. Ultimately, JCI was unable to fix the Phase I platforms due to its insistence on using incompetent personnel designated by Donelson. R. 1 ¶ 165. JCI was also unable to render the platforms from Phase II functional. R. 1 ¶ 165. Ultimately, Phase III was not completed as contracted for. R. 1 ¶ 164. Regardless, JCI continually submitted invoices to the government that falsely certified that the work being performed was in accordance with the contract specifications and federal regulations. R. 1 ¶ 180.

McGee also generally alleges that throughout the Project the State of Illinois and Cook County were required to submit Biannual Strategy Implementation Reports that incorporated false information provided by the alleged conspirators. R. 1 ¶ 174. McGee alleges that the conspirators misrepresented the progress of the Project on each of these reports. R. 1 ¶ 174. By virtue of these acts, and the acts listed above, McGee alleges that all of the named Defendants conspired to, and did, violate the FCA and the IWRPA. R. 1 ¶¶ 181-198.

## Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction. "The standard of review for a Rule 12(b)(1) motion to dismiss depends on the purpose of the motion." *Bolden v. Wells Fargo Bank, N.A.*, 2014 WL 6461690, at *2 (N.D. Ill. Nov. 18, 2014) (citing *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009)). "If a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction (a facial challenge), the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Bolden*, 2014 WL 6461690, at *2 (citing *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003)). A factual challenge to the court's subject matter jurisdiction, on the other hand, is based on the assertion that "the complaint is formally sufficient but . . . there is *in fact* no subject matter jurisdiction." *United Phosphorus,* 322 F.3d at 946 (emphasis in original). When considering a factual challenge to the court's jurisdiction, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Evers v. Astrue*, 536 F.3d 651, 656-57 (7th Cir. 2008) (quoting *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007)). "Where jurisdiction is in question, the party asserting a right to a federal forum has the burden of proof, regardless of who raised the jurisdictional challenge." *Craig v. Ontario Corp.*, 543 F.3d 872, 876 (7th Cir. 2008).

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g.,*

*Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th

Cir. 2009). A complaint must provide "a short and plain statement of the claim

showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to

provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 555 (2007). This "standard demands more than an

unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels

and conclusions, and a formulaic recitation of the elements of a cause of action will

not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual

matter**,** accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged.'"

*Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In

applying this standard, the Court accepts all well-pleaded facts as true and draws

all reasonable inferences in favor of the non-moving party. *Id.*

It is well-established that the FCA "is an anti-fraud statute and claims under

it are subject to the heightened pleading requirements of Rule 9(b)." *Thulin v.*

*Shopko Stores Operating Co., LLC*, 771 F.3d 994, 998 (7th Cir. 2014). Rule 9(b)

requires a "plaintiff to do more than the usual investigation before filing [a]

complaint. Greater precomplaint investigation is warranted in fraud cases because

public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual)." *Ackerman v. Nw. Mut. Life Ins. Co.,* 172 F.3d 467, 469 (7th Cir. 1999) (citations omitted). A complaint generally "must provide the who, what, when, where and how" of the alleged fraud. *United States ex rel. Fowler v. Caremark RX, LLC*, 496 F.3d at 730, 740 (7th Cir. 2007) (quotations and citations omitted).

### Analysis

The FCA, and the equivalent sections of the IFCA, generally prohibit the submission of false or fraudulent claims for payment to the government. *See* 31 U.S.C. § 3729(a); 740 ILCS 175/3(a)(1)(A). Specifically, these statutes prohibit knowingly presenting, or causing to be presented, a false or fraudulent claim for payment, and knowingly making or using a false record or statement that is material to a false or fraudulent claim paid by the government. *See* 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B); 740 ILCS 175/3(a)(1)(A), 175/3(a)(1)(B). The statutes also make it unlawful for persons to conspire to commit a substantive violation of the FCA or the IFCA. *See* 31 U.S.C. § 3729(a)(1)(C); 175/3(a)(1)(C).

The FCA permits private citizens, or "relators," to file a civil action on behalf of the government to recover money that the government paid on account of the false or fraudulent claims. 31 U.S.C. § 3730(b)(1). These actions are referred to as *qui tam* actions. *United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011). "To establish civil liability under the [FCA], a relator generally must prove (1) that the defendant made a statement in order to receive

money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *Id.* (citing *Gross*, 415 F.3d at 604). As previously stated, the standards and resulting analysis for FCA claims are the same as those for IFCA claims. *Kennedy*, 512 F. Supp. 2d at 1163 n.2. Therefore, they will be addressed simultaneously as the "FCA" claims.

## I.  Statute of Limitations

The FCA provides that a civil action may not be brought:

> (1) more than 6 years after the date on which the violation of section 3729 is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in  no event more than 10 years after the date on which the violation is committed, whichever occurs last.

31 U.S.C. § 3731(b). The IFCA contains an almost identical provision. *See* 740 ILCS 175/5(b). IBM argues that this statute precludes any claims prior to May 24, 2005. McGee counters that (1) a statute of limitations defense is not properly brought as a motion to dismiss, (2) the Wartime Suspension of Limitations Act tolls the FCA statute of limitations, (3) he is subject to the 10-year statute of limitations as opposed to the 6-year statute of limitations, and (4) allegations relating to conduct that led to a false claim remain inchoate until a claim for payment is made, making all of his allegations timely. R. 99-1 ¶¶ 50-53.

Under Federal Rule of Civil Procedure 8(c)(1), a statute of limitations argument is an affirmative defense, not an attack against the sufficiency of the pleadings. "Dismissing a claim as untimely at the pleading state is an 'unusual step,

since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations.'" *Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 815 (N.D. Ill. 2013) (quoting *Cancer Found., Inc. v. Ceberus Capital Mgmt., LP,* 559 F.3d 671, 674 (7th Cir. 2009)). Because McGee alleges an ongoing fraudulent scheme involving different theories of FCA liability that began prior to and continued after May 24, 2005, the Court declines at this juncture to make a determination as to whether any of McGee's claims against IBM are barred by the statute of limitations. *See id*. IBM's motion to dismiss claims that predate May 24, 2005 is denied.

## II. Public Disclosure Bar

Both IBM and JCI argue that the public disclosure bar requires dismissal of McGee's *qui tam* suit. The parties dispute, however, whether the public disclosure bar is a jurisdictional issue properly addressed under Rule 12(b)(1) or a substantive issue properly addressed under Rule 12(b)(6). The question stems from a 2010 amendment to the FCA that changed the statute's language from "no court shall have jurisdiction" to "[t]he court shall dismiss an action or claim under this section." *See United States ex rel. Cause of Action v. Chi. Transit Auth.*, 2014 WL 5333399, at *2 (N.D. Ill. Oct. 20, 2014) (citing § 3730(e)(4)(A)). While the pre-amendment language was clearly jurisdictional, the Seventh Circuit has questioned whether the post-amendment language should be treated as jurisdictional. *See U.S. ex rel. Absher v. Momence Meadows Nursing Center, Inc.*, 764 F.3d 699, 706 (7th Cir. 2014). The 2010 amendment was not retroactive. Because the events giving rise to

the present cause of action occurred prior to 2010, the Court finds that the pre-amendment language applies to this case. *See Cause of Action*, 2014 WL 5333399, at *2 n.2 ("Because the 2010 amendments are not retroactive, the applicable version of § 3730(e)(4) is the one that was 'in force when the events underlying th[e] suit took place.'" (quoting *Leveski v. ITT Educ.. Servs.*, 719 F.3d 818, 828 (7th Cir. 2013)). This is so even though McGee filed his complaint after the enactment of the 2010 amendment. *See Cause of Action*, 2014 WL 5333399, at *2. Therefore, the Court will analyze IBM's and JCI's public-disclosure-bar argument pursuant to Rule 12(b)(1).[3]

Turning to the substance of the argument, the public disclosure bar requires dismissal of a *qui tam* action under Rule 12(b)(1) "when the relator's action is 'based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [sic] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.'" *Glaser*, 570 F.3d at 913 (quoting 31 U.S.C. § 3730(e)(4)(A)); *see also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007). Congress enacted the public disclosure bar to "deter parasitic *qui tam*

---

[3] Even if the Court had concluded that the post-2010 FCA language applied, and that this language rendered the public disclosure bar substantive rather than jurisdictional, it would have mattered little. The Court would not have been permitted to consider the allegations contained in McGee's responsive brief and declaration, and would therefore have likely found that the public disclosure bar prohibited this action as to IBM. However, the Court would have dismissed the action as to IBM without prejudice, and allowed McGee to amend his complaint to either add the allegations contained in his declaration or simply attach the declaration to the complaint, eliminating the deficiencies highlighted below. The Court's ruling as to JCI would not have changed.

actions," *United States ex rel. Gear v. Emergency Med. Assoc. of Ill., Inc.*, 436 F.3d 726, 728 (7th Cir. 2006), which are lawsuits filed by "self-serving opportunists, who do not possess their own insider information, [who will try] to get in on the action . . . when the allegations have already been publicly disclosed and the insiders have nothing new to add," *Glaser*, 570 F.3d at 915. Once a public disclosure is made, the value of a *qui tam* action is lost as the government is aware of the potential of a false claim and can take responsive action itself. *See United States ex rel. Feingold v. AdminaStar Fed., Inc.,* 324 F.3d 492, 495 (7th Cir. 2003). Under the public disclosure bar, "once information becomes public, only the Attorney General and a relator who is an 'original source' of the information may represent the United States." *Glaser*, 570 F.3d at 913. The plaintiff bears the burden of establishing the inapplicability of the public disclosure bar doctrine. *Id.*

To determine whether the public disclosure bar strips the court of jurisdiction, the court is required to engage in a three-step analysis. *United States ex rel. Heath v. Wis. Bell*, 760 F.3d 688, 690 (7th Cir. 2014). First, the court must determine whether the relator's allegations were "publicly disclosed" before the filing of the lawsuit. *Glaser*, 570 F.3d at 913. If the Court determines that they were, the court must next decide "whether the [relator's] lawsuit is 'based upon' those [previously] publicly disclosed allegations." *Id.* If the Court determines that it is, then the public disclosure bar prohibits the relator's suit unless the relator can establish that he "is an 'original source' of the information upon which his lawsuit is based." *Id.* To establish that he is an original source, a plaintiff must establish that

he "'has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an [FCA] action.'" *Leveski*, 719 F.3d at 828-29 (quoting § 3730(3)(4)(B)).[4]

## A.  Whether McGee's Allegations Have Been Publicly Disclosed

IBM and JCI assert that the allegations comprising McGee's claims were previously publicly disclosed through news media and through a federal audit. R. at 7; R. 62-1 at 13-15. McGee does not contest this assertion and thereby waives any argument to the contrary. *Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 466 (7th Cir. 2010). As such, the Court finds that the first prong of the public disclosure bar is met.

## B.  Whether McGee's Complaint Is Based Upon Previously Publicly Disclosed Allegations

If a *qui tam* complaint is based on previously publicly disclosed allegations, it is generally barred unless the relator can establish that he is an original source. The Seventh Circuit has "interpreted the phrase 'based upon [a] public disclosure' to mean 'substantially similar' to publicly disclosed allegations [or transactions].'" *Heath*, 760 F.3d at 691 (quoting *Leveski*, 719 F.3d at 828). However, "'based upon' does not mean 'solely based upon,' for a *qui tam* action even partly based upon publicly disclosed allegations or transactions is nonetheless 'based upon' such

---

[4] The 2010 amendment to § 3730(e)(4) of the FCA also altered the definition of "original source." However, as previously stated, the 2010 amendment to the FCA was not retroactive. Therefore, because the allegations underlying this suit occurred prior to the 2010 amendment, the Court relies upon the pre-2010 FCA definition of "original source." *Leveski*, 719 F.3d at 828.

allegations or transactions." *Heath*, 760 F.3d at 691 (quoting *Glaser*, 570 F.3d at 920). To demonstrate that its claims are not based upon already publicly disclosed allegations, a plaintiff must do more than "add[] extra details" or "additional instances" of false claims. *Heath*, 760 F.3d at 691 (citing *Glaser*, 570 F.3d at 920-21). To determine whether the plaintiff has met this burden, a court must engage in a highly fact-specific comparison of the previously publicly disclosed allegations and the plaintiff's complaint. *See Leveski*, 719 F.3d at 829; *Heath*, 760 F.3d 691; *Glaser*, 570 F.3d at 920-21. Some of the factors used to determine whether a relator's allegations are substantially similar to those already publicly disclosed are: (1) whether the time periods for the allegations or transactions overlap; (2) whether the relator has first-hand knowledge of the allegations; (3) whether the allegations are similar or involve different schemes such that independent investigation and analysis was required; and (4) whether the relator presents genuinely new and material information than that previously disclosed. *Leveski*, 719 F.3d at 829-33; *Heath*, 760 F.3d at 691-92.

### 1. IBM

IBM argues that the allegations comprising McGee's present suit are identical to those previously disclosed through news coverage of the Project. R. 58-1 at 8. McGee disagrees. R. 99-1 at 13-17. Because the Court ultimately finds that McGee is an original source with regard to IBM, it declines to address the "based upon" prong of the public disclosure bar doctrine as to IBM.

## 2.   JCI

Turning to JCI, the Court concludes that McGee has failed to offer competent proof rebutting JCI's assertion that McGee's allegations are substantially similar to those previously publicly disclosed. McGee generally alleges that JCI took over IBM's role as prime contractor in the scheme to defraud the County, and ultimately DHS, by violating the FCA. R. 1. This allegation is substantially similar to previously publicly disclosed allegations. The news articles appended to JCI's memorandum as Exhibits D, J, and K, discuss JCI taking over IBM's prime contract role and the continuing issues the County faced throughout the pendency of the Project.[5] R. 62-1. These articles discuss the same general scheme and the same general issues experienced by the municipalities after JCI became the prime contractor for the Project. *See* R. 62-5; R. 62-11; R. 62-12. For example, the articles state that after JCI became prime contractor, many of the installed platforms were nonfunctional. *See* R. 62-5; R. 62-11; R. 62-12. A 2010 article states that quality assurance reports spanning August 2008 to 2010 indicated that only 60% of the installed platforms were fully functional. *See* R. 62-12. The article goes on to describe how the Project was behind schedule and over budget. *See* R. 62-12. Ultimately, McGee's general averment that JCI took over IBM's role in the fraudulent scheme does not exhibit any indicia of first-hand knowledge, nor does it

---

[5] For the reasons discussed below, the Court concludes that JCI's jurisdictional challenge is factual rather than facial. As such, the Court may properly consider evidence beyond the complaint. *Apex*, 572 F.3d at 443-44.

disclose any new material information. This allegation is substantially similar to those that were previously publicly disclosed.

McGee specifically alleges that JCI bragged that it had a relationship with an influential contractor and was likely to receive the award for the Phase III contract as a result. R. 1 ¶ 161. McGee also alleges that JCI told him that they hired who the County told them to hire. R. 1 ¶ 162. McGee alleges that these statements were made directly to him, evidencing first-hand knowledge. However, these allegations do not appear to be significant. On their face, they do not allege any unlawful conduct. They do not substantiate an allegation of an FCA violation. They do not add any material information to the allegations previously publicly disclosed. These allegations are substantially similar to those previously publicly disclosed.

Finally, McGee alleges that JCI did not successfully complete Phase III of the Project. R. 1 ¶ 164. However, there were numerous news articles published prior to McGee's complaint being filed that reported on the lack of success of the Project after JCI became prime contractor. *See* R. 62-5; R. 62-11; R. 62-12. A 2010 article stated that quality assurance reports spanning August 2008 to 2010 indicated that only 60% of the installed platforms were fully functional. *See* R. 62-12. The article stated that the Project was behind schedule and over budget. *See* R. 62-12. Furthermore, the allegation that JCI did not successfully complete Phase III of the Project does not substantiate an FCA violation, nor does it indicate any unlawful activity. Ultimately, this allegation does not add anything that materially alters or adds to the allegations that had previously been publicly disclosed. Since McGee's

allegations against JCI are all based upon previously publicly disclosed information, unless the Court determines that McGee is an original source with regard to the allegations against JCI, the public disclosure bar will require dismissal of McGee's claims against JCI.

### C.     Whether McGee Is An Original Source

"The original-source exception permits jurisdiction over an FCA action *even if* the relator's lawsuit is based upon publicly disclosed information *provided* that the relator is 'an original source of the information.'" *Glaser*, 570 F.3d at 916 (quoting 3730(e)(4)(A)) (emphasis in original). The pre-2010 FCA defined "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an [FCA] action." *Leveski*, 719 F.3d at 828-29 (quoting § 3730(e)(4)(B)) (internal quotation marks omitted). Accordingly, relators have the burden of showing that they have "(1) direct knowledge of fraudulent activity; (2) independent knowledge of fraudulent activity; and (3) voluntarily provided their information to the government before filing a qui tam action." *Glaser*, 570 F.3d at 917.

"Direct" knowledge is that which is "based on [a relator's] own investigative efforts and *not* derived from the knowledge of others." *Id*. (emphasis in original). For a relator to establish that it has "independent" knowledge, the relator must be "someone who would have learned of the allegation or transactions independently of the public disclosure." *Id*. at 921. However, "potential relators rarely will have

direct and independent knowledge of all essential elements in an FCA action." *U.S. ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971, 982 (E.D. Wis. 1998), *aff'd*, 168 F.3d 1013 (7th Cir. 1999). As such, while "[o]riginal sources should be independently aware of some essential piece of information, [they] need not have direct knowledge of *all* of the vital ingredients in a fraudulent transaction." *Id.* (emphasis in original).

McGee's response brief asserts that he is an original source of the information on which his complaint is based. R. 99-1 at 17. His complaint, however, is silent as to his status as an original source. Indeed, his complaint is devoid of any allegations pertaining to the public disclosure bar. However, this silence is not fatal as a plaintiff is not required to preemptively plead against possible defenses. That being said, because the Defendants have raised this jurisdictional argument, the burden is now on McGee to provide competent proof establishing the Court's subject matter jurisdiction over this case. McGee attempts to do so through evidence attached to his briefs.

### 1.     IBM

IBM does not contradict the factual assertions McGee makes to support his conclusion that he is an original source. Rather, IBM argues that McGee improperly uses his responsive pleadings to respond to Defendants' argument. The Court concludes that Defendants' public disclosure bar argument is jurisdictional and made pursuant to Rule 12(b)(1). The Court further concludes that Defendants' jurisdictional attack is factual rather than facial. This is so because Defendants do

not attack McGee's standing as a relator based on the insufficiency of the allegations in McGee's complaint. Rather, Defendants argue that external facts (the prior public disclosures) strip the Court of jurisdiction. *See Apex*, 572 F.3d at 443-44. As discussed previously, when analyzing a factual 12(b)(1) argument, the Court may consider evidence beyond the pleadings in order to determine whether it has subject matter jurisdiction. *Id*. The Court rejects IBM's argument that McGee improperly used his responsive pleadings to support his contention that he has standing to bring this action, and considers the evidence offered through McGee's declaration.

The Court finds that McGee has offered competent proof through his declaration that he has both direct and independent knowledge of the allegations lodged against IBM, and that he disclosed this knowledge to government officials prior to filing the instant suit. *See* R. 99-1 at 64-77. McGee states that he became personally involved in the Project in September 2005 when his company was solicited and ultimately hired as a subcontractor to fix the platform's functionality issues. R. 99-1 at 66-68 (¶¶ 4-5). Through Responder's role as a subcontractor, McGee personally participated in meetings with IBM, other subcontractors, and County officials. R. 99-1 at 66-68 (¶¶ 4-5). McGee also personally participated in fixing the previously installed platforms. R. 99-1 at 66-68 (¶ 5). In late 2005, Responder acquired TAI's assets including Project-related documents, invoices, internal memoranda, and correspondence among the Defendants. R. 99-1 at 68 (¶ 6). McGee had access to these documents and reviewed them. McGee states that he

and his company remained involved in the Project through Phase II. R. 99-1 at 68-69 (¶ 8). These assertions adequately demonstrate that McGee gained direct and independent knowledge of the allegations contained in his complaint regarding IBM. These assertions are in addition to the allegations contained in McGee's complaint that also indicate direct and independent knowledge of the information contained therein, such as the allegations regarding IBM's fraudulent invoicing and the conversations McGee had with IBM employee Stiffler, among others. R. 1 ¶¶ 90-91, 106, 111-12. Furthermore, McGee offers competent proof that he disclosed the information he obtained through his work on the Project to government officials prior to filing this action. R. 99-1 at 72-75 (¶¶ 12-20). Specifically, McGee provides approximate dates when he met with government officials, the names of who he met with, and the general information he disclosed during those meetings. R. 99-1 at 72-75 (¶¶ 12-20). Accordingly, the public disclosure bar is not a basis to dismiss McGee's claims against IBM.

### 2.    JCI

Turning to JCI, the Court finds that McGee has not offered competent proof that he is an original source with regard to the allegations against JCI. McGee has not offered proof that he disclosed any fraud on behalf of JCI to government officials prior to filing this action. McGee's declaration does not contain any statements to this effect. JCI was not involved with the Project until the spring of 2008. McGee generally asserts that he met with government officials through 2008 but does not specifically state when any of those meetings took place. Most importantly, McGee

does not allege that JCI was the subject of any of these meetings. R. 99-1 at 23; R. 99-1 at 74 (¶ 19). As such, the Court concludes that McGee has not adequately established his status as an original source with regard to JCI and as such, the public disclosure bar removes this Court's subject matter jurisdiction to hear this matter with regard to JCI. For this reason, McGee's claims against JCI are dismissed.

## III. Rule 9(b)

### A. JCI

Alternatively, McGee's claims against JCI are dismissed for failure to plead the claims with the particularity required by Federal Rule of Civil Procedure 9(b).[6] McGee argues that he has adequately alleged FCA violations under four theories: (1) falsely inducing the government to enter into a contract; (2) participating in a bid-rigging scheme; (3) submitting false documents; and (4) rendering worthless services. R. 99-1 at 44. Each of these theories fails.

#### 1. False Inducement

Courts in this district have recognized false inducement as a basis for alleging an FCA violation. *U.S. ex rel. Danielides v. Northrop Grumman Sys. Corp.,* 2014 WL 5420271, at *5 (N.D. Ill. Oct. 23, 2014). A cause of action exists if a

---

[6] While the Court dismisses this action against JCI for failure to adequately establish subject matter jurisdiction, the Court does so without prejudice. *See Frederiksen v. City of Lockport*, 384 F.3d 437, 438-39 (7th Cir. 2004). In the interests of judicial economy, should McGee file an amended complaint attempting to cure the public disclosure bar deficiencies, the Court provides this substantive analysis of JCI's Rule 9(b) motion so that those deficiencies may be addressed in the event an amended complaint is filed.

contractor makes a false statement to induce a government entity to award a grant or contract to that contractor, and which is awarded based on this false statement. All resulting requests for payment are then fraudulent because they are based on the original false statement. *Id*. at *6 (citing *United States ex rel. Main v. Oakland City Univ.,* 426 F.3d 914, 916 (7th Cir. 2005)). The court in *Danielides* ultimately found that the plaintiff had adequately alleged false inducement, citing various allegations that supported its finding. *Id*. at *6 n.6. A few examples of these allegations included promising the government "to do work that it never intended to do" and "promising to do so, [but] never intend[ing] to provide its best efforts in performing the contract and fraudulently inducing the government to enter into the . . . contract." *Id*.

The Court has reviewed McGee's complaint and is unable to find any allegations that JCI promised the government that it would do something that it never intended to do, which in turn, induced the government to award JCI the Phase III contract. Indeed, the complaint is devoid of any allegation that JCI ever made any promise to the government. Perhaps JCI made promises, but they have not been alleged.

Furthermore, McGee's response to JCI's motion to dismiss is noticeably bare of argument in support of its false inducement claim. R. 99-1 at 44. McGee relies solely on the following two allegations to support his fraudulent inducement theory: (1) that someone from JCI anticipated obtaining the Phase III contract due to its South Holland connections, which McGee argues must mean Donelson; and (2) that

after JCI was awarded the contract, someone from JCI told McGee that JCI only hires the subcontractors that the County tells them to hire. R. 99-1 at 44. However, these allegations simply do not allege anything that would allow the Court to infer that JCI made any promise, fraudulent or otherwise, to the government in order to induce an award. Specifically, to the extent that those statements even relate to a fraudulent inducement FCA claim, McGee does not say who made them, what was false or misleading about the statements, or how these statements induced the government to award a contract to JCI. As such, McGee's fraudulent inducement FCA claim does not satisfy the pleading standards espoused in Rule 8(a), let alone the heightened pleading standards required by Rule 9(b), including the "who, what, when, where, and how of the alleged fraud." *Danielides*, 2014 WL 5420271, at *7 (citing *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 948 (7th Cir. 2013)). Therefore, McGee has failed to state a claim under the FCA based on fraudulent inducement.

### 2.    Bid-rigging

Likewise, the Seventh Circuit has recognized bid-rigging as a basis for an FCA violation. *See United States v. Azzarelli Const. Co.,* 647 F.2d 757 (7th Cir. 1981). To adequately plead a bid-rigging claim, a plaintiff must allege an agreement between two or more people to restrain competition for a contract that is to be awarded on the basis of competitive bidding. *See id.* McGee argues that the following allegations are sufficient to maintain a bid-rigging FCA claim: that JCI told McGee that it would only hire subcontractors designated by Donelson, R. 1 ¶

160, that it would "hire who the County tells us to hire," R. 1 ¶ 162, and that "JCI agreed to use the incompetent personnel designated by Donelson for all mobile platform maintenance," R. 1 ¶ 165. R. 99-1 at 44. The Court disagrees.

Again, the Court questions whether these statements in and of themselves are necessarily indicative of fraud. Perhaps the County required control over which subcontractors were hired to perform on the contract. By itself, that is not illegal. But more importantly, what is noticeably lacking from McGee's bid-rigging FCA claim is any discussion of JCI's knowing involvement in a bid-rigging scheme. Specifically, McGee has not alleged that the subcontracts for Phase III were to be competitively bid, or that the subcontracts were not in fact competitively bid. McGee's complaint does not make any allegation with regard to requests for proposals, bids submitted, or subcontracts actually awarded for Phase III of the contract. Where there is no bidding, there can be no bid-rigging. McGee attempts to bootstrap its bid-rigging allegations that occurred prior to JCI's involvement in the Project and apply them with equal force to JCI. R. 99-1 at 48. However, arguing in a response to a motion to dismiss that JCI engaged in the same bid-rigging activity as its predecessors in the contract without specifically alleging this conduct in the complaint is insufficient under Rule 9(b) and impermissible under Rule 12(b)(6). *See Wright v. Assoc. Ins. Comps. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (Court's review is limited to the pleadings on a Rule 12(b)(6) motion). As such, McGee fails to adequately plead a bid-rigging FCA cause of action under Rules 8(a) and 9(b).

### 3.    Submitting False Documents

McGee's FCA claim alleging submission of false documents also fails under the heightened pleadings standards of 9(b). Notably, McGee's response to JCI's motion to dismiss does not argue that the complaint contains any allegations regarding specific invoices submitted by JCI. *See* R. 99-1. Rather, McGee relies on his fraudulent inducement and bid-rigging theories as to why every invoice submitted by JCI must necessarily be false. The Court has found that McGee has not adequately alleged a fraudulent inducement or bid-rigging FCA claim. Therefore, to the extent McGee's false documents FCA claim is based on his fraudulent inducement and bid-rigging claims, he has failed to state a claim.

To the extent that McGee maintains that he has adequately pled a false documents claim, *see* R. 99-1 at 27-28, he mistakenly relies on *United States ex rel. Lusby v. Rolls-Royce Corp*, 570 F.3d 849 (7th Cir. 2009). In *Lusby*, the complaint was devoid of references to specific fraudulent invoices. It did allege that the contracts required that the engine parts contracted for "meet particular specifications; that the parts did not do so (and the complaint describes tests said to prove this deficiency); that Rolls-Royce knew that the parts were non-compliant (not only because Lusby told his supervisors this but also because audits…confirmed Lusby's conclusions); and that Rolls-Royce nonetheless certified that the parts met the contracts' specifications." *Lusby,* 570 F.3d at 853-54. "The complaint names specific parts shipped on specific dates, and it relates the details of payment." *Id.* at 854. The court in *Lusby* also referenced the specific certification required to

accompany each request for payment. *Id.* Based on these allegations, the court held that Lusby had adequately pled an FCA claim even though he could not produce the invoices themselves at that stage of the litigation. *Id.* The allegations in McGee's complaint fall far short of the specificity described in *Lusby*. McGee's detailed allegations regarding the IBM invoices highlight this inadequacy as to JCI.

Finally, the Court rejects McGee's argument that he has adequately pled the false documents claim in the form of the Biannual Strategy Implementation Reports ('BSIR"). R. 99-1 at 44. McGee's complaint broadly alleges that "[i]n each BSIR . . . the conspirators falsely reported the progress of the Project." R. 1 ¶ 174. McGee's complaint lacks the specificity necessary when alleging fraud. Aside from the use of the word "conspirators," McGee does not specifically allege what role JCI had in preparing the report. Aside from the conclusory statement that the BSIR's "falsely reported the progress of the [p]roject," McGee does not specifically allege what was contained in the progress report that was false, such as specific deadlines that were missed. McGee does not allege that JCI specifically knew the content contained in the reports to be false. McGee does not identify when the reports were submitted. Put simply, McGee's allegations regarding submission of fraudulent BSIRs with regard to JCI falls short of satisfying the heightened pleading requirements of Rule 9(b).

### 4.     Rendering Worthless Services

The Seventh Circuit recently declined to opine as to the validity of "worthless services" as a separate theory of liability under the FCA. *Absher*, 764 F.3d at 710.

Nevertheless, in *Absher*, the Seventh Circuit analyzed the claim on its merits and in doing so, provided a framework for this Court to analyze McGee's claim. To establish a worthless services claim, "the performance of the service [must be] so deficient that for all practical purposes it is the equivalent of no performance at all." *Id.* (quoting *Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2001)) (internal quotation marks omitted). "It is not enough . . . that the defendant provided services that are worth some amount less than the services paid for . . . [s]ervices that are 'worth less' are not 'worthless.'" *Id.* Using this framework, the Seventh Circuit concluded that no jury could have reasonably found that the defendant provided truly worthless services since there was undisputed evidence that the defendant provided services of some value to its patients. *Id.*

Without deciding whether the worthless services theory is a proper theory of liability under the FCA, the Court finds that to the extent it is, McGee has failed to plead that the services rendered by JCI were truly worthless, and his claim fails. McGee alleges that with regard to the mobile platforms installed by JCI in Phase III of the contract, they are either "non-functional or unreliable." R. 1 ¶ 164. McGee further alleges that some municipalities have requested that the equipment be removed. R. 1 ¶ 164. McGee also alleges that JCI was unable to maintain the IBM-installed Phase I mobile platform, and was unable to fix, or render functional, the mobile platforms installed by IBM in Phase II of the contract. R. 1 ¶ 165. McGee asserts that with regard to the Phase I mobile platforms, his company could have maintained the functionality of that equipment had JCI given it the opportunity. R.

1 ¶ 165. Finally, McGee alleges that any value obtained from the successful installation of the mobile platforms in Phase I has somehow been eliminated. R. 1 ¶ 166.

Applying the analysis adopted in *Absher*, McGee has successfully alleged that JCI rendered worthless services with regard to the repair of the Phase I mobile platform equipment. McGee fails, however, to properly allege that JCI rendered truly worthless services with regard to its work on the Phase II and III mobile platform equipment. McGee does allege that JCI was unable to render the Phase II equipment functional. R. 1 ¶ 165. However, unlike his allegations regarding the Phase I equipment, McGee does not allege that JCI's inability to fix the Phase II equipment was somehow unique to JCI. Indeed, McGee alleges that he declined to accept a subcontract to fix the Phase II platforms because "no commercially reasonable amount of effort would result in rendering the Phase [II] design functional." R. 1 ¶ 142. McGee cannot then turn around and allege that JCI provided worthless services for not being able to fix something McGee himself claimed unfixable. The Court cannot reasonably infer that JCI rendered worthless services with regard to the Phase II equipment.

McGee alleges that some of the Phase III equipment was non-functional, and some of the equipment was unreliable. Unreliable is not the same as non-functional or worthless. Unreliable necessarily means that there are occasions where the equipment works, as well as occasions where it does not. However, by alleging that some of the equipment was unreliable, McGee concedes that JCI provided

something of value, even if unreliable. Ultimately, JCI was awarded a contract to complete multiple tasks. McGee certainly alleges that JCI did not perform all of those tasks well, and that the services JCI provided were worth less than what was contracted for. Nevertheless, McGee does not allege that all of the services performed by JCI pursuant to the contract were entirely worthless. Therefore, the Court finds that McGee failed to adequately plead a worthless services FCA claim, to the extent it is even a viable claim.

### 5. Conspiracy

McGee has also failed to state a claim for conspiracy against JCI. JCI is correct that general civil conspiracy principles apply to FCA conspiracy claims. *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 n.3 (7th Cir. 1999). Accordingly, to adequately plead an FCA conspiracy claim, a plaintiff must allege "1) that "the [d]efendants had an agreement . . . to defraud the government by getting a false or fraudulent claim allowed or paid; and 2) that the [d]efendants did so for the purpose of obtaining or aiding to obtain payment from the government or approval of a claim against the government." *United States ex rel. Walner v. NorthShore Univ. HealthSystems*, 660 F. Supp. 2d 891, 895-96 (N.D. Ill. 2009). McGee fails to allege who the agreement was with, "how they agreed, how they decided to file a false claim, who made the alleged misrepresentation, who filed the allegedly false claim, the method by which it was filed, and how much the payment was for." *Id*. at 898. In sum, McGee fails to allege anything that would allow the Court to reasonably infer that JCI had an agreement with anyone, let alone what

the terms of that agreement were. As such, JCI's motion to dismiss the conspiracy causes of action is granted and those counts are dismissed without prejudice.

### B. Chin

Chin moves to dismiss the non-conspiracy FCA claims, asserting that they were not pled with the particularity required by Rule 9(b). R. 67 at 7. Chin contends that McGee has failed to allege any facts identifying Chin's role in the presentment of a false claim. R. 67 at 7. Rather, Chin asserts that McGee merely alleges that Chin was WIT's president, and then bootstraps the allegations of WIT's wrongdoing onto Chin. R. 67 at 7. McGee counters that Chin's signing of the teaming agreement, in combination with the remainder of the complaint's allegations, sufficiently allege the requisite elements of an FCA claim, including knowledge of the submission of the false claims and the conspiracy. R. 99-1 at 36-37.

When analyzing a motion to dismiss made pursuant to Rule 12(b)(6), the Court's review is generally limited to the four corners of the complaint. Looking at McGee's complaint, the only allegations against Chin are he signed the teaming agreement as President of WIT. McGee alleges the teaming agreement memorialized the bid-rigging conspiracy, and that Chin "otherwise knowingly directed, authorized and participated in the wrongful acts of WIT alleged herein." R. 1 ¶ 28. These are the only allegations in McGee's 198 paragraph complaint that mention Chin. WIT, as a separately named Defendant, has numerous allegations made against it throughout the complaint.

The allegation that Chin knowingly directed, authorized, and participated in the wrongful acts of WIT alleged throughout the complaint is seemingly intended to be a catch-all to tie Chin to all subsequent allegations involving WIT. But aside from the allegation that Chin was WIT's president, McGee's complaint does not make any allegation as to Chin's role or conduct in directing or participating in the wrongful acts of WIT. McGee's complaint does not satisfy the "who, what, where, when and how" of Chin's involvement in WIT's allegedly fraudulent conduct that is required by Rule 9(b). Accordingly, this allegation fails to substantiate an FCA claim.

The Court is thus left to determine whether McGee's allegation that Chin signed the teaming agreement is sufficient to plead a FCA violation against Chin. The teaming agreement is not attached to the complaint. This is puzzling, given Responder's acquisition of TAI's Project-related assets, and considering the length and otherwise detailed nature of the complaint. McGee's allegations about the content of the teaming agreement are insufficient to demonstrate that the agreement itself is illegal or fraudulent. Rather, with regard to IBM at least, it is McGee's allegations that incompetent contractors were hired, and poor work was improperly compensated, which states a claim under the FCA. McGee, however, does not allege that Chin, as opposed to WIT, was directly involved in the fraudulent work and payments. McGee alleges that WIT knowingly engaged in a bid-rigging scheme. But McGee does not allege that Chin had any knowledge of or role in this scheme. The mere fact that Chin was WIT's president and signed what

may have been a facially legal teaming agreement is not enough to allow the Court to draw the inference that he knowingly agreed to participate in a bid-rigging scheme.

McGee attempts to buttress his allegations against Chin by adding allegations in his response to Chin's motion to dismiss that are not contained in his complaint. R. 99-1 at 37-38. In analyzing a Rule 12(b)(6) motion, the Court's review is limited to the complaint, and any attached documents. So the Court must disregard "allegations" contained in McGee's response briefs. McGee's reliance on Chin's title with WIT and his signing of the teaming agreement are insufficient to sustain an allegation that Chin violated the FCA.

The FCA conspiracy claims against Chin also fail. McGee fails to adequately allege that Chin entered into an agreement for the purpose of violating subpart (A) or (B) of 31 U.S.C. § 3729(a), as is required to allege a conspiracy under 31 U.S.C. § 3729(a)(1)(C).[7] McGee's sole allegation against Chin is that he signed the teaming agreement. Because the Court has dismissed the substantive counts predicated on this allegation, the Court also dismisses McGee's conspiracy claim.

## C. IBM

IBM puts forth a number of reasons why McGee's complaint fails to plead fraud with particularity, as required by Rule 9(b). IBM asserts that it did not bid for or participate in any way in Phase III of the Project. R. 58 at 13-14. IBM also

---

[7] This argument applies equally to the corresponding provisions of the IFCA. *Kennedy,* 512 F. Supp. 2d at 1163 n.2.

contends that because McGee was not involved in Phase II of the Project, McGee's allegations as to IBM's fraudulent conduct with regard to Phase II are necessarily based on hearsay, which is insufficient to satisfy the heightened pleading requirements of 9(b). R. 58 at 13-14. IBM makes a similar argument with regard to certain allegations in Phase I, as well as making the general argument that McGee has failed to specifically allege IBM's role in the alleged fraud. R. 58 at 14-15.

McGee argues that he has adequately pled IBM's role in the fraudulent scheme. R. 99-1 at 29-35. Specifically, McGee points to the allegations in his complaint that IBM's bid for Phase I contained knowingly false statements. R. 99-1 at 29. McGee contends that these allegations adequately plead a fraudulent inducement FCA claim. R. 99-1 at 30-31. In addition, McGee refers to various allegations in his complaint that specifically plead IBM's submission of knowingly false invoices. R. 99-1 at 31-32. According to McGee, these allegations satisfy the heightened pleading standard of Rule 9(b).

As a preliminary matter, the Court disagrees with IBM's assertions that an FCA claim cannot be sufficiently pled on information and belief. IBM is correct that the Seventh Circuit in *Pirelli* put forth a general rule that allegations based on information and belief are insufficient to satisfy Rule 9(b). *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 442 (7th Cir. 2011). IBM is also correct that a complaint need not explicitly say that it is filed on information and belief to fall within this general rule. *Id*. However, there is an exception to this general prohibition in cases where "(1) the facts constituting the

fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." *Id.* at 443 (citing *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992)) (internal quotation marks omitted). This exception is designed to balance the purpose of the heightened pleading requirements in cases of fraud, preventing fishing expeditions and "privileged libel," with the practical reality that plaintiffs will likely have limited access to documentary evidence at the pleading stage in a fraud case due to the inherent secretiveness of fraud. *See Pirelli,* 631 F.3d at 441; *Lusby*, 570 F.3d at 853-54; *see also Goldberg*, 929 F. Supp. 2d at 817-18.

IBM urges the Court to conduct a paragraph-by-paragraph analysis of McGee's complaint to determine which allegations are properly substantiated and which are not. That is not what is required of the Court when deciding a motion to dismiss made pursuant to Rule 9(b). Rather, reading the complaint as a whole, and drawing all reasonable inferences in favor of McGee, the Court must determine whether McGee has sufficiently alleged at least one instance of a violation of subparts (A), (B), and (C) of § 3729(a)(1).[8] The Court acknowledges that all 198 paragraphs of McGee's complaint may not contain relevant or properly substantiated allegations. Nevertheless, the causes of action survive if McGee has made allegations sufficient to allow the Court to draw the reasonable inference that IBM violated the named provisions of the FCA. The Court finds that McGee has done so, even under the more stringent pleading requirements of Rule 9(b).

---

[8] This determination applies with equal force to the corresponding provisions of the IFCA. *Kennedy,* 512 F. Supp. 2d at 1163 n.2.

With regard to the presentation of false claims under § 3729(a)(1)(A), McGee alleges that IBM knowingly paid TAI for work that was not actually performed, and then passed this cost along to the government. R. 1 ¶¶ 90-91. McGee references a specific invoice number, the precise amount paid, the date on which it was paid, and the description of the work that was to be encompassed by the invoice. R. 1 ¶ 90. McGee adequately alleges that IBM knowingly paid a fraudulent bill as the invoice itself was titled "Billing for services/Hardware/Software *not* provided." *Id.* (emphasis added). Despite Rule 9(b)'s heightened pleading requirements, plaintiffs are still allowed to plead scienter generally. *See* Fed. R. Civ. P. 9(b); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). McGee alleges that IBM billed the County for all of TAI's charges. R. 1 ¶ 91. While McGee does not specifically allege when IBM invoiced the County for reimbursement for this charge, that is precisely the type of evidence that a relator is unlikely to have at the pleading stage of litigation. It is reasonable to infer that IBM did in fact submit this invoice to the County for reimbursement. TAI continued working on the Project, IBM paid TAI for this work, and IBM submitted invoices for all of TAI's work to the County. R. 1 ¶¶ 90-91.

In addition, there are allegations that allow the Court to reasonably infer that IBM knew that TAI was not adequately performing its subcontract work. A 2005 Incident Readiness Index Report showed that only 17 of 46 cars were functioning. R. 1 ¶ 80. TAI revised the software 150 times, "but never succeeded in deploying a functional platform." R. 1 ¶ 81. The computer hard drives TAI installed

were only guaranteed to perform in temperatures greater than 41° Fahrenheit, but TAI never installed a heating system to ensure such conditions. R. 1 ¶ 81. Based on these allegations, McGee sufficiently alleges that IBM continued to accept TAI's work and pay TAI for its defective work, and then passed along those costs to the County. R. 1 ¶¶ 88-89, 91. This adequately pleads a violation of § 3729(a)(1)(A).

Moreover, McGee's allegations that IBM knowingly made false representations in its proposals and in its contracts adequately allege a fraudulent inducement FCA claim under § 3729(a)(1)(B). R. 1 ¶¶ 72(c), 74. McGee cites the specific language in both the proposal and the contract that it identifies as false. For instance, McGee alleges that PSC submitted a bid to design a new mobile platform for Phase II of the Project. R. 1 ¶ 111. McGee further alleges that IBM employee Stiffler admitted to him that PSC "couldn't get their building cameras to work, never mind developing a mobile video platform that is functional." R. 1 ¶ 112. Nevertheless, IBM certified in its Phase II contract that each subcontractor was "competent to perform [its] respective duties and obligations" and that "all services that require the exercise of professional skills or judgment shall be accomplished by professionals qualified and competent in the applicable discipline." R. 1 ¶ 74. From these allegations the Court can reasonably infer that IBM knew that PSC was not qualified to perform the work designated to it by IBM's contract, yet made representations in the contract to the contrary. The Court can also reasonably infer that the County relied on this representation in determining who to award the

Phase II contract to, and that as a result, it was falsely induced into awarding the contract to IBM.

McGee has also sufficiently alleged IBM's participation in a conspiracy to violate the FCA. McGee has alleged that TAI installed nonfunctional mobile platforms, that IBM accepted and approved this work, and that IBM paid for this work, ultimately passing along those costs to the government. R. 1 ¶¶ 90-91. While McGee has not alleged the specifics of the agreement between TAI and IBM, this is the sort of information that would likely be unobtainable by McGee at the pleading stage. Nevertheless, the allegations allow the Court to reasonably infer that IBM and TAI had an agreement whereby IBM would accept TAI's work, despite its nonconformance with the contract specifications, and submit claims certifying the correctness of this work to the government in order to receive repayment. The Court can reasonably infer the existence of a conspiracy because there is no other plausible reason why IBM would accept and pay for defective work, and then submit claims to the government falsely certifying the adequacy of the work, were it not to defraud the government in an effort to obtain payment and enrich both IBM and TAI.

McGee's allegations enable the Court to reasonably infer that IBM conspired with PSC to violate the FCA. IBM was aware of PSC's inability to perform the work required by the Project prior to Phase II. R. 1 ¶¶ 111-112. Indeed, McGee alleges that IBM manager O'Leary removed Stiffler from the Project because Stiffler was taking work away from PSC due to PSC's incompetence. R. 1 ¶ 77. And yet, IBM

awarded a Phase II subcontract to PSC for work that it knew PSC did not have the expertise to perform. R. 1 ¶¶ 112, 115. From these allegations the Court can reasonably infer that IBM and PSC conspired to violate the FCA. Again, there is no plausible reason why IBM would subcontract with PSC were it not in furtherance of a conspiracy to violate the FCA.

One of the primary purposes of Rule 9(b) is to provide notice to the adverse party of the claims lodged against it. *Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 777 (7th Cir. 1994). McGee's complaint, though lacking in some respects, provides sufficient notice regarding the claims asserted against IBM to allow them to answer. The Court finds that McGee has sufficiently alleged violations of false claims, false records, and conspiracy provisions of the FCA and the IFCA. As such, IBM's motion to dismiss the complaint pursuant to Rule 9(b) is denied.

## Conclusion

For the foregoing reasons, IBM's motion to dismiss, R. 58, is denied in its entirety. JCI's motion to dismiss, R. 62, is granted and all counts are dismissed as to JCI without prejudice. Chin's motion to dismiss, R. 66, is granted and all counts are dismissed as to Chin without prejudice. Plaintiff is granted leave to amend its complaint to rectify the deficiencies noted by the Court within 21 days of this Order. IBM is ordered to complete its Rule 26(a)(1) disclosures in that same time frame.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: February 26, 2015