| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *EX REL.* MICHAEL MCGEE AND | ) | |
| PEOPLE OF THE STATE OF ILLINOIS | ) | |
| *EX REL.* MICHAEL MCGEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 11-C-3482 |
| v. | ) | |
| | ) | |
| IBM CORPORATION, ET AL., | ) | Judge Thomas M. Durkin |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff-Relator Michael McGee ("McGee") brings this *qui tam* case on behalf of the United States and the State of Illinois. R. 1. McGee alleges that defendants IBM Corporation, Catherine Maras, Daniel Coughlin, and others violated the "Presentation of False Records" (Count 1), "False Records and Statements" (Count 2), and "Conspiracy" (Count 3) provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a), and the corresponding provisions of the Illinois False Claims Act ("IFCA"), 740 ILCS 175/3 (Counts 4, 5, and 6). R. 1. McGee alleges that defendants colluded to defraud Cook County, the State of Illinois, and the Department of Homeland Security ("DHS") out of approximately $50 million dollars of grant funds in connection with a program called "Project Shield" (the "Project"). *Id.* McGee filed his complaint under seal on May 24, 2011. *Id.* On July 22, 2013, the United States and Illinois declined to intervene, R. 4, after which the complaint was unsealed.

Pending before the Court are: (1) defendant IBM's motion for summary judgment (R. 283); and (2) defendants Catherine Maras and Daniel Coughlin's (the "County Defendants'") motion for summary judgment (R. 282). For the reasons that follow, the Court grants in part and denies in part both motions.

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis[1]

---

[1]     The Court cites IBM's Statement of Material Facts (R. 285) as IBM ¶ __; McGee's Response to IBM's Statement of Material Facts (R. 295) as R-IBM ¶ __; McGee's Statement of Additional Material Facts as to IBM (R. 296) as AFIBM ¶ __; IBM's Response to McGee's Statement of Additional Material Facts as to IBM (R. 317) as R-AFIBM ¶ __; the County Defendants' Statement of Material Facts (R. 281) as CD ¶ __; McGee's Response to the County Defendants' Statement of Material Facts (R. 299) as R-CD ¶ __; McGee's Statement of Additional Material Facts as to

As the Court explained in its February 26, 2015 opinion addressing several motions to dismiss in this case, the FCA and IFCA prohibit knowingly presenting, or causing to be presented, a false or fraudulent claim for payment by the government, and knowingly making a false statement that is material to a false or fraudulent claim paid by the government. R. 119 at 14. The statutes also make it unlawful to conspire to violate the FCA or IFCA. *Id.*

IBM and the County Defendants seek summary judgment with respect to all FCA and IFCA claims against them. The Court first addresses the claims on which IBM and the County Defendants are entitled to summary judgment, and then turns to the remaining claims.

## I.     Phase 3 Claims

The Project proceeded in three phases. IBM served as prime contractor for Phases 1 and 2, and another company that has already been dismissed from this case served as prime contractor in Phase 3. *See id.* at 6, 10, 27. IBM argues that summary judgment is appropriate with respect to all claims submitted pursuant to the Phase 3 contract for two reasons: (1) McGee was not an original source with respect to Phase 3, meaning that the FCA's and IFCA's public-disclosure bar deprives this Court of jurisdiction over Phase 3 claims; and (2) IBM had withdrawn as a matter of law from any conspiracy by Phase 3. The County Defendants join the first argument. R. 280 at 7-8. The Court addresses each argument in turn.

---

the County Defendants (R. 300) as AFCD ¶ __; and the County Defendants' Response to McGee's Statement of Additional Material Facts (R. 316) as R-AFCD ¶ __. The Court cites the joint set of exhibits in support of McGee's Statements of Additional Material Facts (R. 297) as McGee Ex. __.

**Public-Disclosure Bar.** Ordinarily, the FCA's[2] public-disclosure bar deprives a court of jurisdiction over a *qui tam* action "'based upon the public disclosure of allegations or transactions.'" *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009) (quoting 31 U.S.C. § 3730(e)(4)(A)). But "[t]he original-source exemption permits jurisdiction over an FCA action *even if* the relator's lawsuit is based upon publicly disclosed information *provided* that the relator is 'an original source of the information.'" *Id.* at 916 (quoting 31 U.S.C. § 3730(e)(4)(A)) (emphasis in original). To be an original source, the relator must have direct knowledge of the fraudulent acts alleged. *Id.* at 117.

This Court already has determined in its motion to dismiss ruling that: (1) McGee's Phase 3-related allegations are based on publicly disclosed information; and (2) McGee was not an original source as to claims against the prime contractor for Phase 3 because he lacked direct knowledge of or involvement in Phase 3. R. 119 at 23-24, 26-27; *see also* R-IBM ¶¶ 74, 78 (McGee acknowledges lack of involvement in Phase 3). The Court therefore dismissed, based on the public-disclosure bar, claims against the prime contractor for Phase 3. R. 119 at 27. The same reasoning extends to Phase 3 claims against IBM and the County Defendants.

McGee claims that his direct knowledge of Phases 1 and 2 establishes his knowledge of an ongoing scheme and makes him an original source as to Phase 3 as well. But the Supreme Court has held that the FCA "does not permit jurisdiction in

---

[2] Except where otherwise noted, the standards for FCA claims are the same as for IFCA claims. *See United States ex rel. Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158, 1163 n.2 (N.D. Ill. 2007).

gross just because a relator is an original source with respect to some claims." *Rockwell Int'l Corp v. United States*, 549 U.S. 457, 476 (2007). In other words, a relator's "original source status with respect to . . . [a] claim" does not provide jurisdiction over a claim "related to a time period different from" the claim for which the relator has original source status. *Id*. The FCA forbids such "claim smuggling." *Id*. The Fifth Circuit thus held earlier this year that a relator who joined an "ongoing plan" to promote medical devices was not an original source as to misconduct occurring before or after his involvement. *U.S. ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 375-77 (5th Cir. 2017).

McGee cites a pair of district court cases in a footnote for the proposition that, when relators are original sources of knowledge about an "underlying scheme," they are original sources of "additional allegations that the same underlying scheme is continuing." *U.S. ex rel. Galmines v. Novartis Pharms.*, 88 F. Supp. 3d 447, 451 (E.D. Pa. 2015); *see also U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 519 F. Supp. 2d 7, 11 (D.C. Cir. 2007). But the Court agrees with IBM that these cases improperly permit the "claim smuggling" prohibited by *Rockwell*. *See, e.g., Colquitt*, 858 F.3d at 375-76; *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 352 (4th Cir. 2009) (under *Rockwell*, relator "cannot be a direct and independent source with respect to any allegations of fraud" after relator withdrew from practicing medicine). The Court holds that under *Rockwell*, McGee is not an original source as

to Phase 3 claims. Accordingly, the Court lacks jurisdiction to adjudicate McGee's claims with respect to Phase 3. *See Glaser*, 570 F.3d at 913.[3]

**IBM's Withdrawal from Alleged Conspiracy.** IBM argues that it also cannot be liable for Phase 3 for another reason: it has established withdrawal from any conspiracy by Phase 3 as a matter of law. McGee does not dispute that conspiracy is the only theory by which he may hold IBM liable for Phase 3.

Courts apply "general civil conspiracy principles" in FCA conspiracy cases. *U.S. ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 n.3 (7th Cir. 1999). "To withdraw from a conspiracy, a defendant must terminate completely his active involvement in the conspiracy, as well as take affirmative steps to defeat or disavow the conspiracy's purpose." *United States v. Wilson*, 134 F.3d 855, 863 (7th Cir. 1998). It is clear that IBM "terminate[d] completely [its] active involvement in [any] conspiracy" by Phase 3. *See id.* IBM was not a party to the Phase 3 contract, did not seek to be, did no work under it, and did no work at all on the Project after July 2008. R-IBM ¶¶ 73-75.

The question is thus whether IBM took the necessary affirmative step to withdraw. If an alleged co-conspirator "communicat[es] . . . the fact of his withdrawal in a manner designed to reach his co-conspirators," it has taken "[t]he affirmative step required to constitute withdrawal." *Wilson*, 134 F.3d at 863; *accord*

---

[3]    McGee incorrectly states that "IBM has admitted the Court has jurisdiction over McGee's claims" in its Statement of Material Facts. R. 294 at 24 n.13. In fact, IBM expressly carves out "McGee's claims insofar as they are based on publicly available information of which McGee is not the original source" from its concessions about "subject-matter jurisdiction" in its Statement. IBM ¶¶ 3-4.

*Watson Carpet & Flooring Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 460 (6th Cir. 2011) (alleged conspirator can withdraw through "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators") (quotation marks omitted).

As McGee acknowledges in his complaint, "it was publicly announced that IBM was replaced for Phase 3 of the Project." R. 1 ¶ 159. Rather than IBM "merely declining to make a proposal" for Phase 3 as McGee claims (R. 294 at 23), this announcement communicated the fact of IBM's withdrawal in a manner reasonably calculated to reach its alleged co-conspirators and thus constituted the affirmative step necessary for withdrawal as a matter of law. *See Wilson*, 134 F.3d at 863; *see, e.g.*, *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 839 (11th Cir. 1999), amended in part, 211 F.3d 1224 (11th Cir. 2000) (dairy defendant "communicat[ing]" his ceasing participation "to the other dairies by the media" constituted withdrawal as a matter of law).

McGee claims that IBM did not effectively withdraw from the alleged conspiracy because the County did not pay a few IBM invoices until March 2009, after Phase 3 began. R-AFIBM ¶ 34. But these invoices were for Phase 2 work. *Id.*; *see also* R-IBM ¶ 73 (acknowledging that "IBM and its subcontractors continued to perform maintenance on Phase 1 and Phase 2 equipment until July 14, 2008," after which "IBM ceased any and all work on Project Shield"). These invoices therefore do not establish any IBM involvement in Phase 3 or lack of withdrawal prior to Phase

3. For this reason as well, IBM is entitled to summary judgment with respect to Phase 3 liability.[4]

## II.     Count 1 – Presentment Claim Under FCA

The parties agree that Count 1 arises under the pre-amendment version of the FCA, 31 U.S.C. § 3729(a)(1) (2006). R. 284 at 11; R. 294 at 7 n.7; *accord United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 642 (7th Cir. 2016) (2009 amendment to § 3729(a)(1) is not retroactive). IBM argues that it is entitled to summary judgment on Count 1 because there is no evidence that any claims were presented to a federal employee as the pre-amendment version of the statute requires. The County Defendants adopt this argument. R. 280 at 7.

The pre-amendment version of the FCA limits liability to those who "knowingly present[], or cause[] to be presented, *to an officer or employee of the United States Government* . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (2006) (emphasis added). This statute requires presenting claims "directly" to the federal government. *Garbe*, 824 F.3d at 642. Presentment to a grantee or subgrantee of federal funds is not sufficient. *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 493-502 (D.C. Cir. 2004).

Here, as McGee concedes, the federal government provided funds through multiple lump sum grants (R-IBM ¶ 7)—not by approving or reimbursing specific

---

[4]     Maras argues in a footnote that she likewise cannot be held liable for Phase 3 because "she had left the County and had no involvement in overseeing Phase 3." R. 280 at 8 n.2. But unlike IBM, Maras does not meaningfully argue or present evidence showing as a matter of law that she withdrew from the alleged conspiracy. Therefore, the Court does not extend the same, alternative holding to Maras.

claims. *See also* R. 294 at 24 (McGee acknowledges the "block-grant nature of the funds" from the federal government). The lack of evidence that any claim related to the Project was presented "directly" "to an officer or employee of the United States government," defeats McGee's Count 1 claim. *See Totten*, 380 F.3d at 493; *Garbe*, 824 F.3d at 642.

McGee's arguments to the contrary fail. McGee posits that the Illinois Emergency Management Agency ("IEMA") presented claims "for approval to the U.S. government, including through audits." R. 294 at 19. But he does not cite any evidence of an invoice being submitted directly to anyone at the federal government. A letter asking for updates on reimbursement from a federal grant (R-AFIBM ¶ 31) is not a submission of a claim to a federal employee "for payment or approval" as the statute requires. *See* 31 U.S.C. § 3729(a)(1) (2006). Nor does turning invoices over for subsequent audits constitute "present[ing]" claims "for payment or approval." *See id.* McGee cites no case to the contrary.

McGee also says that the alleged conspiracy caused IEMA "to obtain grant funding and extensions from the U.S. government." R. 294 at 19. But all this shows is that the grants originated with the federal government (which is undisputed), not that false claims were presented to it.

The Court thus grants IBM's and the County Defendants' motion for summary judgment as to Count 1.

### III.  Count 3 – Conspiracy Claim Under FCA

IBM also seeks summary judgment on Count 3 under the pre-amendment version of the FCA's conspiracy provision, 31 U.S.C. § 3729(a)(3) (2006). The County Defendants adopt this argument. R. 280 at 7.

McGee argues that the amended version of the FCA governs his Count 3 conspiracy claim. But "Congress did not make the [2009] amendments" to the conspiracy subsection of the FCA, 31 U.S.C. § 3729(a)(3), "retroactive." *U.S. ex rel. King v. Solvay S.A.*, 823 F. Supp. 2d 472, 515-16 (S.D. Tex. 2011), *order vacated in part on reconsideration on other grounds*, 2012 WL 1067228 (S.D. Tex. Mar. 28, 2012); *see also Garbe*, 824 F.3d at 640-41 (only the 2009 amendments to § 3729(a)(2) are retroactive). "The amended version" therefore "applies only 'to conduct on or after the date of enactment'—May 20, 2009." *King*, 823 F. Supp. 2d at 516 (quoting Pub. L. 111-21 § 4(f), 123 Stat. 1625); *see also U.S. ex rel. Holbrook v. Brink's Co.*, 2015 WL 196424, at *9, *23-24 (S.D. Ohio Jan. 15, 2015) (on FCA conspiracy claim, "apply[ing] the pre-[amendment] version of the FCA to [conspiratorial] conduct alleged in the complaint prior to May 20, 2009, and the post-[amendment] version of the FCA to conduct alleged after May 20, 2009").

As the Court has just found, it lacks jurisdiction over Phase 3 conduct (*i.e.*, all conduct post-March 2009), and IBM had withdrawn from any conspiracy before May 20, 2009 in any event. Thus, IBM is correct that the pre-amendment version of the FCA applies. *See, e.g.*, *King*, 823 F. Supp. 2d at 516.

This distinction matters because under the pre-amendment version, relators had to establish an agreement to defraud the federal government itself—not a federally funded entity. *See Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672-73 (2008). Thus, where "the federal government provid[ed] money in a lump sum to a grantee, and [wa]s thereafter uninvolved in the disbursement of the funds, the FCA [did] not apply." *U.S. Dep't of Transp. ex rel. Arnold v. CMC Eng'g,* 564 F.3d 673, 678 (3d Cir. 2009).

McGee claims the conspiracy contemplated "getting the federal government to allow IBM's fraudulent claims, by way of IEMA's presentation to the federal government and through the federal audit process." R. 294 at 25. But as the Court has already ruled, this is a situation where "the federal government provid[ed] money in . . . lump sum[s]." *Arnold*, 564 F.3d at 678. As such, the alleged agreement to make a "false record or statement" could not "have a material effect on the [federal] Government's decision to pay the false or fraudulent claim." *Allison Engine*, 553 U.S. at 673. And McGee cites no case supporting the proposition that the after-the-fact federal audit process constitutes "getting a false or fraudulent claim allowed or paid" by the federal government. 31 U.S.C. § 3729(a)(3) (2006).

Because McGee has not presented evidence of a conspiracy to defraud the federal government itself as required by the applicable version of the FCA, the Court grants summary judgment for IBM and the County Defendants on Count 3.

## IV.     Counts 2 and 5 – False Statement Claims Under FCA And IFCA

The parties agree that Counts 2 and 5 arise under the retroactive, amended version of the FCA, 31 U.S.C. § 3729(a)(1)(B) (2012), and the pre-amendment version of the IFCA, 740 ILCS 175/3(a)(2) (2009). A defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable under these Acts. 31 U.S.C. § 3729(a)(1)(B) (2012); 740 ILCS 175/3(a)(2) (2009).

The FCA and IFCA false statement provisions are essentially the same, with the exception of the definition of "claim," which encompasses requests for money if the *state* will reimburse any portion of that money under the IFCA, and encompasses requests for money if the *federal* government will reimburse or has provided that money under the FCA. 31 U.S.C. § 3729(b)(2) (2012); 740 ILCS 175/3(b)(2) (2009). IBM implies in certain places (*e.g.*, R. 284 at 15) that because the County entered into the relevant contracts, these definitions may not be satisfied. But the federal government through DHS undisputedly provided or reimbursed the County (through block grants) for amounts spent on the Project. *See* R-AFIBM ¶ 2 ("IBM was aware that DHS was the source of funds" for the Project). And the state government through IEMA undisputedly reimbursed the County for amounts spent on the Project. *See id.* Accordingly, the definition of "claim" for purposes of both statutes' false statement provisions is satisfied. *See, e.g.*, *Garbe*, 824 F.3d at 639 (false statement provisions attach liability to "false claims to intermediaries" that "implement government programs or use government funds").

McGee sets forth two theories under which he seeks to hold IBM liable for submitting false claims: fraudulent inducement and false certification. McGee seeks to hold County Defendant Maras liable under a fraudulent-inducement theory, and he seeks to hold both County Defendants liable under a false-certification theory. IBM and the County Defendants argue that summary judgment is appropriate on both theories. The Court addresses the fraudulent-inducement theory first, followed by the false-certification theory.

### A.    Fraudulent-Inducement Theory

#### 1.    Statute of Limitations

As an initial matter, IBM (and the County Defendants by adopting IBM's argument, R. 280 at 8) argue that McGee's claim for fraudulent inducement of the Phase 1 contract is time-barred because the County approved the Phase 1 contract on October 5, 2004, which is outside the limitations period. The Court disagrees.

The FCA and IFCA "do not expressly address when the statute of limitations . . . begins to run," instead "only stat[ing] that the six-year statute of limitations starts to run when a 'violation . . . is committed.'" *U.S. ex rel. Dugan v. ADT Sec. Servs., Inc.*, 2009 WL 3232080, at *4 (D. Md. Sept. 29, 2009); *see* 31 U.S.C. § 3731(b)(1); 740 ILCS 175/5(b)(1). But numerous courts have held that "[t]he six year limitations period" "begins to run on the date the claim is made, or if the claim is paid, on the date of the payment." *United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006, 1007 (N.D. Ill. 2001) (collecting cases). And IBM does not dispute that all claims (*i.e.*, invoices) for Phase 1 were paid within the limitations period.

Contrary to what IBM says, the District of Maryland in *Dugan* did not hold that the statute of limitations begins to run on a fraudulent-inducement claim at the time of inducement (*i.e.*, in this case, when the County approved the Phase 1 contract). Rather, the *Dugan* court described a disagreement among other courts as to whether the statute of limitations begins to run: (1) at the time of "*submission of a claim* for payment to the government"; or (2) at the time of "the *actual payment of a claim* by the government." 2009 WL 3232080, at *4 (emphasis added). The *Dugan* court dismissed a fraudulent-inducement claim because the plaintiff did not identify "any specific false claim"—either a demand "to the government for payment" or a "specific payment by the government to defendant"—within the limitations period. *Id.* The court did not dismiss the claim because the alleged inducement pre-dated the start of the limitations period. *See id.*

The only case within this Circuit cited by the *Dugan* court on the divided issue it describes is *Tech Refrigeration*. *Id.* at *4 n.3. And *Tech Refrigeration* held that the statute begins to run for paid claims on the date the claim is paid. 143 F. Supp. 2d at 1007; *accord United States ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993) (same).

IBM claims *Tech Refrigeration's* rule does not make sense in the context of a fraudulent-inducement theory, arguing that under this theory, the cause of action should accrue at the time of inducement. The Court does not agree. "A claim ordinarily accrues when [a] plaintiff has a complete and present cause of action." *Petrella v. MGM, Inc.*, 134 S. Ct. 1962, 1969 (2014) (quotation marks omitted). And

the FCA attaches liability to the submission of false claims. *See* 31 U.S.C. § 3729(a)(1)(B) (2012); 740 ILCS 175/3(a)(2) (2009); R. 119 at 27-28. McGee would not have a cause of action under the FCA based on fraudulent inducement of a contract alone in the absence of a subsequent false claim. *See id.* Holding that McGee's claim accrued at the time of inducement as IBM advocates would mean that it accrued before he "ha[d] a complete and present cause of action," violating the ordinary rule for claim accrual. *See Petrella*, 134 S. Ct. at 1969.

For these reasons, this Court adopts the holding in *Tech Refrigeration* and *Kriendler* and finds that McGee's fraudulent-inducement claim for the Phase 1 contract is not time-barred.

### 2.     IBM

As this Court explained when it denied IBM's motion to dismiss, to prove a false statement claim based on fraudulent inducement, McGee must show: (1) that IBM knowingly made "a false statement to induce a government entity to award a grant or contract to that contractor," and (2) causation (*i.e.*, that the contract was "awarded based on this false statement"). R. 119 at 27-28 (citing *U.S. ex rel. Danielides v. Northrop Brumman Sys. Corp.*, 2014 WL 5420271, at *5 (N.D. Ill. Oct. 23, 2014)). "All resulting requests for payment [*i.e.*, claims] are then fraudulent because they are based on the original false statement." *Id.* at 28.

McGee argues that IBM made several knowingly false statements to induce the awards of the Phase 1 and 2 contracts to IBM, and both contracts were awarded based on these false statements. The Court addresses Phases 1 and 2 in turn. For

each phase, the Court addresses the knowingly false statement element first, followed by the causation element.

### a.    Phase 1

**Knowingly False Statement.** "A statement may be deemed false for purposes of the False Claims Act only if the statement represents an objective falsehood. Although a breached contractual term may be considered a falsehood in a looser sense—a false promise—a mere breach of a contractual duty does not satisfy this standard." *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 836 (7th Cir. 2011). And a defendant acts "knowingly" when it "has actual knowledge" of the information or acts "in deliberate ignorance" or "in reckless disregard" of the truth of information. 31 U.S.C. § 3729(b)(1); 740 ILCS 175/3(b)(1) (2009). Parties cannot be held liable for "[i]nnocent mistakes." *Yannacopoulos*, 652 F.3d at 832.

McGee sets forth a number of facts based on which a reasonable jury could find that IBM made one or more knowingly false statements in connection with the Phase 1 contract (entered into in fall 2004).

*First*, IBM represented in the Phase 1 contract that "no person having [a conflict of] interest shall knowingly be employed or engaged by [IBM] or any of its subcontractors." R-AFIBM ¶ 7. It is not meaningfully disputed that IBM's subcontractor PSC had a conflict of interest with Dudley Donelson, the County's director of information technology. Interviews in an FBI investigation indicated that Donelson received cash kickbacks from PSC, that he established and controlled

PSC, that his godson was PSC's president, and that of the $6 million of Project-related funds received by PSC, $1.5 million was converted to cash. R-AFIBM ¶ 36.

IBM tries to parse the language of its conflict-of-interest representation finely to argue that PSC did not "employ or engage" Donelson within the meaning of that representation. IBM claims McGee's evidence shows at most that "Donelson was to be 'working *with*'—not *for*—both 'PSC and [another subcontractor] TechAlt,'" which is not "employ[ment] or engage[ment]." R. 318 at 7. The parties do not provide extensive factual detail regarding the nature of the relationship between Donelson and PSC, but given the facts that have been presented about Donelson's potential kickbacks from and control of PSC, the Court finds that the question of whether that relationship constituted "employ[ment] or engag[ement]" is one for the jury.

The remaining question is the "knowledge" component—*i.e.*, whether there is any evidence that IBM had "actual knowledge" that its conflict-of-interest representation was false or acted in "deliberate ignorance" of its truth. 31 U.S.C. § 3729(b)(1); 740 ILCS 175/3(b)(1) (2009). A week before IBM responded to the County's RFP for Phase 1, IBM's subcontractor TechAlt sent IBM a chart showing that Donelson, PSC, and TechAlt worked together on another project, which TechAlt described to IBM as "proof of concept" and "indicative of our approach to implementation." McGee Exs. 23-25. And according to Thomas Dubelbeis, an employee of another IBM subcontractor named WIT, Donelson and Maras told IBM in a meeting in August or September 2003—well before the Phase 1 contract—that if it wanted to be the prime contractor, it "would need to submit a proposal" that

included TechAlt, PSC, and WIT. McGee Ex. 3 ¶ 8. Dubelbeis states that prior to this meeting, PSC, TechAlt, and WIT "agreed to work together as a team and began discussing a teaming agreement whereby the three companies would not compete with one another." *Id.* ¶ 7.

Based on these facts, a reasonable jury could infer that IBM learned about or acted in "deliberate ignorance" of the conflict between Donelson and PSC by the time it signed the Phase 1 contract in fall 2004. *See* 31 U.S.C. § 3729(b)(1); 740 ILCS 175/3(b)(1) (2009); *see e.g.*, *Laymon, Jr. v. Bombardier Transp. (Holdings) USA, Inc.*, 2009 WL 793627, at *12 (W.D. Pa. Mar. 23, 2009) (explaining in the course of denying summary judgment on an FCA claim that a defendant can be liable for "burying [his] head in the sand").

*Second*, IBM represented in its Phase 1 contract that its subcontractors were at "at all times . . . competent to perform their respective duties and obligations" and that its services would be "accomplished by professionals qualified and competent in the applicable discipline." R-AFIBM ¶ 7. But an IBM presentation describes an "array of red flags" about the "financially weak & unproven local delivery subcontractors" and "financially weak & unproven manufacturer subcontractors" in "Spring 2003," prior to IBM signing the Phase 1 contract in "late 4Q 2004." McGee Ex. 9 at IBM_RS_E00190420-21. A reasonable jury could infer based on this evidence that IBM knew that its subcontractors were unqualified but represented in the Phase 1 contract that they were qualified. The questions of: (1) whether IBM's representation about its subcontractors constitutes a mere "breached

contractual term" or "objective falsehood" (*Yannacopoulos*, 652 F.3d at 836); and (2) whether IBM made an "[i]nnocent mistake" (*id.* at 832) or acted with "actual knowledge" or in "deliberate ignorance" of falsehood (31 U.S.C. § 3729(b)(1); 740 ILCS 175/3(b)(1) (2009)) are for the jury to decide. *See, e.g.*, *Laymon, Jr.*, 2009 WL 793627, at *12 (explaining in the course of denying summary judgment on an FCA claim that "a defendant's state of mind typically should not be decided on summary judgment").

*Third*, IBM represented in its RFP response to the County for Phase 1 that "[t]he IBM solution . . . provides Cook County with a proven technological solution," and under the heading "Why IBM" explained that "We Use Proven Methodologies." R-AFIBM ¶ 5. But an IBM employee later commented that he had voiced "objections . . . prior to the [RFP] response based on the solution alone." McGee Exs. 26-27. And subsequent IBM documents state that the solution "ha[d] never been deployed" in its current form and was "never tested" as an "integrated solution." McGee Ex. 9 at IBM_RS_E00190421. A reasonable jury could infer based on this evidence that IBM knew the proposed solution was unproven prior to representing that it was proven in its RFP response. Again, the questions of: (1) whether IBM's representation about proven solutions constitutes a mere "breached contractual term" or "objective falsehood" (*Yannacopoulos*, 652 F.3d at 836); and (2) whether IBM made an "[i]nnocent mistake" (*id.* at 832) or acted with "actual knowledge" or in "deliberate ignorance" of falsehood (31 U.S.C. § 3729(b)(1); 740 ILCS 175/3(b)(1) (2009)) are for the jury to decide. *See, e.g.*, *Laymon, Jr.*, 2009 WL 793627, at *12.

**Causation.** For a contract to be awarded based on a false statement, "the defendant's conduct must cause the government to make a payment or to forfeit money owed." *D'Agostino v. ev3, Inc.*, 845 F.3d 1, 8 (1st Cir. 2016). This means that if the County "would have approved" IBM "notwithstanding the alleged fraudulent representation[s]," causation has not been proven. *Id.* The false statement also must be "material," which is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); 740 ILCS 175/3(b)(4) (2009).

McGee points to several facts based on which a reasonable jury could find that the County would not have approved or paid IBM if its representations were false and the County knew the truth. The conflict-of-interest and subcontractor-competence covenants are part of the standard contract requirements to work for the County. R-AFIBM ¶ 7; McGee Ex. 2 ¶¶ 22, 28. And Anthony Peraica, a former member of the County Board, testified that if he knew that the solution was untested, the contractors were not competent, and there was a conflict of interest, he would not have voted to approve the IBM contracts. McGee Ex. 2 ¶¶ 5, 20-26; *see, e.g.*, *U.S. v. Science Applications Intern. Corp.*, 626 F.3d 1257, 1271-73 (D.C. Cir. 2010) (FCA false statement claim properly submitted to jury where "record evidence could have allowed the jury to conclude" that provisions at issue mattered, including testimony that witnesses would not have awarded contracts if they knew about "apparent or actual conflicts").

IBM responds by citing statements by County Defendant Maras about what she "cared about" in approving IBM and what she already believed about the subcontractors' competence and the proven nature of the technology. R. 284 at 16. But Maras was not the only decision-maker—the contracts required County Board approval. R-AFIBM ¶ 30 (admitting that "IBM knew the County board had to approve the Contracts before they were effective, and IBM also knew that the County Board had to approve any payment to IBM"). Especially given her status as a defendant and alleged co-conspirator, Maras's statements regarding her knowledge and intent cannot carry the day. *See U.S. ex rel Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 916 (N.D. Ill. 2015) (where decisionmaker is part of alleged conspiracy, it is no surprise that he approved of the set up).

IBM also relies on *D'Agostino*, 845 F.3d at 8, where the First Circuit granted summary judgment on an FCA claim based on lack of proof of materiality and causation. But the First Circuit relied heavily on the fact that the FDA did not "withdraw its approval" of a product "in the face of [relator's] allegations," providing strong evidence that "the FDA would have approved [the product] notwithstanding the alleged fraudulent representations." *Id.* Here, by contrast, the County ended the Project after an investigation by a new administration. R-AFIBM ¶ 39.

In sum, the Court finds that McGee has presented facts that could support a reasonable jury finding that IBM would not have been approved or paid if the representations discussed above were objectively false and the County knew the

truth. *E.g.*, *U.S. ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 503-05 (8th Cir. 2016) (reversing summary judgment on fraudulent-inducement claim).

### b. Phase 2

**Knowingly False Statement.** IBM made the same representations in the November 2005, Phase 2 contract regarding (a) conflict of interest and (b) subcontractor competency as it made in the Phase 1 contract. R-AFIBM ¶ 20. By that time, IBM knew everything it did prior to Phase 1. And McGee sets forth a number of additional facts post-dating the start of Phase 1 that go to the issues of IBM's knowledge and the representations' falsehood. For example, in December 2004, IBM project manager Tim Herlihy wrote to IBM executives and requested to be removed from the Project, stating that the "opportunity was constructed and imposed on IBM, for reasons yet to be determined, with contractors that have a relationship with the county." R-AFIBM ¶ 11; McGee Ex. 21. He further stated that "[i]f IBM were given the opportunity to bid this out we would have a completely different story." McGee Ex. 21.

In September 2005, IBM project manager Christine Beaudin likewise requested removal from the Project because she could "not professionally and ethically speaking remain engaged on this project." R-AFIBM ¶ 12; McGee Ex. 29. She stated: "why does the client force us to use an insolvent and unproven contractor? There has to be something going on here that is beyond inappropriate?" McGee Ex. 29. Beaudin reported a possible "family connection" between County staff and a subcontractor. McGee Ex. 30; *see also* R-AFIBM ¶ 12; McGee Exs. 42, 98

(other evidence that IBM managers were discussing subcontractor conflicts with the County prior to Phase 2). It is therefore not true, as IBM says (R. 284 at 18), that McGee's "uncorroborated" testimony is the "only 'evidence'" that IBM "even heard *suspicions*" regarding a conflict of interest before entering the Phase 2 contract.

Coupled with the Phase 1 evidence, the evidence of internal IBM discussion about conflicts and subcontractor qualifications prior to Phase 2 creates fact issues for the jury as to whether IBM's conflict-of-interest and subcontractor-competency representations in the Phase 2 contract were: (1) an "objective falsehood" (*Yannacopoulos*, 652 F.3d at 836) or true based on what the jury determines about the nature of the relationship between PSC and Donelson; and (2) "[i]nnocent mistake[s]" (*id.* at 832) or statements made with "actual knowledge" or in "deliberate ignorance" (31 U.S.C. § 3729(b)(1); 740 ILCS 175/3(b)(1) (2009)).

**Causation.** The causation-related evidence cited above with respect to Phase 1 applies equally to Phase 2 and likewise creates a fact issue as to whether IBM would have been approved or paid if the representations set forth above were objectively false and the County had known the truth.

### 3.  Maras

McGee's fraudulent-inducement theory as to County Defendant Maras is derivative of his conspiracy theory, which the Court addresses below. McGee claims that Maras induced the Board to enter into the Phase 1 and Phase 2 contracts by falsely representing that: (1) Phase 1 was competitively bid when in fact she knew about the alleged teaming agreement between the subcontractors; and (2) that

Phase 1 was a success when in fact it was not and she knew it, but she wanted to further the alleged conspiracy (or prevent it from being discovered). McGee further claims that the FCA and IFCA encompass lies of omission, and Maras's failure to disclose a known conflict between Donelson and PSC fraudulently induced the Board to approve the contracts.

In response, Maras does not dispute the alleged representations themselves, or that the FCA encompasses lies by omission. *See Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2000 (2016) ("half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentation" under FCA). She also does not meaningfully contest materiality or causation.

Instead, Maras argues generally that she did not make knowingly false statements because there is no proof: (1) of her knowledge of Donelson's conflict; (2) of her knowledge about the alleged "secret teaming agreement among the three subcontractors" for the project; or (3) that she "fraudulently induced the County to approve the phase 2 contract with IBM so the alleged co-conspirators would continue with their conspiracy." R. 315 at 5-6. Because the Court finds genuine issues of material fact as to Maras's participation in the conspiracy and her involvement and knowledge as to these questions below, the Court denies summary judgment on McGee's fraudulent-inducement theory with respect to Maras as well.

### B. False-Certification Theory

#### 1. IBM

In the alternative to his fraudulent-inducement theory, McGee alleges that IBM is liable for making false statements under an express false-certification theory. To prove express false certification, McGee must show: "(1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew the statement was false." *United States ex rel. Cieszyski v. LifeWatch Servs., Inc.*, 2015 WL 6153937, at *8 (N.D. Ill. Oct. 19, 2015). The false statement also must be "material," which is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); 740 ILCS 175/3(b)(4) (2009).

McGee's theory of express false certification is that "[e]very IBM payment request was accompanied by a voucher containing knowingly false statements that IBM was in compliance with the contracts and federal regulations." R. 294 at 14. McGee specifically claims that: (1) the representations in the vouchers regarding compliance with contracts and federal regulations were knowingly false because both prohibited conflicts of interest and required subcontractor competency; and (2) the representation in the vouchers of compliance with the Phase 2 contract was knowingly false because IBM knew it could not provide an integrated, operable system as promised. R. 294 at 14-15.

As an initial matter, IBM argues that McGee has waived his express false-certification theory because the specific false certifications identified by McGee on

summary judgment differ from the express false certifications identified by McGee in interrogatory responses. R. 318 at 5-6. Although the Court agrees that McGee's interrogatory responses could have been more precise, it does not find that McGee has waived his express false-certification theory. McGee's interrogatory responses identified an express false-certification theory that sufficiently overlaps with McGee's current allegations so as to give IBM notice. *Compare* IBM ¶ 60 (in interrogatory response, McGee alleged "false[] certifi[cation] with the submission of each invoice that it was in compliance with" certain "contractual responsibilities" including "that work performed by its subcontractors was in compliance with the contracts") *with* R. 294 at 14-15 (on summary judgment, McGee alleges false certification with the submission of each invoice that it was in compliance with contractual responsibilities including subcontractor-related responsibilities, as well as with federal regulations).

IBM further objects to McGee's express false-certification theory because it is based on language in "Cook County's boilerplate Form" that "IBM would print and attach" to invoices, sometimes signed by IBM and sometimes not. R. 318 at 6. But courts have held that similar promises on form documents support an express false-certification theory. *E.g.*, *Cieszyski*, 2015 WL 6153937, at *8 (promise on "Form . . . to abide by all Medicare and Medicaid laws and regulations" "support[s] an express false certification theory of liability" under FCA); *U.S. ex rel. Grenadyor v. Ukrainian Village Pharm., Inc.,* 772 F.3d 1102, 1105 (7th Cir. 2014) (similar promises in form document supported express false-certification theory under FCA).

McGee's theory does not fail as a matter of law because it is based on representations in a form document attached to invoices.

The Court turns to the alleged certifications themselves and whether there is sufficient evidence in the record as to (a) knowing falsity and (b) materiality to create a genuine issue of material fact for trial.

**Conflict of Interest and Incompetent Subcontractors.** McGee's false-certification theory is based in part on essentially the same conflict-of-interest-related and incompetent-subcontractors-related evidence as McGee's fraudulent-inducement theory. IBM included with each invoice a form stating that the invoice was rendered in conformance with the contract and federal regulations. R-AFIBM ¶ 27. As explained above, both the Phase 1 and Phase 2 contracts contained prohibitions on conflicts of interest and representations of subcontractor competence. Federal regulations likewise require use of competent subcontractors and prohibit conflicts. *See* 28 C.F.R. §§ 66.36(b)(3), (b)(8) (2009). Based on the same evidence set forth above, the Court finds genuine issues of material fact as to whether IBM's certifications of subcontractor competence and lack of subcontractor conflict: (1) were knowingly false; and (2) "could have influenced the . . . decision to pay" and therefore were material. *See Cieszyski*, 2015 WL 6153937, at *8.

IBM claims that the federal regulation regarding conflict of interest does not apply to IBM because it was not a "grantee or subgrantee" within the meaning of the regulation. The regulation prohibits an "employee, officer or agent of the grantee or subgrantee" of federal funds from participating "in the award or

administration of a contract supported by federal funds if a conflict of interest, real or apparent, would be involved." 28 C.F.R. §§ 66.36(b)(3). Although IBM is not a "grantee or subgrantee," Donelson is an "employee" of "subgrantee" Cook County. Thus, the regulation prohibited Donelson's conflict. And the Court has already found that whether IBM knew about that conflict is a question of fact for the jury. Whether IBM falsely certified compliance with federal regulations prohibiting such a conflict is also a question of fact for the jury.

**Compatible System.** McGee also claims that IBM falsely certified in its payment vouchers compliance with the Phase 2 contract because that contract made representations about system compatibility that IBM knew were false. The Phase 2 contract represented that "as of Final Acceptance of the System, all Components provided by Contractor hereunder shall be fully compatible with each other." R-AFIBM ¶ 7. McGee has presented evidence from which a reasonable jury could infer that IBM knew before making this representation that the system in the Phase 1 vehicles could not be integrated with the Phase 2 vehicles. McGee Ex. 58 (IBM document stating before Phase 2 that system is "not integrated"); McGee Ex. 147 at 172-73 (IBM employee testimony regarding same). This theory is perhaps the closest of McGee's theories to a garden-variety contract dispute. But the Court finds sufficient evidence supporting McGee's theory to let the question go to the jury.

The Court also declines to hold as a matter of law that the County Board would have approved all of IBM's Phase 2 invoices if it knew that this representation was false. A reasonable jury could find that this representation was

sufficiently "core" to the Phase 2 contract that "common sense" dictates it "was capable of influencing the Government's decision to pay" and therefore material. *See United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017).

Finally, the Court agrees with IBM that McGee's alternative, implied false-certification theory is "completely undeveloped." *See Marcatante v. City of Chicago*, 657 F.3d 433, 444 n.3 (7th Cir. 2011). McGee himself concedes that his "theory is grounded in express false certifications." R. 294 at 16. He then claims in a few cursory sentences that "the result would be the same if analyzed under an implied certification theory." *Id*. By failing to develop it, McGee has waived this alternative theory. *See Marcatante*, 657 F.3d at 444 n.3.

### 2. County Defendants

McGee's express false-certification theory with respect to the County Defendants is twofold. He claims they were: (1) responsible for the County's false certifications in Project grant documents; and (2) responsible for approving IBM's false certifications discussed above. The Court addresses these theories in turn.

**Grant Documents.** Again, a defendant is liable for express false certification when he or she makes a knowingly false statement in order to receive money from the government and that statement is material. *E.g.*, *Cieszyski*, 2015 WL 6153937, at *8. This theory encompasses false certifications in grant documents. *E.g.*, *U.S. ex rel. Feldman v. van Gorp*, 697 F.3d 78, 91 (2d Cir. 2012) (affirming FCA verdict involving false statements in grant renewals). Under the IFCA conspiracy provisions, a proven conspiracy member also can be liable for an

IFCA violation as long as one or more members of the conspiracy committed a violation. *United States ex rel. Rockey v. Ear Inst. of Chicago, LLC*, 92 F. Supp. 3d 804, 826 (N.D. Ill. 2015).

All of the Project grant agreements between the County and IEMA during the 2003 and 2008 period: (1) represented that no County employee had "any financial or other personal interest" in any contract using grant funds; (2) represented compliance with all applicable federal and state laws and regulations, including the federal regulations on conflict of interest and subcontractor competency discussed above, as well as regulations requiring contracts to be awarded through "full and open competition"; and (3) prohibited "employees, contractors, and subcontractors from using their positions for a purpose that constitutes or presents the appearance of personal or organizational conflict of interest, or personal gain." R-AFCD ¶ 16; 28 C.F.R. §§ 66.36(b)(3), (b)(8), (c)(1). County Defendant Coughlin either signed these agreements or caused these agreements to be signed. *Id.* And Coughlin testified that he generally relied on Maras to provide him with truthful information regarding the Project. R-AFCD ¶ 25; McGee Ex. 131 at 59, 80-81, 96-97.

Based on the facts discussed in more detail when addressing McGee's IFCA conspiracy claim below, the Court finds genuine issues of material fact as to the County Defendants' knowledge of subcontractor incompetency, both County

Defendants' knowledge of Donelson's conflict with PSC,[5] whether the bidding process involved "full and open competition," and whether Maras knew that the bidding process did not involve "full and open competition." Accordingly, the Court also finds genuine issues of material fact as to whether the County Defendants, either individually or together with one another and Donelson as members of the alleged conspiracy, made one or more knowingly false certifications in the grant agreements.

The County Defendants generally respond that they lacked any personal, financial motive for submitting false certifications. Because the FCA specifically defines "knowingly" to "require no proof of specific intent to defraud," however, "a plaintiff need not prove that a defendant had a financial motive to make a false statement relating to a claim seeking government funds." *Laymon, Jr.*, 2009 WL 793627, at *12 (citing 31 U.S.C. § 3729(b)(1)(B)); *U.S. ex rel. Harrison v. Wrestinghouse Savannah River Co.*, 352 F.3d 908, 921 (4th Cir. 2003) ("under the FCA, a plaintiff need not prove the defendant had a financial motive to make a false statement relating to a claim seeking government funds").

McGee also claims that Coughlin made a knowingly false statement in a specific grant extension request. On May 1, 2007, Coughlin represented to IEMA that a grant extension was necessary for completion "of the installation of Project Shield Phase II." R-AFCD ¶ 21; McGee Ex. 182 at FEMA_MCGEE_00005708. He

---

[5] Even after McGee reported Donelson's conflict to Maras and Coughlin on October 11, 2006 such that they clearly knew, subsequent grant agreements did not inform IEMA of the conflict. McGee Exs. 166, 170, 179, & 131 at 75-77, 85-87, 95-97.

represented that the extension was necessary because of a "delay" caused by IBM's "difficulty in resolving difficulties with their subcontractors and their usage rights to key software" that had since "been resolved." *Id*. But months earlier, Coughlin met with IBM to discuss the "catastrophic failure" of the equipment and inform IBM that he was "highly concerned" about being able to show any success of the Project. R-AFCD ¶ 19; McGee Exs. 167, 178. Maras similarly described the Project during Phase 2 as having "the highest failure rate of any one in the country" because the equipment was "defective," "d[idn't] work," and had "not worked since [it was] installed." R-AFCD ¶ 12; McGee Ex. 48. It is not clear from the record whether the software difficulties were in fact resolved by the time of Coughlin's representation. *See* R-AFCD ¶ 19. On the current record, the Court finds this evidence sufficient to create a genuine issue of material fact as to whether Coughlin made a knowingly false statement to IEMA to obtain the 2007 grant extension and whether Maras is liable for that false statement as an alleged co-conspirator.

The Court further finds genuine issues of material fact as to whether the certifications in the grant agreements and Coughlin's statement in the 2007 extension request were material. IEMA and DHS guidelines required the certifications in the grant agreements for funds to be obtained. R-AFCD ¶ 16. And DHS required certifications from IEMA regarding the use of funds to support extensions. *Id*. As with IBM's similar certifications, the record contains sufficient evidence that a "reasonable person" "would attach importance to" these

certifications and statements to create a jury issue. *See U.S. v. Luce*, 2016 WL 6892857, at *2 (N.D. Ill. Nov. 23, 2016) (quotation marks omitted).

**Approval of IBM's Certifications.** The Court has already found genuine issues of material fact as to whether IBM's certifications in its invoice vouchers about compliance with contract provisions and federal regulations regarding competence of subcontractors and conflict of interest were knowingly false and material. Because the Court finds genuine issues of material fact as to the County Defendants' participation in the alleged conspiracy below, they could be liable for any proven IBM violation if the jury finds that they were co-conspirators. *See Rockey*, 92 F. Supp. 3d at 826. But they also could be liable independently. Coughlin and Maras were in charge of approving IBM's invoices and sending them to the County Board for payment. R-AFCD ¶ 22; McGee Exs. 95, 131 at 221-22. And below, the Court finds genuine issues of material fact with respect to the County Defendants' knowledge regarding the competence of subcontractors and Donelson's conflict while they were approving these invoices. The Court thus denies summary judgment with respect to McGee's theory that the County Defendants are liable, either individually or as members of the alleged conspiracy, for approving allegedly false claims by IBM and passing them along to the Board.

## V.    Count 6 – Conspiracy

The Court's grant of summary judgment on Count 3, McGee's FCA conspiracy claim, leaves untouched McGee's IFCA conspiracy claim in Count 6, which arises

under the pre-amendment version of the IFCA, 740 ILCS 175/3(a)(3) (2009).[6] An

actionable IFCA "conspiracy exists only where at least one of the alleged co-

conspirators actually committed an [underlying] violation." *Rockey*, 92 F. Supp. 3d

at 826. Any defendant's liability for conspiracy in this case thus depends not only on

McGee proving a conspiracy, but also proving that one of the co-conspirators

committed one or more of the alleged violations discussed above.

"[G]eneral civil conspiracy principles apply" to IFCA claims. *Durcholz*, 189

F.3d at 545 n.3. A conspiracy is "a combination of two or more persons acting in

concert to commit an unlawful act, or to commit a lawful act by unlawful means, the

principal element of which is an agreement between the parties to inflict a wrong

against or injury upon another, and an overt act that results in damage." *Rockey*, 92

F. Supp. 3d at 825.

"[T]he question whether an agreement exists should not be taken from the

jury in a civil conspiracy case so long as there is a possibility that the jury can infer

---

[6]     McGee contends that his Count 6 conspiracy claim is governed by the
amended version of the IFCA, 740 ILCS 175/3(a)(1)(C) (2010). R. 294 at 7 n.2. IBM
disagrees, citing language from the 2010 IFCA amendments indicating that they
are not retroactive. R. 284 at 7. McGee does not claim the amendments are
retroactive; indeed, he concedes that his other IFCA claims are governed by the pre-
amendment version. The Court assumes that, as with Count 3, McGee's theory is
that because some alleged conspiratorial conduct occurred after the 2010
amendments, the entire claim is governed by the amended version. This theory is
incorrect. Only post-amendment conspiratorial conduct is governed by the amended
IFCA. *See*, *e.g.*, *Holbrook*, 2015 WL 196424, at *23-24 (alleged conspiratorial
conduct pre-dating amendment is governed by pre-amendment version of FCA and
alleged conspiratorial conduct after amendment is governed by amended version).
Because the Court has granted summary judgment as to Phase 3 liability and
Phases 1 and 2 occurred prior to the July 27, 2010 IFCA amendment, the Court
applies the pre-amendment version of the IFCA conspiracy provision.

from the circumstances [that the alleged conspirators] had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Krilich v. Vill. of S. Holland*, 1994 WL 457227, at *2 (N.D. Ill. Aug. 19, 1994) (quotation marks omitted). McGee "need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy" to prove his claim, and "a defendant may be found liable for conspiracy even if he joined or terminated his relationship with core conspirators at different times." *United States v. Rogan*, 459 F. Supp. 2d 692, 719 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008) (addressing FCA conspiracy claim).

The Court first addresses McGee's IFCA conspiracy claim against IBM, followed by his conspiracy claim against the County Defendants.

## A. IBM

McGee alleges that "Donelson formed an entity (PSC) and a conspiracy to take advantage of his County position and convert funds from a federal grant to his own (and his friends') personal benefit." R. 294 at 20. McGee further claims that "IBM joined that conspiracy and facilitated its success." *Id.* The Court finds sufficient evidence in the record from which a reasonable jury could infer that Donelson formed a conspiracy with PSC in the manner alleged. Again, interviews in an FBI investigation indicated that Donelson established PSC and received significant cash kickbacks from PSC. R-AFIBM ¶ 36. And Dubelbeis (an employee of subcontractor WIT) states in his declaration that prior to Phase 1, PSC, TechAlt, and WIT formed a "teaming agreement" at Donelson's direction. McGee Ex. 3 ¶ 7.

The question is what can be inferred from the evidence about IBM's involvement in that conspiracy. IBM claims it cannot be liable for conspiracy because there is no evidence that it reached any agreement with Donelson or PSC. But an "agreement can be inferred from the circumstances." *Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 961 (7th Cir. 1996); *accord Durcholz*, 189 F.3d at 456 ("conspiracies, by their very nature, are not often susceptible to direct proof"); *Krilich*, 1994 WL 457227, at *2 ("As there will rarely be direct evidence of an express agreement among the conspirators, circumstantial evidence may be used to establish proof of conspiracy.").

McGee sets out significant circumstantial evidence based on which he claims a reasonable jury could infer that IBM at some point along the way reached an agreement with Donelson or PSC. To begin, he points to the evidence already discussed that Donelson introduced IBM to PSC and made clear to IBM that PSC had to be involved in the Project. McGee Exs. 3, 23-25.

McGee also cites evidence that IBM ignored a pattern of red flags raised by its employees about that conflict and about PSC's incompetence. In addition to the evidence described above (*see* R-AFIBM ¶¶ 11-12 & McGee Exs. 9, 21, 29, 30, 42, 98), the final Project executive from IBM, George Aguiar, testified that he repeatedly raised concerns with IBM about PSC to no effect. McGee Ex. 130 at 41-42 (Aguiar told Project executives that he "wanted PSC replaced" "[m]any times" and "was adamantly told just do not bring this again, I don't want to hear it again"). After seeing a local news broadcast linking Donelson to PSC and "having exhausted

[his] pleas to all the executives above [him] . . . within reach," "[Aguiar] decided to contact the FBI." *Id.* at 52-53. He told the FBI that taxpayer money "was being siphoned *with IBM help* to PSC where one public official was withdrawing money from." *Id.* at 56 (emphasis added). IBM subsequently fired Aguiar despite strong performance reviews. R-AFIBM ¶14; McGee Exs. 44-47.

McGee further points to evidence that Donelson and Maras influenced the payment terms between IBM and PSC and would often seek expedited payment of PSC's invoices from IBM. R-AFIBM ¶ 25; McGee Ex. 130 at 59-61 (Aguiar testified that "Donelson and PSC . . . urge[d]" him to make "expedited" payments to PSC "[m]any times"); McGee Ex. 60 (discussing expedited payment to PSC after communications with Donelson and Maras).

McGee "need not prove that [IBM] knew each and every detail of the conspiracy or played more than a minor role in the conspiracy" for it to be liable. *Rogan*, 459 F. Supp. 2d at 719. A reasonable jury could infer based on this evidence that IBM ignored the red flags raised by its employees because it had reached an agreement with Donelson (or PSC) to use his conflicted and incompetent subcontractor PSC and make expedited payments of PSC invoices. If the jury finds that IBM did this, and the jury also finds that this conflict or subcontractor incompetence resulted in the submission of false claims to IEMA, then IBM would be liable for "conspir[ing] to defraud the State by getting a false or fraudulent claim allowed or paid." 740 ILCS 175/3(a)(3) (2009).

IBM contests the plausibility of the alleged conspiracy based on lack of motive. As explained above, McGee does not need to prove a specific, "financial motive" on the part of IBM "to make a false statement relating to a claim seeking government funds" in order to prove an FCA violation. *Laymon, Jr.*, 2009 WL 793627, at *12. Evidence of motive is, generally however, relevant to the plausibility of a conspiracy. *E.g.*, *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 1988 WL 20183, at *7 (N.D. Ill. Feb. 26, 1988).

IBM argues that it bore the downside risk of working with incompetent subcontractors based on the "fixed-price" contracts at issue. R. 284 at 24. But McGee presents evidence that the contracts may have been fixed-price in theory but not in practice. IBM and the County undisputedly agreed to project change requests that amended the Phase 1 and Phase 2 contracts. R-AFIBM ¶ 26. And McGee's evidence supports the assertion that IBM may have used these project change requests to recoup its losses from incompetent subcontractors. AFIBM ¶ 26; *see, e.g.*, McGee Ex. 7 at 7-8; McGee Ex. 9 at IBM_RS_E00190424.

Additionally, IBM's downside risk is only one fact among many to consider in assessing motive. Other facts include that, by the time IBM was introduced to PSC by Donelson, it was aware that large grants were generally available to state and local municipalities to enhance security against terrorism. AFIBM ¶ 4; McGee Exs. 18-20. IBM knew it had to work with PSC to be awarded the Cook County contract involving these grant funds. McGee Ex. 3 ¶ 8. IBM later noted the "other large contracts . . . at play" that factored into its decision to pay to fix the Phase 1

vehicles. McGee Ex. 55. And between 2003 and 2009, IBM received $26 million from the County unrelated to the Project. R-AFIBM ¶ 18; McGee Ex. 56. A reasonable jury could infer based on this evidence that IBM agreed to the alleged conspiracy in order to win the business with Cook County, which might lead to more business with the County or other municipalities awarded similar grants. The Court thus finds sufficient evidence through which a jury could infer motive—including a financial motive—on the part of IBM. *See, e.g.*, *Schachar*, 1988 WL 20183, at *7 (denying summary judgment where "a jury could find that defendants had a motive for the alleged conspiracy").

Because the Court finds a dispute of material fact concerning the existence of a conspiracy involving IBM, the Court denies IBM's motion for summary judgment on Count 6.

### B.     County Defendants

The County Defendants similarly claim they cannot be liable for conspiracy because of the lack of evidence of any agreement by them to participate in Donelson's PSC-related scheme. As with IBM, however, McGee presents significant circumstantial evidence based on which he claims a reasonable jury could infer a meeting of the minds on the part of both County Defendants.

**Maras.** First addressing County Defendant Maras, the evidence supports that Maras worked closely with Donelson on acts alleged to be part of the conspiracy. Former IBM Project executive Aguiar described Maras, Coughlin, and Donelson as the "Three Amigos" who "acted in concert," "had a very close

relationship," and "were partners in everything that was going on." R-AFCD ¶ 25 & McGee Ex. 130 at 240-45. And Dubelbeis states in his declaration that shortly after a "teaming agreement" was formed between WIT, TechAlt, and PSC, Maras and Donelson together instructed IBM that it must submit an RFP using those subcontractors. R-AFCD ¶ 4; McGee Ex. 3 ¶¶ 6-9.

Maras emphasizes that the RFP allowed bidders to propose a technology platform different from TechAlt's, McGee Ex. 138 at 83, 133, which she claims shows that the RFP allowed for open bidding and use of other subcontractors. But that does not change the fact that according to Dubelbeis, Maras and Donelson orally instructed IBM that it "need[ed] to submit a proposal that included the team of PSC, TechAlt, and WIT as its subcontractors." R-AFCD ¶ 4; McGee Ex. 3 ¶¶ 6-9. It is for the jury to decide whether to credit Dubelbeis's testimony and whether to conclude that the bidding process was in fact open.

McGee also presents evidence that Maras advocated for expedited payments to PSC, even when its work was outside the Project scope. R-AFCD ¶ 13; McGee Exs. 43, 111. When IBM employee Harold Stiffler objected to paying PSC for work outside the scope of the Project, Stiffler wrote in an email that Maras and Donelson "want[ed] to funnel money to specific contractors," and Stiffler "stood in the way of that by making sound and ethical business decisions." R-AFCD ¶ 13; McGee Ex. 43.

Furthermore, the FBI investigation revealed that Donelson received $15,000 in cash kickbacks from Avatar, a subcontractor in Phase 2. R-AFCD ¶ 28; McGee Ex. 1 ¶ 4 & FBI000024. And Maras's employment with the County ended not long

after the County's litigation subcommittee investigated her request that the Board approve Avatar as the primary contractor on Phase 3. *See* R-AFCD ¶ 28; McGee Ex. 81 (request by Maras to approve Avatar for Phase 3); McGee Ex. 190 at CC_SEC_BOARD_0000432 (referral of Maras's request to litigation subcommittee for additional "inquiry"); McGee Ex. 138 at 19. Although Maras claims she was not fired, McGee Ex. 138 at 20, other evidence supports that she was, McGee Ex. 191.

Finally, there is evidence that Maras acted to hide her involvement. Like Donelson, Maras avoided email or other documentation of Project-related communications. Just before being awarded the Phase 1 contract, an IBM employee stated that "Cathy [Maras] is paranoid about email, for some reason." R-AFCD ¶ 26; McGee Ex. 92. And Maras instructed the team that she wanted "to use email as an exception and verbal communications as the primary." R-AFCD ¶ 26; McGee Ex. 58.

Taken together, these facts comprise sufficient circumstantial evidence of a "meeting of the minds" between Maras and Donelson that "the question whether an agreement exists should not be taken from the jury." *See Krilich*, 1994 WL 457227, at *2.

**Coughlin.** Coughlin claims to have had minimal involvement in the Project. But again, McGee "need not prove that [Coughlin] knew each and every detail of the conspiracy or played more than a minor role in the conspiracy" to succeed on his claim. *Rogan*, 459 F. Supp. 2d at 719. As with Maras, there is evidence that Coughlin played a role in a number of acts involved in the alleged conspiracy and

evidence from which a reasonably jury could infer a meeting of the minds between Donelson and Coughlin.

Former IBM executive Aguiar described Coughlin as the third member of the "Three Amigos" with Donelson and Maras who "acted in concert," "had a very close relationship," and "were partners in everything that was going on." R-AFCD ¶ 25; McGee Ex. 130 at 240-45. Not only that, but he described Coughlin as Donelson's "godfather." McGee Ex. 130 at 240.

With respect to specific Project tasks, Aguiar described Coughlin as "The Wizard" who pushed through the project change request "amendments to [the IBM] contract and acceptance of deliverables" by "working behind closed doors." R-AFCD ¶ 25; McGee Ex. 130 at 240-41. It is undisputed that Coughlin was responsible for signing or causing to be signed the grant agreements with IEMA and seeking reimbursement for IBM's invoices. R-AFCD ¶ 20. And there is evidence that Coughlin pushed through invoices for payments to IBM even after learning that IBM and its subcontractors had performance problems. R-AFCD ¶ 19; McGee Exs. 163, 167, 177, 178. It is undisputed that Coughlin never informed the Board about any such problems. R-AFCD ¶ 20; McGee Ex. 131 at 76-77, 86-87. And at some point, Coughlin undisputedly learned about Donelson's conflict with PSC and kept pushing through invoices. R-AFCD ¶ 19; McGee Exs. 179, 132 at 317. An email from an IBM employee further supports that Coughlin asked IBM to find $80,000 of work for SOS, a subcontractor promoted by Donelson, before IBM bid out the Phase 2 subcontracts. R-AFCD ¶ 19; McGee Ex. 180.

Lastly, there is evidence that Coughlin sought to conceal Project-related issues. The FBI reported that according to Stiffler of IBM, Coughlin "physically pointed to a camera" and "commented on the camera's presence" after Stiffler raised concerns regarding the Project. R-AFCD ¶ 25; McGee Ex. 185 at FBI000005.

As with Maras, these facts taken together constitute sufficient circumstantial evidence of a "meeting of the minds" between Coughlin and Donelson that "the question whether an agreement exists should not be taken from the jury." *See Krilich*, 1994 WL 457227, at *2.

**Motive.** The County Defendants argue that neither had anything to gain from helping Donelson. Again, although evidence of motive is relevant to the plausibility of a conspiracy, *Schachar*, 1988 WL 20183, at *7, "a plaintiff need not prove" a specific "financial motive to make a false statement relating to a claim seeking government funds" to establish an FCA violation, *Laymon, Jr.*, 2009 WL 793627, at *12.

The evidence described above supports that Maras, Coughlin, and Donelson worked closely together on the Project and that Coughlin was a godfather figure to Donelson. Maras's and Coughlin's close relationship with Donelson could have been a plausible reason for them to go along with his scheme. There is also evidence that all three expended political "capital" on the project and thus had an incentive for it to go well to avoid losing their jobs (as Maras ultimately did). *See* R-AFCD ¶ 27; McGee Ex. 186 (email from Coughlin stating that he had "used a great deal of capital to keep things" "amicable" on the Project); McGee Ex. 167 (Coughlin reports

to IBM that he is "highly concerned" about how new County administration will view success of Project). The Court finds the evidence of possible motive, especially when considered alongside evidence of Maras's and Coughlin's actions and roles, to be sufficient to warrant sending the conspiracy claim against the County Defendants to the jury.[7]

## VI.  Count 4 – Presentment

Neither IBM nor the County Defendants separately address McGee's presentment claim in Count 4, which is governed by the pre-amendment version of the IFCA, 740 ILCS 175/3(a)(1) (2009). Under that statute, a defendant is liable for "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the State . . . a false or fraudulent claim for approval." 740 ILCS 175/3(a)(1) (2009).

The Court already has found genuine issues of material fact as to whether IBM's Phase 1 and Phase 2 invoices were false claims. And IBM acknowledges that "Cook County submitted IBM's invoices to IEMA"—a state agency—"for reimbursement." R-AFIBM ¶ 31. The Court also has found genuine issues of material fact as to whether the IBM and the County Defendants participated in the

---

[7]     McGee asks the Court to consider as evidence supporting the denial of summary judgment the fact that, when asked questions about the County Defendants' and IBM's involvement at his deposition, Donelson refused to answer, invoking the Fifth Amendment. R-AFIBM ¶ 37; R-AFCD ¶ 34. Like the court in *State Farm Mutual Automobile Insurance Company v. Abrams*, 2000 WL 574466 (N.D. Ill. May 11, 2000), the Court finds that "an adverse inference c[an] be drawn against a party from an alleged co-conspirator's invocation of the Fifth Amendment privilege against self-incrimination." *Id.* at *7. But whether "[d]rawing an adverse inference" is appropriate depends in part on whether "the jury finds" "proof of a conspiracy." *Id.* "[B]ecause the court can decide this summary judgment motion without relying on Fifth Amendment adverse inferences, the [C]ourt saves the issue of the admissibility of these invocations for another day." *Id.*

alleged conspiracy. And it has found genuine issues of material fact as to whether the alleged co-conspirators caused the County to present false claims for approval by IEMA or to falsely certify compliance with federal regulations to IEMA. For these reasons, the Court also finds genuine issues of material fact as to whether IBM and the County Defendants "presented or caused to be presented" false claims to IEMA. *See, e.g.*, *U.S. ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 36 (D.D.C. 2010) ("Given the common elements of the presentment and false statement provisions, the Court's analysis of the sufficiency" of one claim generally "applies with equal force to" the other) (internal citations omitted).[8]

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part IBM's motion for summary judgment (R. 283) and the County Defendants' motion for summary judgment (R. 282). The Court grants both motions with respect to Phase 3 liability and Counts 1 and 3. The Court denies both motions with respect to McGee's remaining claims (*i.e.*, liability for Phases 1 and 2 in Counts 2, 4, 5, and 6).

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: October 6, 2017

---

[8] McGee suggests in a single sentence that a jury alternatively could find IBM liable for presentment under a worthless services theory. The Court finds this theory, like McGee's implied false-certification theory, to be "underdeveloped" and "waived." *Marcatante*, 657 F.3d at 444 n.3.